**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**


| | |
|---|---|
| BRUNSON COMMUNICATIONS, INC. | : |
| | : |
| **Plaintiff** | : |
| | : |
| VS. | : |
| | : |
| ARBITRON, INC. | :    NO.  02-CV-3223 |
| | : |
| **Defendant** | : |
| | : |


**AMENDED COMPLAINT**


Plaintiff, Brunson Communications Inc. brings this suit upon a cause of action of which the following is a statement:

1.   Plaintiff Brunson Communications Inc. is a New York Corporation, having a principal place of business at 3900 Main Street (Manayunk) Philadelphia, Pennsylvania.

2.   Defendant Arbitron Inc, Is a corporation of the state of Delaware, has a principal place of business located at Columbia Maryland, and a Pennsylvania address at 1635 Market Street, Philadelphia, Pennsylvania.

3.   This Court has jurisdiction pursuant to 28 U.S.C. Section 1331 (federal questions) in that the matter arises under the antitrust laws, 15 U.S.C. Section 1 et seq, and the Lanham Act, 15 U.S.C. Section1525 et seq.  Jurisdiction

is also asserted pursuant to diversity of citizenship, 28
U.S.C. Section 1332, in that plaintiff and defendant are
citizens of different states. The sum in controversy exceeds
$100,000 exclusive of interest and costs.

4.   Venue is properly laid in the Eastern District of
Pennsylvania in that the statutes provide for nationwide
venue, and/or plaintiff is a citizen of the Eastern
District, and most or all of the acts, which are relevant
hereto, have occurred in the Commonwealth of Pennsylvania in
the Eastern District.

<u>OPERATIVE FACTS</u>

5.   Plaintiff s business is to own and operate WGTW TV
Channel 48 television, which broadcasts program content from
studios at 3900 Main Street, Philadelphia County, to
Pennsylvania, New Jersey and Delaware and sells time on its
station in interstate commerce.

6.   WGTW TV Channel 48 is a small corporation headed,
as defined by the SBA Small Business Act, by a female and is
the only minority owned station in the Philadelphia market
and in the nation.

7.   WGTW TV Channel 48 is a dramatic success story of
a small company which is independent of all networks and
cable systems and has achieved an audience penetration of

2

nearly 30% of the Philadelphia market as measured by the Neilsen Ratings System and has maintained economic viability.

8.   Television stations competing with each other for revenue, utilize systems to measure viewing size to set rates for and to sell and market commercial air time on their stations. Advertising agencies, media buyers, and advertisers utilize the data to measure the economic desirability of advertising on various competing television stations based on the size of their audience.

9.   Defendant Arbitron Inc. is in the business of constructing and operating measurement systems that monitor listeners and viewers for usage by radio, cable and more recently television stations, and purchasers of advertising time from television stations.

10. Prior to 2001, Arbitron developed a new and proprietary system for measuring viewership of television stations, currently called a   personal people meter (  PPM  ).  As plaintiff only learned in April 2002, it operates by imbedding an inaudible signal in the transmitter of the various stations.  It then places a receiving device on the person of  individuals to detect and record when he

is watching television sets tuned to only those stations whose signals which have been imbedded by Arbitron.

11.  Nielsen Corporation had the only measuring system prior to Arbitron s.  Nielsen and Arbitron have entered into a corporate financial relationship by which Nielsen and Arbitron are related in regard to the new system, the details of which are not known to plaintiff.  References to Arbitron herein include Nielsen as an owner or joint venturer in the viewer measurement program.

12.  Together the combination enjoys a monopoly in the market for the measurement of television listeners and viewers in this country and in the Philadelphia viewing market.  This market is not limited to a single product; it is comprised of Arbitron s and Nielsen s systems.

13.  In or about 2001, Arbitron commenced a program to penetrate the Philadelphia television viewing market with the new technology.  It selectively chose to working only with the larger conglomerates in the market.

14.  This product is a product (a) in the television viewer measurement market, (b) a product utilized and also creates a new product market, i.e., imbedded direct measuring, whereby no reporting by the viewer is required

4

(unlike the Nielsen system).  Defendant enjoys a monopoly in both markets.

15. During the fourth quarter 2001 Arbitron conducted a test and announced that the launch of the test would be an open and equally competitive process that would  accurately and creditably measure the performance of the entire market  .

16.  As Arbitron intended, the impartial nature of the work of rating companies and the representations of Arbitron led Brunson to believe, that WGTW-TV 48 would be included in the survey.

17.  Arbitron  s statement was false and malicious. Arbitron omitted the WGTW-TV48, Brunson Comm. Inc. signal in the survey data even though it has close to 30% cumulative audience reach.  Arbitron and the large networks and cable systems with whom it partnered in starting the test process, embedded the Arbitron signal only in the transmitters of those stations, excluding plaintiff.

18.  Arbitron selectively and discriminatorily excluded WGTW Channel 48 in its embedding test measurement program in cooperation with and to the interest of WGTW-TV 48's competitors,  the large networks and cable systems.

19.  On information and belief, the exclusion was a boycott imposed at the request of plaintiff  s competitors.

20.  By failing to include WGTW Channel 48 viewership, Arbitron guaranteed that no usage of WGTW Channel 48 viewership would be reported in the survey, impairing WGTW  s ability to be competitive and operate on an equal basis with other stations in the market, and thus injuring Plaintiff and restraining competition in the market for sales of television listener time.

21.  Arbitron did <u>not</u> inform WGTW that the new process was different from others and the measurement test required embedding into the transmitter.  Because the only other survey, Nielsen, includes  all  stations, without any contact with the station, WGTW believed and assumed that its signal was being measured along with its competitors. Arbitron did not share the information outside the select group of network stations nor invite WGTW to participate.

22.  By its misleading statements, and by not informing WGTW-TV Channel 48 that imbedding was a necessary part of the process,  Arbitron WGTW-TV Channel 48 to take no action to protect itself.  WGTW assumed that no participation was necessary for its signal to be included in the measurement survey.

23.  April 2002, WGTW-TV Channel 48 learned by happenstance that a meter was required to be imbedded to be included in the Arbitron survey.  WGTW-TV Channel 48 notified Arbitron of its improper unfairness in excluding the station.  By then Arbitron had substantially completed the survey.  Arbitron responded that the request came from a group of stations to make Philadelphia a preference market. Arbitron acknowledge the problem and stated it would review the files and get back to WGTW TV Channel 48.

24.  Receiving no satisfaction plaintiff continued to complain.  Arbitron then embedded plaintiff  s meter, but only after completion of the survey.

25.  When the first survey was released, and WGTW TV Channel 48 was not included, and the survey was released to stations, advertisers, agencies and other media sources in the market, as is known to Arbitron, this malicious disparagement placed and will place WGTW TV Channel 48 at a clear disadvantage and disparages its product.

26.  As known to Arbitron, because of the intense competition in the Philadelphia market for the declining television station revenue, inclusion in the survey was more critical for an independent station like WGTW, because WGTW  s competitors would be projected as the only  real  on-

7

air commercial service in the market, and WGTW TV Channel
48, due to its unusual ownership and independence, would be
unable to convince customers and others that WGTW was worth
considering because of lack of critical data to support its
representations, and would be unable to prove its viability,
all of which, as known to Arbitron, will cause serious
economic losses to a profitable and growing station.

27.  WGTW TV Channel 48 plaintiff pointed out to
Arbitron that the release of its measurement survey without
WGTW would cause substantial and potentially irreparable
harm, to its ability to compete with other stations. On
numerous occasions after WGTW TV Channel 48 initiated
contact with Arbitron, it was assured that Arbitron
understood the data was flawed and that it could cause
severe damage and harm to WGTW TV Channel 48 as it,   could
not give a full picture of the market  .

28.  Because both the competing stations, advertisers,
and agencies would perceive that WGTW TV Channel 48 was
excluded from the survey, Arbitron has de-facto reduced
WGTW  s standing in the eyes of the persons and companies it
must solicit to buy on the stations product, i.e. view
watching time.

8

29.  Although Arbitron was made knowledgeable by WGTW TV Channel 48 of its exclusion of WGTW from its survey, and of the catastrophic and adverse impacts which publication of its survey would have on WGTW TV Channel 48, Arbitron refused to correct the obvious and appropriate action, namely to reconstruct and rewrite the survey to properly include WGTW TV Channel 48 as a element instead of releasing it.

30.  For selfish reasons and  promises to their core group whom they promised the information to  , and with knowledge of the detrimental anti-competitive effect on WGTW, which was unwarranted and unjustified, Arbitron nevertheless persisted in promulgating a survey which is faulty and incomplete.

31.  Despite knowing of its inaccuracy and competitive unfairness and the exclusion of WGTW-TV 48, defendant not only promulgated the survey but also maliciously publicized to the industry and the public that the survey was,

  accurate, creditable and fair.

32.  Appearing at a meeting of the Pennsylvania Association of Broadcasters on May 20th, 2002,  after having acknowledged to plaintiff that the survey was improper in having excluded WGTW TV Channel 48, Kevin Smith, Senior Vice

9

President of Arbitron, knowingly and intentionally represented that the survey was fair, accurate and complete.

33.  If there was any doubt that might in reviewing the survey and noticing the absence of WGTW TV Channel 48, Smith compounded the misinformation by arbitrarily and falsely stating that although there had been glitches, that they had been rectified.

34.  Arbitron further compounded the injustice by refusing to mitigate the damage by prominently informing the public that WGTW TV Channel 48 had been inappropriately excluded from the survey without justification. While offering to disclose the fact of the omission in a footnote, Arbitron did not offer to correct the false impression that the omission of WGTW TV Channel 48 was so unimportant that its omission did not affect the accuracy, e.g., by stating that WGTW was inappropriately excluded and corroborating that fact by acknowledging the many meetings it held with the competitor larger network owned stations while designing and pre-testing the system.

35.  Arbitron was motivated in its false and misleading activity by its own selfish desire to obtain the benefit of working with the larger networks, plaintiff s competitors, who have  most of the outlets in the markets.  Therefore its

pursuit of profits caused it to knowingly give preferential treatment to plaintiff s competitors and exclude an independent non-network station that did not have the market power of the competitors.

36.  In April to June 2002, defendant maliciously perpetuated the exclusion of WGTW by intentionally and/or negligently causing and for allowing defective encoding of WGTW s signal, and accusing WGTW of causing a defective signal, whereas at all times, the technology and expertise to ensure proper encoding was within the control of defendant.

37.  Arbitron s above described actions have knowingly caused substantial and on-going damage and injury to plaintiff in that plaintiff s competitors are and will be able to cause customers to believe that plaintiff is so insignificant as to have been disregarded in relationship to surveying r.e. by an impartial agency,  as well to avoid acknowledging WGTW TV Channel 48 s audience size, to answer inquiries by referring to the fact that WGTW TV Channel 48 was ignored in the survey, thereby substantially depriving WGTW TV Channel 48 of competitive capability.

38.  As known to Arbitron, advertising agencies will be unable to recommend WGTW TV Channel 48, for lack of

comprehensible data, and advertisers will hesitate to advertise with WGTW TV Channel 48 as a result of not having information.

39. As a result of the foregoing, Arbitron is and should be liable for with the cost and damage to WGTW TV Channel 48, and also required to fully inform the community as to its improper and inaccurate actions.

### COUNT I - ANTITRUST - SHERMAN ACT SECTION 1

40. The allegations of paragraphs 1 through 39 of this Complaint are realleged herein as if fully set forth.

41. The Sherman Antitrust Act, 15 U.S.C. Section 1 prohibits the exercise of monopoly power in a monopolistic fashion to restrain competition.

42. The Act prohibits a concerted refusal to deal, or exclusion from the market by competitors, in concert with competitors having monopolistic control over a market.

43. Defendant Arbitron has and has utilized its monopoly power, in and with an agreement and financial participation of Nielsen over the data markets, and on information and belief, marketing participation of Nielsen and in concert with plaintiff  s competitors, in the sales of time market in Philadelphia, to promote and effect the exclusion of plaintiff from the advertising sales or

12

broadcasting viewing in the Philadelphia SMSA listener market, through a refusal to deal with plaintiff, by conducting, providing and promoting its survey, with plaintiff excluded, in restraint of trade in interstate commerce, in violation of the Sherman Act Section 1.

44.  The Sherman Act Section 1 prohibits group boycott and other combinations which through the use of monopoly power, restrict or injures competition in any market, and prohibits persons with monopoly power in a relevant market, including prohibiting an essential supplier from joining with competitors in such an exclusion.

45.  Arbitron (with Nielsen) enjoys monopoly powers in the providing of viewer measurement in the relevant market, i.e, Philadelphia area television viewing market, which is a well recognized market for television viewers and advertisers.  It is defined by the reach of signals of stations, and the service areas of the cable systems.  It includes a radius of about sixty miles from City Hall, Philadelphia.

46.  Viewer measuring is essential to advertising marketing by plaintiff and its program provider advertising sales competitors in serving these audiences and advertisers.  Without these viewer measures, a television

station or other program provider cannot effectively compete
for advertising sales and revenue.

47.  Inability to compete effectively for advertising
revenue causes a programming provider to lose the ability to
compete effectively in providing programming, and thereby
injures competition in the interstate marketing of
advertising sales and programming.

48.  Through their monopoly over viewer measurement, in
the Philadelphia market, Arbitron/Nielsen exercise market
control over competitors in the viewing market.

49.  Though its proprietary imbedded system which
herein after will supplant any other system because of its
superior accuracy and reliability (when employed fairly)
Arbitron has monopoly power over the Philadelphia viewer
measurement market.

50.  By combining and coordinating with plaintiff  s
competitors to exclude plaintiff from the survey, and
through falsely representing it as complete defendant
sponsored, and practiced a group boycott, and participated
with plaintiff  s competitors in a program to exclude
plaintiff from the Philadelphia television advertising sales
market, injuring competition for the sale of advertising and

delivery of programming, contrary to Section 1, antitrust
injury.

51.  Pursuant to 15 U.S.C. Section 15, plaintiff is
entitled to bring suit for injunctive relief and treble
damages as a result of the anticompetitve conduct under the
antitrust laws, which have injured it.

**WHEREFORE,** on this Count, plaintiff prays for injuctive
relief, both preliminary and final, trebal damages, and such
other relief as may be appropriate, including attorney fees
and costs.

## II.  SHERMAN ACT SECTION 2

52.  The allegations of paragraphs 1 through 51 of this
Complaint are realleged herein as if fully set forth.

53.  Arbitron, through acquisition combinations with
Nielsen, intentionally became and is a monopolist in the
Philadelphia viewer measurement market.

54.  Arbitron, through its combination with Nielsen is
attempting to monopolize the Philadelphia viewer measurement
market.

55.  Arbitron has used its monopolist power to cause
antitrust injury to plaintiff, i.e., to injure plaintiff  s
ability to compete in the sale of advertising, thereby
injuring programming.

   **WHEREFORE**, on this Count, plaintiff prays for
injunctive relief, both preliminary and final, treble
damages, and such other relief as may be appropriate,
including attorney fees and costs.

### COUNT III - LANHAM ACT

   56.   The allegations of paragraphs 1 through 55 of this
Complaint are realleged herein as if fully set forth.

   57.   The Lanham Act, 15 U.S.C. Section 1525(b),
provides that a person who misrepresents the qualities of
another person  s goods, services or commercial activities
shall be liable in a civil action by a person  who believes
that he or she is liable to be damaged by such act.

   58.   Alone and in combination with the dominant
programming services in Philadelphia the defendant has
knowingly and maliciously misrepresented, knowingly, the
characteristics and qualities of plaintiff  s goods, services
and activities, whereby plaintiff has been substantially
damaged.  The reckless and malicious misrepresentation
included, without limitation, the omission of plaintiff from
the viewership surveys, and the representation that the
surveys accurately described viewership.

   59.   Arbitron has made false and misleading public
statements about the accuracy of the information collected

16

through the PPM test.  Arbitron informed the media that it
would   accurately and creditably measure the performance of
the entire market.   Arbitron did not measure the entire
market and excluded plaintiff.  Arbitron then published its
PPM ratings data and this information was made available to
advertising agencies.  Arbitron presented these results to
be an accurate depiction of the population watching
television in the Philadelphia market.

60.  Television stations rely on rating systems such as
Arbitron  s PPM to sell commercial air time.  Advertising
agencies and media buyers utilize such data to measure the
economic desirability of advertising on various competing
television stations based on the size of the viewing
audience.  The advertising agencies are anticipating the PPM
data because it is a new technological advancement in
measuring viewership.  Since WGTW was excluded from the
initial PPM surveys, the results would deceive advertisers
and lead them to believe that WGTW has no ratings worth
measuring.  This unjustifiably relegated WGTW to second-rate
status, likely to cause declining sales and loss of good
will.

**WHEREFORE,** on this Count, plaintiff prays for injunctive
relief, compensatory and punitive damages, treble damages,

attorneys fees, and such other relief as may be appropriate.

## COUNT IV

### DISPARAGEMENT OF COMMERCIAL PRODUCTS

61.  The allegations of paragraphs 1 through 60 of this Complaint are realleged herein as if fully set forth.

62.  It is an actionable misconduct for a party to maliciously substantially, unfairly and without privilege to disparage the product of another.

63.  By its conduct as described above, Arbitron has unfairly and falsely disparaged plaintiff  s product, i.e., by misrepresenting its listening audience and importance in the market.

**WHEREFORE,** on this Count, plaintiff prays for damages in injunctive relief, together with counsel fees and such other relief as may be appropriate.

## COUNT V

### TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

64.  The allegations of paragraphs 1 through 63  of this Complaint are realleged herein as if fully set forth.

65.  One who interferes with prospective contractual relationships without privilege, is liable to an injured party as a result thereof.

66.   Defendant has improperly interfered with plaintiff s likely and prospective contractual relations, by its conduct as described herein.

**WHEREFORE,** on this Count, plaintiff prays for damages and injunctive relief, and prospective customer John Duffin such other relief as may be appropriate.

### COUNT VI - NEGLIGENCE

67.   The allegations of paragraphs 1 to 66 are realleged herein as if fully set forth.

68.   Commencing in or about April 2002, defendant requested permission to, and was permitted, to enter plaintiff s premises to and for the stated purpose of installing a  encoder , in order to transmit to defendant s equipment signals from plaintiff s cables.

69.   Defendant, thereby, directly and knowingly assumed an obligation to correctly and accurately install and monitor the equipment and to correctly and accurately record plaintiff s viewers signals through the use of defendant s equipment.

70.   To the extent that the defendant needed to rely upon plaintiff s personnel for oversight, cooperation and maintenance, defendant was obligated to provide plaintiff with adequate instruction and information to permit

19

plaintiff  s personnel to do so.

71.  Defendant also was obligate to inform plaintiff of any defect, malfunction, or other interference with the transmission of adequate and timely information, and/or any defect in the equipment or its installation.

72.  Defendant was a possessor, user, and beneficiary of plaintiff  s land, property, and information.

73.  Contrary to its duty of care, defendant acted negligently, recklessly, and/or intentionally, and violated its duty of care, in the following respects, among others not yet known:

(a)  Defendant improperly installed the equipment in plaintiff  s transmitting facility;

(b)  Defendant failed to provide plaintiff  s personnel with any instruction materials or verbal instruction;

(c)  Defendant  s personnel failed to inform plaintiff of an alleged defect in the installation;

(d)  Defendant  s personnel falsely stated that plaintiff  s personnel had installed the equipment;

(f)  Defendant failed to take necessary and proper action to correct the installation.

74.  Defendant failed to inform plaintiff that the

20

signal was defective or malfunctioning.

75.   After the signal was found defective defendant failed to inform plaintiff in a timely manner that the signal was defective, and instead excluded plaintiff from yet another round of surveys.

76.   Even after plaintiff was informed by defendant, negligently late, and plaintiff took steps to correct the problem, defendant failed to inform plaintiff that the signal had become  corroded and/or defective or weak  again in a timely fashion.

77.   Defendant has thus and in these respects negligently, recklessly and wantonly, caused serious and irreparable damage to plaintiff, by continuing to exclude plaintiff from the survey.

78.   Instead of correcting the problem defendant has perpetuated it, both negligently and recklessly, and on information and belief, intentionally.

**WHEREFORE**, on this Count, plaintiff prays for compensatory and punitive damages, in an amount exceeding $100,000, together with interest and costs, and such other relief as may be just and appropriate.

### COUNT VII - BREACH OF CONTRACT - PROMISSORY ESTOPPEL

79.   The allegations of paragraphs 1 through 78 are

21

realleged herein as if fully set forth.

80.  Upon gaining and being allowed entry to the plaintiff s equipment, defendant assumed, accepted, and is burdened with the duty to use a reasonable standard of care in regard to the protection of the equipment, and the proper utilization of the equipment for the purpose for which it was admitted, i.e., to provide an accurate and satisfactory transmission of plaintiff s viewership.

81.  Through its neglect and failure to observe the standard of care, and due to its reckless and malicious conduct, for the reasons aforesaid, defendant, and others which may become known to plaintiff through discovery and otherwise, defendant violated the duty of reasonable care, causing serious injury to the plaintiff, as aforesaid.

**WHEREFORE**, on this Count, plaintiff prays for compensatory damages, and such other relief as may be appropriate.

**JURY TRIAL DEMANDED.**

_____
ROBERT J. SUGARMAN
Attorney I. D. #03332
Counsel for Plaintiff

OF COUNSEL:

SUGARMAN & ASSOCIATES
11th Floor, Robert Morris Building
100 North 17th Street
Philadelphia, PA 19103
(215) 864-2500

Dated:  July _____, 2002