IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

—————————————————————x
                                              :
BRUNSON COMMUNICATIONS, INC.                  :
                                              :
            Plaintiff,                        :
                                              : Civil Action No.:  02 CV. 3223
      v.                                       :
                                              :
ARBITRON, INC.                                :
                                              :
            Defendant.                        :
—————————————————————x


**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S
AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. RULE 12(b)(6)**

David B. Picker, Esq.
**SPECTOR GADON & ROSEN, P.C.**
1635 Market Street, 7th Floor
Philadelphia, Pennsylvania 19103
Telephone: (215) 241-8888
Facsimile: (215) 241-8844
   and
Alfred Fabricant, Esq.
Marc Lieberstein, Esq.
**OSTROLENK, FABER, GERB & SOFFEN, LLP**
1180 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 382-0700
Facsimile:  (212) 382-0888

Date:  August 22, 2002

Attorneys for Defendant

00577125.1

## I.    **PRELIMINARY STATEMENT**

On May 24, 2002, Plaintiff, Brunson Communications, Inc. ("Brunson" or "Plaintiff") filed its original Complaint.  Defendant, Arbitron, Inc. ("Arbitron" or "Defendant") promptly filed a motion to dismiss the Complaint in its entirety for failure to state a claim upon which relief may be granted.  In response to Arbitron's motion, Brunson served and filed an Amended Complaint.  A copy of the Amended Complaint is as Appendix 1 hereto.  The Amended Complaint adds new claims for negligence and promissory estoppel but otherwise is substantially similar to the original complaint.  Most importantly, the amended pleading does not cure the fatal deficiencies found in the original complaint nor does it adequately set forth viable and sustainable claims for plaintiff's newly added claims for negligence and promissory estoppel.  Thus, notwithstanding the amendment, dismissal of the complaint, in its entirety, is still mandated as a matter of law.

In a rather thinly veiled and desperate attempt to find some claim that will survive a motion to dismiss, plaintiff has literally thrown the "kitchen sink" of claims against Arbitron ranging from anti-trust violations on the one hand to negligence on the other.  All of these claims arise out of Arbitron's testing in the Philadelphia area of a new type of ratings meter to measure radio and television audiences.  Arbitron is primarily a radio ratings company and does not have a commercial television ratings product or service.  The primary provider of television ratings products and services in the United States is Nielsen.    In this case, Plaintiff is upset because ratings data from one of its television stations, WGTW Channel 48, was omitted from the Arbitron test report initially because the encoder was installed late and subsequently due to technical difficulties with the encoding equipment.  Plaintiff's contention that this omission constitutes anti-trust violations and other extreme acts of wrong doing is simply preposterous.  It is in Arbitron's best interests that all stations in the tested market be included so that the test results can be as meaningful as possible.

The Amended Complaint purports to set forth seven claims for relief: (i) antitrust injury under Section 1 of the Sherman Act; (ii) antitrust injury under Section 2 of the Sherman Act; (iii) false advertising under the Lanham Act; (iv) commercial disparagement; (v) tortious interference with prospective contractual relations; (vi) negligence, and; (vii) promissory estoppel.  Arbitron renews the instant Motion to Dismiss because the Amended Complaint fails to set forth prima facie allegations necessary to support each of these claims and also fails to sufficiently plead factual allegations essential to the survival of its claims.  Plaintiff's claims amount to nothing more than conclusory and speculative allegations which are legally insufficient to allow it to proceed with this lawsuit.[1]

The gravamen of this lawsuit is that Arbitron has harmed Plaintiff's ability to compete in the Philadelphia broadcast television market by not being included in the Arbitron test report.  This grievance simply ignores the irrefutable fact, as admitted by Plaintiff in its Amended Complaint at ¶¶ 11 & 21, that the Nielsen Company (and not Arbitron) is the leading provider of television ratings data in Philadelphia and in the United States and that Plaintiff has at all times been included in the Nielsen reports.  Arbitron is a media research company which is primarily in the business of licensing proprietary syndicated market research data,, including radio audience measurement data, to its customers throughout the United States.  Snyder Decl. at ¶ 2.  Arbitron's customers include radio broadcasters, advertising agencies and advertisers.  Snyder Decl. at ¶ 2.  Arbitron does not offer to its customers a commercial product which measures broadcast television viewing audiences in any U.S. city including Philadelphia.  Snyder Decl. at ¶¶ 2 & 8.  Arbitron is certainly not a competitor of Brunson.  Amended Complaint, ¶¶ 5 & 9.  Brunson owns and operates a television station, WGTW Channel 48 ("WGTW") in the Philadelphia area and is in the business of broadcasting

---

[1]  Arbitron has submitted the Declaration of Marshall L. Snyder ("Snyder Decl."), as well as supporting exhibits thereto.  Should the Court deem it necessary, this motion may also be considered a motion for summary judgment under Fed. R. Civ. Proc. Rule 56.

television programs and selling media time on its station.  Amended Complaint, ¶ 5.  Arbitron is not a

television broadcaster at all.  Amended Complaint, ¶ 9.

Notwithstanding these irrefutable facts Plaintiff alleges, in essence, that it has suffered a competitive

injury at the hands of Arbitron as a result of the **testing** by Arbitron in Philadelphia of a new type of

experimental audience ratings meter for television and radio known as Arbitron's Personal Portable Meter

("PPM").  Amended Complaint at ¶¶ 10, 15 & 37.  In sum and substance, Plaintiff complains that WGTW

was not timely included in Arbitron's test and therefore Plaintiff's viewership was not reported in the release

of test data which was distributed by Arbitron on a trial basis.  Amended Complaint at ¶ 25 & 26.

The PPM has been in development by Arbitron for several years and its first and only U.S. test city

is Philadelphia.  Snyder Decl. at ¶¶ 3 & 4.  Arbitron is not commercially marketing the test data which it is

compiling from the Philadelphia test and has only provided test data information to participants for evaluation

purposes.  Snyder Decl. at ¶ 7.  Moreover, all participants who receive the PPM test data, are bound by

written agreement not to use the PPM test data for commercial purposes.  Snyder Decl. at ¶ 7 and Exhs. 3

& 4.  Participants who receive the PPM test data have been advised and have agreed in writing that the PPM

data is

> [B]eing provided solely as an advance opportunity to evaluate current data
> generated from the test deployment of Arbitron's PPM technology.  This
> Evaluation Data and application may be used only by Licensee for internal
> purposes and analysis purposes.  The Licensee is not permitted to use the
> evaluation data to buy, plan or sell media time.

*See* Snyder Decl. at ¶ 7 and Exhs. 3 & 4.  Arbitron also places a "WARNING" in each release of PPM test

data which states that "any use of these estimates and data for the buying, planning and/or selling of media

time is strictly prohibited."  Snyder Decl. at ¶ 8; Snyder Decl. Exh. 1.

Arbitron is solely responsible for the development and testing of the PPM and no other entity, including the Nielsen Company, has played any role in the installation of test equipment, the encoding or decoding of test codes or the gathering or reporting of PPM test data. Snyder Decl. at ¶ 9. Nor does Arbitron own, control or have any ownership interest whatsoever in Nielsen or Nielsen's television ratings business. Snyder Decl. at ¶ 9. As Plaintiff alleges it is the Nielsen company, and not Arbitron, which commercially provides television audience ratings data to its subscribers in Philadelphia and elswhere in the United States. Amended Complaint at ¶ 21. Plaintiff does not and cannot deny that at all times material to this action WGTW viewership -- like all television stations in Philadelphia -- has been and continues to be reported by Nielsen as part of Nielsen's commercial ratings service.

As set forth more fully below, Plaintiff's claims are ripe for dismissal because of serious and material pleading deficiencies. On the Sherman Act claims, Plaintiff has simply failed to properly plead an agreement or conspiracy with any person or entity to violate the antitrust laws other than to allege a "bare bones" and wildly unsupportable statement of "combination" or "conspiracy" without any supporting facts. In addition, Plaintiff has failed to allege a plausible definition of the relevant product market in which an injury to competition to the marketplace as a whole (and not an alleged injury to an individual competitor) has been alleged. Most blatant, of course, is Plaintiff's failure to allege any actionable antitrust injury to competition in the marketplace. The Amended Complaint merely asserts that Plaintiff has been injured as a result of Arbitron's exclusion of WGTW from the recent testing "thus injuring Plaintiff and restraining competition in the market for sales of television listener time." Amended Complaint at ¶ 20. Yet, the Amended Complaint fails to plead or describe how excluding WGTW from this test has "restrained competition in the market for sales of television listener time" particularly in light of the fact that at all material times "all stations" have been surveyed and included in the Nielsen reports. Amended Complaint at ¶21.

With respect to Plaintiff's Lanham Act and commercial disparagement claims, Plaintiff has not and can not allege that Arbitron has made any intentionally false or misleading statements about WGTW or its viewership.  The Amended Complaint fails to allege any disparaging statement by Arbitron and there is no support in the law for Plaintiff's allegation that Arbitron's omission of WGTW from the PPM test constitutes disparagement.  Not only does Plaintiff fail to allege the publication of any false statements at all about WGTW or its business but, to the contrary, Plaintiff admits that Arbitron offered to include in its March test data release a statement to the effect that no test data from WGTW had been collected due to the station not being encoded in time to be included in the test report.  Amended Complaint, ¶ 34.  And, in fact, it is not disputed that the actual test data release included the following statement by Arbitron:

> NOTE: WGTW (Ind.), WUVP (Univision), WWSI (Telemundo) and Court TV are now encoded.  However, these outlets were not Encoded in time to be included in the March release of data.  MSNBC was encoded in time to be included in the March release of data. But, MSNBC was not encoding for 13 days of the survey period and is therefore not included in the March release of data.

See Exhibit 1 to the Snyder Decl.  Intent to harm Plaintiff is a prima facie element of a Lanham Act false advertising claim as well as a claim for commercial disparagement and is completely absent here.

Plaintiff's claim for tortious interference with prospective contractual relations is woefully deficient.  Plaintiff's own Amended Complaint concedes that the Arbitron data was merely **test** data and that Nielsen, not Arbitron, provides **commercial** television ratings to the marketplace.  Amended Complaint, ¶ 21.  Plaintiff has not and can not plead that particular anticipated contracts would, with reasonable probability, have been entered into with WGTW   notwithstanding the Nielsen ratings for the period -- but for Arbitron's failure to include WGTW in Arbitron's initial or subsequent test reports.  This is particularly true in light of the fact that all participants agreed as a condition of receiving the test data that they would not use the test data "to buy, plan or sell media time"  Snyder Decl. at ¶ 7.

Plaintiff's claim of negligence is likewise barred as Plaintiff's alleged facts do not create an obligation or legal duty on the part of Arbitron to monitor the installation of Plaintiff's encoder nor its encoded signal nor is there a legal duty on Arbitron's part to include any station's data in its test reports, particularly incomplete or deficient data.  It is undisputed in this case that participation by any station in the test is purely on a voluntary basis and Arbitron does not have access to or control any stations transmitter or other electronic equipment.  Furthermore, the economic loss doctrine bars a claim for negligence where the alleged injury stems from a business agreement absent any injury to persons or property. Since Plaintiff does not allege any personal injury or property damage, a claim for negligence under these circumstances is wholly insupportable.

Finally, Plaintiff's claim of promissory estoppel must be dismissed as Plaintiff has not plead the necessary elements to support that claim.  The Amended Complaint fails to specifically allege that Arbitron made a promise to Plaintiff and that Plaintiff relied on said promise to its detriment.  Therefore, Plaintiff's claim for promissory estoppel is legally insufficient.

The dismissal of Plaintiff's claims is now mandated.[2]


## II.    ARGUMENT

---

[2] Although we believe unnecessary for the resolution of the present motion under Rule 12 (b)(6), it is important to note that WGTW was included as a participant as soon as it indicated its willingness to install the necessary technical equipment. Snyder Decl. at ¶ 4.  In fact, throughout the test period Arbitron has added media outlets to the PPM test, and upon request did the same for Brunson's WGTW station. *Id.* Initially, after installation of its encoder, WGTW experienced technical difficulties with its installation of Arbitron's PPM test encoder. Arbitron then assisted WGTW to correct the problems, and also took steps to notify recipients of the PPM test data that the media outlets included in the report represented only those outlets that were properly encoding their signal for greater than 90% of the days in that survey period. Id at ¶5.  Therefore, WGTW data was not included in the July, 2002 release of data.  Snyder Decl. ¶ 5.  The PPM at WGTW's location is now working properly and WGTW data will be included in future test repots provided that WGTW properly encodes its data in accordance with Arbitron's standards and will receive copies of those reports provided that Plaintiff agrees to execute the participant's agreement (Exhibit 4 to the Snyder Decl.) which, to date, Plaintiff has been unwilling to do.  Snyder Decl. at 10.

## A.    THE RULE 12(B)(6) STANDARD

While the Court must accept as true all of the allegations in the pleadings and must give Plaintiff the benefit of every favorable inference that can be drawn from the Amended Complaint's allegations, this general rule is not without limitations. *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). As the Third Circuit explained in *Morse*, "a court need not credit a Amended Complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Id.* at 906 (citations omitted). An Amended Complaint is properly dismissed when a plaintiff "can prove no set of facts in support of the claim that would entitle him to relief." *Unisource Worldwide, Inc. v. Heller*, 1999 U.S. Dist. LEXIS 8530, *8 (E.D. Pa. 1999) (see Appendix 2, attached hereto).

On a Rule 12(b)(6) motion, while the Court must primarily consider the allegations contained in the Amended Complaint, certain documents may be taken into account. *City of Pittsburgh v. West Penn. Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998). Of particular importance to the instant case, the *City of Pittsburgh* Court explained that "a court may consider an undisputedly authentic document that a defendant attaches to a motion to dismiss if the plaintiff's claims are based on that document." *Id.* at 259 (citations omitted). In this case, the Arbitron PPM test data report, the PPM Addendum Agreement and the PPM Data Evaluation Agreement (Snyder Decl. Exhs. 1, 3 & 4 respectively) should properly be considered.

## B.    PLAINTIFF'S SHERMAN ANTITRUST CLAIMS FAIL AS A MATTER OF LAW

Although antitrust pleadings are governed by Rule 8(a) of the Federal Rules of Civil Procedure, an Amended Complaint must plead adequately each and every element of an antitrust violation. Courts have properly dismissed antitrust claims on the pleadings where the plaintiff has failed to state facts sufficient to meet the necessary elements of an antitrust claim. As one court in this district explained,

> We should not shy away from dismissing an antitrust claim that is vague and conclusory in nature, for allegations of Section 1 conspiracy must be plead with a degree of specificity. 'A general allegation of conspiracy without a statement of the facts is an allegation of a legal conclusion and insufficient of itself to constitute a cause of action.'

*Rototherm Corp. v. Penn Linen & Uniform Serv., Inc.*, 1997 U.S. Dist. LEXIS 10057, *41 (E.D. Pa. 1997) (citations omitted) (see Appendix 3, attached hereto). The Third Circuit has held that dismissing antitrust claims on the pleadings is appropriate where, as in the instant case, the plaintiff could not succeed as a matter of law on the facts presented. *Garshman v. Universal Resources Holding, Inc.*, 824 F.2d 223, 230 (3d Cir. 1987) ("The allegation of unspecified contracts with unnamed other entities to achieve unidentified anti-competitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act."). Accordingly, an antitrust complaint should be dismissed where a "plaintiff has failed adequately to define the relevant product market, to allege antitrust injury, or to allege conduct in violation of the antitrust laws." *Re-Alco Industries, Inc. v. National Center for Health Education, Inc.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993). As demonstrated below, Plaintiff has failed to meet this pleading burden in its claims under Section 1 and 2 of the Sherman Act.

### 1.    Plaintiff's Amended Complaint Fails to Allege Facts to Support an Antitrust Claim Under §1 of the Sherman Act

The Sherman Act Section 1, 15 U.S.C. § 1, provides, in pertinent part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . .

To state a cause of action under the Sherman Act, 15 U.S.C. § 1, courts apply the "rule of reason test,"[3] which requires: (1) that the defendants contracted, combined or conspired among each other; (2) that

---

[3] The "rule of reason" test is controlling unless the allegations fall into one of the categories judicially determined to be illegal *per se*. Activities which have been held to be illegal *per se* under the Sherman Act are "group boycotts, price fixing, resale price maintenance, tying arrangements and reciprocal dealing." *Eichorn v.*

the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.  *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 442 (3d Cir.1997).

Based on this standard, Plaintiff's pleadings are deficient as a matter of law as they do not sufficiently identify the other entities of the alleged conspiracy, the nature of the contract or agreement reached between the alleged co-conspirators, the concerted action taken by the alleged co-conspirators, the proximate injury caused by the conspiracy, or particularly describe how the alleged conspiracy produced anti-competitive effects in the relevant market.

**(a)** **Plaintiff's Amended Complaint Fails
to Sufficiently Allege a Conspiracy**

To establish the conspiracy element above, Plaintiff must show concerted action, an essential element of the claim under §1 of the Sherman Act.  *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) ("Section 1 of the Sherman Act ... reaches unreasonable restraints of trade effected by a 'contract, combination ... or conspiracy' between *separate* entities.  It does not reach conduct that is wholly unilateral.") (emphasis in original) (citations omitted).  "Unilateral activity, no matter what its motivation, cannot give rise to §1 liability, *see Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 110-11 (3d Cir. 1980), because a company "has the right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."  *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 461 (3d Cir. 1998) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)).  Moreover, Plaintiff is required as a matter of law to

---

*AT&T Corp.*, 248 F.3d 131, 138 (3d Cir. 2001).  While Plaintiff has now amended its Complaint to allege a "group boycott," as explained *infra* at 17-18, Plaintiff's alleged facts are legally insufficient to support this type of claim.

plead its allegations of conspiracy with particularity in order to survive a motion to dismiss. *Commonwealth of Pennsylvania v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988). This is an exception to the notice pleadings requirements under Fed.R.Civ.P. *Id.*

Even assuming that all of the facts alleged in Plaintiff's Amended Complaint herein are true, Plaintiff does not sufficiently allege a conspiracy between Arbitron and any entity let alone plead that conspiracy with particularity. Plaintiff alleges that "Arbitron was motivated in its false and misleading activity by **its own selfish desire** to obtain the benefit of working with the larger networks, plaintiff's competitors, who have most of the outlets in the markets." Amended Complaint, ¶35 (emphasis added). This allegation of "selfish" unilateral activity does not state a claim for a violation of the Sherman Act as it fails to allege the required conspiracy. Is plaintiff seriously alleging that "the larger networks" (whoever they might be) have conspired with Arbitron to exclude WGTW from the PPM test and, if so, what concerted action was taken in furtherance of this conspiracy?

Plaintiff's other theory of conspiracy or combination asserted in its Amended Complaint is that Arbitron, a radio ratings company, has somehow gained monopoly power in the broadcast television ratings business solely as a result of its test in Philadelphia and some purported relationship with Nielsen, the nation's leading television ratings company. Arbitron and Nielsen are separate unrelated companies. Snyder Decl at ¶ 9. These allegations simply do not satisfy the pleading requirements of a sustainable anti-trust claim under the Sherman Act.

Plaintiff alleges that "Nielsen and Arbitron have entered into a corporate financial relationship by which Nielsen and Arbitron are related in regard to the new system [presumably Arbitron's PPM], the details of which are not known to plaintiff. References to Arbitron herein include Nielsen as an owner or joint venturer in the viewer measurement program." Amended Complaint, ¶ 11 & 21. On its face, even if Nielsen

owned or controlled Arbitron's PPM test  which it does not-- these allegations do not support an anti-trust violation.  It is undisputed that Nielsen already provides its own measuring system which is the industry standard and that the Nielsen's reports include station WGTW viewership in the Philadelphia  market. Plaintiff alleges and thus admits that "Nielsen Corporation had the only measuring system prior to Arbitron's" test system.  Amended Complaint,  ¶ 11.  Thus, plaintiff's allegations are not only conclusory and insupportable but the theory that Nielsen, the only player, conspired with Arbitron to monopolize the market it already controlled  is illogical and belies common sense.

Plaintiff further alleges that, "Arbitron has utilized its monopoly power, in and with an agreement and financial participation of Nielsen ... in concert with plaintiff's competitors, in the sales of time market in Philadelphia, to promote and effect the exclusion of plaintiff."  Amended Complaint, ¶ 43.  Yet again, this asserted conclusion by Plaintiff of "assistance" by Neilsen and some undisclosed action in "concert" with Plaintiff's undisclosed "competitors" is nothing more than a vague, conclusion of liability.  Plaintiff fails to plead with particularity what "assistance" Nielsen provided and fails to identify the other "competitors" who have participated in this agreement or conspiracy to injure Plaintiff.  Nor does Plaintiff address how Arbitron, a radio ratings business, has somehow obtained a monopoly over the television ratings business based solely upon its activities of testing a new meter in Philadelphia.  *See* Amended Complaint, ¶ 9.  Moreover, to be actionable, any conspiracy or combination must produce anti-competitive effects within the relevant product and geographic markets.  Here, as Plaintiff alleges, "Nielsen includes 'all' stations" in its television ratings surveys including WGTW. Amended Complaint, ¶21.

The essence of Plaintiff's claims lies in the fact that Arbitron conducted a **test** in Philadelphia which allegedly excluded WGTW and that Arbitron thus failed to include WGTW viewership information in its test report.  On its face, these allegations have nothing to do with anyone except Arbitrion and WGTW.  Plaintiff

11

has not and cannot allege with specificity any involvement of Nielsen in the Arbitron test nor on Arbitron's part with Nielsen's television business.  Nor can Plaintiff allege with any specificity any other "competitors" of Plaintiff who played any role whatsoever in the exclusion of WGTW from the test report.  Accordingly, the Amended Complaint's allegations of Arbitron's unilateral activity in connection with its PPM test system, as well as its alleged unilateral act to omit Plaintiff's WGTW television station from the initial releases of PPM test data, do not state a claim under §1 of the Sherman Act.  *See Edward J. Sweeney*, 637 F.2d at 110-11.

**(b)**    **Plaintiff Fails to Define and Allege a Plausible Market**

The purpose of the Sherman Act is to protect competition in the marketplace, not an alleged injury to an individual competitor.  *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996). Accordingly, under both Sections 1 and 2 of the Sherman Act, the courts have required that a complaint must allege a plausible definition of the relevant product market in which the injury to competition occurred. *Eichorn v. AT&T Corp.*, 248 F.3d 131,147- 48 (3d Cir. 2001); *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 437 (3d Cir. 1997); *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991); *Mogul v. General Motors Corp.*, 391 F. Supp. 1305, 1312-13 (E.D. Pa. 1975), *aff'd* 527 F.2d 645 (3d Cir. 1976); *Deep South Pepsi-Cola Bottling Co. v. PepsiCo, Inc.*, 1989 U.S. Dist. LEXIS 4639, 18-19 (S.D.N.Y. 1989) (quoted below) (see Appendix 4, attached hereto).  The relevant product market must include all products that are reasonably interchangeable.  *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956).

Plaintiff's Amended Complaint does not clearly define any relevant product market in connection with its antitrust claims.  Is the market the television audience measurement market in Philadelphia, the market

for Arbitron PPM test data in Philadelphia or the television broadcast market in general?[4]  For this reason alone the Sherman Act claims must be dismissed.  If we assume for argument's sake that Plaintiff was attempting to define the relevant product market as either (i) the market in Philadelphia for Arbitron's PPM test meter and data for television audience ratings, or (ii) the market in Philadelphia for all television audience ratings data, these allegations would nevertheless be legally insufficient to support an antitrust claim.

A single branded product as well as the distribution of a single branded product by a manufacturer or distributor has routinely been found to be too narrow a definition to support an antitrust claim.  *See Deep South*, 1989 U.S. Dist. LEXIS 4639 at 19-20.  The United States Supreme Court has held that definitions of a market in terms of a single brand of product are inherently implausible.  *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956) ("The determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another.").  Put simply, to test the charge of defendant that plaintiffs cannot show the requisite market, the Court must discover whether reasonable substitutes for the pertinent product are available to buyers.  *Deep South*, 1989 U.S. Dist. LEXIS 4639 at 19-20.  *Du Pont* contains a fitting example:

> [O]ne can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product.  However, this power that, let us say, automobile or soft-drink manufacturers have over their trademarked products

---

[4]  Plaintiff alleges that Arbitrion's PPM "creates a new product market, i.e., imbedded [sic] direct measuring, whereby no reporting by the viewer is required (unlike the Nielsen system)."  Amended Complaint, ¶ 14. However, Plaintiff also alleges that the market injured by the alleged anti-competitive activities is "the market of broadcasting in the Philadelphia SMSA listener Market."  Amended Complaint, ¶ 43.  Plaintiff also asserts that "Arbitron (with Neilsen) enjoys monopoly powers in the providing of viewer measurement in the relevant market, i.e., Philadelphia area television viewing market, which is a well recognized market for television viewers and advertisers.  It is defined by the reach of signals of stations, and the service areas of the cable systems.  It includes a radius of about sixty miles from City Hall, Philadelphia."  Amended Complaint, ¶ 45.

>    is not the power that makes an illegal monopoly.   Illegal power must be
>    appraised in terms of the competitive market for the product.

*Du Pont*, 351 U.S. at 392-93 (emphasis added).   Following *Du Pont*, the Third Circuit explained in *Eichorn*

that "[b]y defining the market so narrowly that it only includes the defendants, plaintiffs' proffered

geographic and product markets are unrealistic."   *Eichorn*, 248 F.3d at 147 (quoting *Du Pont*, 351 U.S. at

395) (internal citations omitted).

    In *Deep South* plaintiffs alleged that defendants violated Sections 1 and 2 of the Sherman Act by

conspiring to restrain trade and monopolize the market for the purchase and sale of "independent Pepsi-Cola

soft drink bottling franchises in the United States."   1989 U.S. Dist. LEXIS at *18.   The *Deep South* Court

held in pertinent part:

>    But the law is clear that the distribution of a single brand, like the manufacture
>    of a single brand, does not constitute a legally cognizable market . . . . This
>    means that just as PepsiCo could not monopolize the market for soft drinks by
>    monopolizing only Pepsi-Cola soft drinks, it cannot monopolize an alleged
>    market for soft drink distribution of only Pepsi-Cola soft drinks.   Plaintiffs
>    have failed to set out a theoretically rational explanation to support its
>    proposed relevant product market.   Plaintiffs have failed to allege why Pepsi-
>    Cola franchises are not interchangeable with franchises for the distribution of
>    other soft drinks.   Plaintiffs simply delineate the market without using the
>    methodology prescribed by the courts to define a market for antitrust purposes
>    -- analysis of the interchange- ability of use or the cross-elasticity of demand
>    for potential substitute products.

*Deep South*, 1989 U.S. Dist. LEXIS 4639 at *19-20 (emphasis added) (citations omitted).

    In this case, Plaintiff has not and cannot reasonably define a product market for an antitrust violation

which will survive a motion to dismiss.   To the extent that Plaintiff would define the relevant product market

as the market in Philadelphia for Arbitron's PPM test meter and data for television audience measurement,

such a definition would fail as a matter of law.   Plaintiff's narrow market definition is unrealistic and not

plausible.   *Eichorn*, 248 F.3d at 147.   Alternatively, if the defined market is expanded, as it must be, to

include all television audience measurement data and reports in the Philadelphia area, this too necessitates dismissal because the only available commercial television ratings service and data is offered by Nielsen, not Arbitron. Amended Complaint, ¶¶ 11 & 21. Arbitron does not offer a commercial television ratings service. Snyder Decl. at ¶¶ 2 & 8. Nor can Plaintiff allege that "reasonable substitutes" to the Arbitron test data are not widely available. Thus, using the broader market definition, Plaintiff's claims fail as well.

### (c)     Plaintiff's Amended Complaint Fails To Allege Any Cognizable Antitrust Injury

Plaintiff has avoided expressly alleging the existence of a defined broader market for a very good reason. "[T]he antitrust laws . . . were enacted for the protection of <u>competition</u>, not <u>competitors</u>." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (emphasis in original). Injury to one competitor, even if true is not a restraint of trade. *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 725-26 (3d Cir. 1991); *Eichorn*, 248 F.3d at 140 ("We have consistently held an individual plaintiff personally aggrieved by and alleged anti-competitive agreement has not suffered and antitrust injury unless the activity has a wider impact on the competitive market."); *Kelco Disposal, Inc. v. Browning-Ferris Industries, Inc.*, 845 F.2d 404, 411 (2d Cir. 1988).

In this case, Plaintiff has not plead any antitrust injury to the defined marketplace as a whole, but rather has only alleged that WGTW was injured by the failure of Arbitron to include the station in its PPM test. Amended Complaint, ¶¶ 37-39. This is simply not an antitrust injury. The Amended Complaint is devoid of allegations that other actual or potential competitors of Plaintiff were foreclosed from the test data and the Amended Complaint contains no other factual allegations showing that overall competition even in the implausible market Plaintiff suggests was affected. Instead, the Amended Complaint only alleges that WGTW was harmed by being left out of the PPM data report. Amended Complaint, ¶¶ 37-38.

As the Court stated in *Re-Alco Industries*:

In order to prevail on a monopolization claim, "[p]laintiff must prove an <u>antitrust</u> injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." <u>Brunswick Corp. v. Pueblo Bowl-O-Mat,</u> Inc., 429 U.S. 477, 97 S. Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original). An exclusive distributorship agreement between a manufacturer and a distributor causing harm to another distributor is not, standing alone, sufficient to show antitrust injury. <u>Rutman Wine Co. v. E. & J. Gallo Winery</u>, 829 F.2d 729, 735 (9th Cir. 1987). <u>Rather, there is no violation unless the agreement is intended to or actually does harm competition in the relevant market.</u> <u>Id.</u> . . . <u>Even if there were a conspiracy to shut out Re-Alco, there would not necessarily be an antitrust violation absent an anticompetitive effect on the industry as a whole.</u> <u>See</u> <u>Oreck Corp. v. Whirlpool Corp.,</u> 579 F.2d 126, 130 (2d Cir.), <u>cert. denied</u>, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). Accordingly, plaintiff's claims under the Sherman Act are dismissed.

812 F. Supp. 387, 392 (S.D.N.Y. 1987) (emphasis added; citations deleted).

In this action, Plaintiff has not -- and cannot -- allege antitrust injury to any plausible market. Plaintiff summarily asserts that Arbitron's actions have impaired "WGTW's ability to be competitive and operate on an equal basis with other stations in the market, thus injuring Plaintiff and restraining competition in the market for sales of television listener time." Amended Complaint, ¶20. But the only conceivable restraint on "sales of television listener time" raised in the Amended Complaint is an injury to itself; namely, the purported inability of WGTW to make advertising sales as a result of its exclusion from the Arbitron test. More specifically, Plaintiff alleges that "Arbitron has utilized its monopoly power, in and with an agreement and financial participation of Nielsen ... in concert with plaintiff's competitors, in the sales of time market in Philadelphia, to promote and effect the exclusion of plaintiff." Amended Complaint, ¶ 43. "Arbitron has used its monopolist power to cause antitrust injury to plaintiff, i.e., to injure plaintiff's ability to compete in the sale of advertising, thereby injuring programming." Amended Complaint, ¶ 55. These allegations

mandate the dismissal of Plaintiff's antitrust claims, since Plaintiff admits that the alleged injury was only

to itself and not its competitors (and therefore the market).[5]

### (d)  Plaintiff Fails to Allege Facts Necessary to Support its Claim of a Group Boycott

Plaintiff also now alleges a group boycott "imposed at the request of plaintiff's competitors."

Amended Complaint, ¶ 19. First, as explained in Point II (B), *supra* at 8, allegations of "unspecified contracts

with unnamed other entities" fails to meet the pleadings requirement for pleading a conspiracy under the

Sherman Act. *Garshman*, 824 F.2d at 230. A group boycott is a concerted effort by a group of competitors

"at one level to protect themselves from competition from non-group members who seek to compete at that

level. Typically, the boycotting group combines to deprive would be competitors of a trade relationship which

they need in order to enter (or survive in) the level wherein the group operates." *Larry V. Muko, Inc. v. S.W.

Pa. Bldg. and Const. Trades Council*, 670 F.2d 421, 429 n.11 (3d. Cir.), *cert. denied*, 459 U.S. 916 (1982)

(citation omitted). Moreover, to be actionable the alleged boycott must be horizontal, not vertical. In other

words the boycotting competitors must be competitors of Plaintiff at the same level of competition.

Plaintiff's attempt in its Amended Complaint to characterize the exclusion of WGTW from the PPM

test as a "group boycott" strains credulity. On its face, Plaintiff's alleged boycott is "vertical" -- between

"entities operating at different levels of the market structure, such as manufacturers and distributors" -- and

not "horizontal" -- "among competitors at the same level of distribution." Black's Law Dictionary 1563, 737

(6th ed. 1991). "[A] purely vertical arrangement, by which (for example) a supplier or dealer makes an

arrangement exclusively to supply or serve a manufacturer, is not a group boycott." *U.S. Healthcare, Inc.*

---

[5]  Plaintiff also pleads only that the omission will cause WGTW harm at some future date with advertisers. Even this alleged injury, however, is belied by the undisputed fact that all participants in the PPM test program and recipients of the PPM test data are prohibited from using the PPM test data for commercial purposes. Snyder Decl. ¶ 7, Exhs. 3 & 4.

*v. Healthsource, Inc.*, 986 F.2d 589, 594 (1st Cir. 1993) (referring to *Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 212 (1959)). Nor has Plaintiff even attempted to identify the boycotting competitors of plaintiff or otherwise plead the claim with the requisite particularity.

In addition, Plaintiff has not plead, nor can it, that it has been excluded from Nielsen's ratings surveys -- the only television ratings that are used commercially by advertisers, manufacturers and others.  Amended Complaint, ¶ 11 & 21.  As explained in Point II (B)(1)(b), *supra* at 11-12, any plausible market definition must include both Neilsen's and Arbitron's ratings systems.  Nor is Nielsen, under any construction, a competitor of Plaintiff let alone a horizontal competitor.  The only commercially available television ratings product in the Philadelphia area, Nielsen, includes WGTW's viewership data.

According to the Supreme Court, per se boycott cases contain three elements: "denial of something a competitor needs to compete effectively, defendants who are vertical competitors with a dominant position in the relevant market, and the absence of any plausible contention that the challenged behavior would enhance overall efficiency and make markets more competitive." *Northwest Wholesale Stationers v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294-95 (1985). Plaintiff's Amended Complaint fails to allege sufficient facts to meet all three of the required elements.  What a station in Philadelphia needs to compete effectively with other stations to sell advertisement time are Nielsen ratings.  WGTW is part of the Nielsen survey.  Defendant Arbitron is not a vertical competitor of Plaintiff.  Each recipient of the PPM test data has agreed by contract not to use the test data for commercial purposes.  Snyder Decl. Exhs. 3 & 4.  The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive." *Northwest Wholesale*, 472 U.S. at 295, 298; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) ("conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy").

Finally, even if the Court were to analyze Plaintiff's allegations under the *per se* standard, Plaintiff could not succeed because Plaintiff must still establish that it has suffered an antitrust injury as a prerequisite to a Sherman Act claim under either the rule of reason or *per se* tests. *Eichorn*, 248 F.3d at 138.

> **2.      Plaintiff's Amended Complaint Fails to Allege Facts
> to Support a Claim Under §2 of the Sherman Act**

Sherman Act Section 2, 15 U.S.C. § 2, provides, in pertinent part:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor . . . .

Plaintiff's cause of action based on §2 of the Sherman Antitrust Act should likewise be dismissed based on the factual deficiencies in the Amended Complaint. A cause of action under 15 U.S.C. §2 requires: 1) that the defendant has engaged in predatory or anti-competitive conduct with; 2) a specific intent to monopolize; and 3) a dangerous probability of achieving monopoly power. *Pastore v. Bell Telephone Co. of Pennsylvania*, 24 F.3d 508, 512 (3d Cir. 1994). None of these factors is present here.

### (a)    Plaintiff Failed to Plead Intent Sufficiently

Plaintiff is unable to show the necessary intent element in its Amended Complaint.  The Amended Complaint merely alleges in conclusory form that "Arbitron through acquisition combinations with Nielsen, intentionally became and is a monopolist in the Philadelphia viewer measurement market."  Amended Complaint, ¶53.  However, it is the Neilsen Company -- not Arbitron  which provides commercial television audience measurement data to subscribers in the Philadelphia market.  Except for the PPM test data, Arbitron does not offer a commercial television audience measurement product in Philadelphia or any other U.S. city.  Snyder Decl. ¶¶ 2 & 8..  Despite the amendment to its complaint, Plaintiff cannot plead any facts in support of this contention.

The facts alleged in the Amended Complaint also belie intent.  For example, Plaintiff alleges that: "[r]eceiving no satisfaction Brunson continued to complain [to Arbitron].  Arbitron then embedded Brunson's signal, but only after completion of the survey."  Amended Complaint, ¶24.  Plaintiff not only admits that Arbitron actually offered "to disclose the fact of the omission in a footnote..." (Amended Complaint, ¶34) but Plaintiff also admits that Arbitron provided Brunson with a PPM encoder to install. Amended Complaint, ¶68.  In addition, it is undisputed that the actual test data release expressly stated that WGTW (and other stations including MSNBC and Court TV) had been excluded from the test survey due to late arrival of the encoder or technical difficulties. *See* Snyder Decl. Exh. 1.   Plaintiff's alleged facts in the Amended Complaint fail to support an allegation of  "specific intent" to monopolize.

### (b)    Plaintiff Fails to Sufficiently Plead Antitrust Injury

In order to survive a motion to dismiss, Plaintiff must also allege an antitrust injury under §2 of the Sherman Act.  *The Arbitron Company v. Tropicana Product Sales, Inc.*, 1993 U.S. Dist. Lexis 5587, *33-34 (S.D.N.Y. 1993) (see Appendix 5, attached hereto).  As explained above, Plaintiff's Amended Complaint

merely alleges that Plaintiff has been injured, not that competition in the relevant market as a whole has been injured. Amended Complaint, ¶ 37-39. Accordingly, Plaintiff's antitrust claim under §2 of the Sherman Act should be dismissed. *Id.*

### (c)    Plaintiff's Allegations Belie Any Probability of Monopoly

Last, as to the requirement that there be a dangerous probability of achieving monopoly power under §2 of the Sherman Act, Plaintiff's allegations contradict this required element of the antitrust claim. Plaintiff's Amended Complaint admits that Arbitron's PPM is not a commercial service and affirmatively avers that Nielsen provides the television audience measurement data in the Philadelphia market. Amended Complaint ¶11, 15 & 21. Since Arbitron does not even have a commercial television ratings product for sale, it strains credulity that Plaintiff can plead or establish that there is a dangerous probability of Arbitron's achieving monopoly power in the relevant product market at this time. Snyder Decl. at ¶¶2, 4 &8..

It is also undisputed that the participants in the Arbitron PPM test program have expressly agreed that the PPM data is not a commercial service, nor to be used for commercial purposes. Snyder Decl., Exhs. 3 and 4. Consequently, the Amended Complaint fails to allege a plausible product market upon which Arbitron could reasonably achieve monopoly power, or one in which the Court could assess that Arbitron has a dangerous probability of achieving same. Plaintiff's antitrust claim under §2 of the Sherman Act should be dismissed. *See Pastore*, 24 F.3d at 512 (in the absence of showing a market, or that the defendant had monopoly power, the Third Circuit affirmed the lower courts grant of summary judgment dismissing the antitrust claims after converting the motion to dismiss).

### C.    PLAINTIFF'S LANHAM ACT CLAIM SHOULD BE DISMISSED BECAUSE THE ARBITRON PPM TEST DATA IS NOT A COMMERCIAL SERVICE NOR USED FOR COMMERCIAL PURPOSES

Plaintiff's Amended Complaint is also woefully deficient in pleading the required elements of a Lanham Act claim for false representation. To establish a false representation claim, the Third Circuit has interpreted the Lanham Act to require a plaintiff to show that:

> (1) the defendant has made false or misleading statements as to his or her's or another's products or services; (2) there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales and loss of good will.

*Synygy, Inc. v. Scott-Levin, Inc.*, 51 F.Supp.2d 570, 575 (E.D. Pa. 1999) (citing *U.S. Healthcare, Inc. v. Blue Cross Greater Phila.*, 898 F.2d 914, 922-23 (3d. Cir.), *cert. denied*, 498 U.S. 816 (1990))

### (a)    The Amended Complaint Does Not Allege Arbitron Made Any False Statements About Brunson or WGTW

Plaintiff's Amended Complaint does not allege that Arbitron made a single express statement **about Brunson or WGTW**. For this reason alone, Plaintiff's Lanham Act claim should be dismissed.

### (b)    Failure to Include WGTW in the PPM Test Does Not Constitute a Lanham Act Violation

It is undisputed that Arbitron did not make or publish false or misleading statements about WGTW. Plaintiff is straining to concoct a Lanham Act claim by alleging that Arbitron's representatives made the following statements about the PPM test in general, a test that did not include WGTW data: (1) that Arbitron would "accurately and creditably measure the performance of the entire market" and (2) that the PPM survey was "fair, accurate and complete." Amended Complaint, ¶ 32. Plaintiff then alleges that because WGTW was not included in the PPM test data, those "misleading" statements somehow injured Plaintiff. However, the omission of WGTW from the PPM test data does not mean that Arbitron's alleged statements about the PPM data are false or misleading. Those statements, must be taken in the context of the test report which

expressly advised that viewing data from WGTW and other stations had not been included for the report period due to technical difficulties.  *See* Snyder Decl. at ¶ 5, Exh. 1.

Even if the Court accepted as true the allegations that misrepresentations were made about Arbitron's PPM test data, the Amended Complaint does not allege that these misrepresentations resulted in an injury, or even a likelihood of an injury, to Plaintiff.  In this case, Plaintiff seeks not only monetary damages, but also injunctive relief, and hence, it must show actual damages.  *Synygy, Inc.*, 51 F.Supp. at 577.   The Amended Complaint is devoid of any allegations concerning actual damages that Plaintiff may have suffered from the alleged misrepresentations.  Indeed, in view of the numerous steps Arbitron has taken to advise participants in the PPM test that the PPM test data is not to be used for commercial purposes, and is for internal use only, there is no set of facts or circumstances that could support Plaintiff's claim for damages. Accordingly, the Lanham Act claim should be dismissed for failure to state a claim upon which relief can be granted.

### (c)      The Alleged Deception Is Immaterial, Unlikely to Influence <u>Purchasing Decisions and/or Result in Declining Sales to Plaintiff</u>

As noted above, the alleged misrepresentations are immaterial as they do not concern Brunson or WGTW.  Moreover, in view of the steps Arbitron has taken to make sure its PPM test data is not viewed as a commercial service, and specifically that the PPM data is not to be used to buy, plan or sell media, Arbitron's alleged misrepresentations could not reasonably have influenced purchasing decisions.  Snyder Decl. ¶ 7, Exhs. 1, 2 and 3.  Further, the Amended Complaint does not allege facts to support the likelihood of injury from the alleged misrepresentations.

### (d)      Arbitron's Conduct and Statements About Its PPM Test <u>Data Were Not "Commercial Advertising or Promotion"</u>

To support an alleged Lanham Act claim, the alleged misrepresentation must also take place as part of "commercial advertising or promotion." *Id.* "Commercial advertising or promotion" requires: (1) commercial speech; (2) **by a defendant in commercial competition with the plaintiff**; (3) designed to influence customers to buy the defendant's commercial products; and that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry. *Synygy, Inc.*, 51 F.Supp.2d at 576 (emphasis added).

The Amended Complaint does not make a prima facie showing that the alleged Arbitron representations about the PPM test data took place as part of "commercial advertising or promotion" as that term is defined by the Third Circuit. First, Arbitron, a marketing research firm, is not in commercial competition with Plaintiff, a television broadcaster. Thus, the required element that Plaintiff be in commercial competition with Arbitron cannot be met here.

Moreover, the Amended Complaint is devoid of any allegations that Arbitron's statements about its PPM test data, were designed to influence customers to buy Arbitron's PPM test data rather than Plaintiff's television advertising space. These products are apples and oranges. The undisputed facts are that Arbitron's agreements with participants in the PPM test program obligate them not to use the PPM test data for any commercial purposes. That is because the data has been gathered as part of a test for a new ratings meter in the United States. Snyder Decl. ¶ 7, Exhs.3 & 4. The release of the PPM test data itself has a warning on every page which states "WARNING -- Any use of these estimates and data for the buying, planning and/or selling media time is strictly prohibited." Snyder Decl. ¶ 8, Exh. 1. Thus, it is clear that at minimum, there can be no Lanham Act violation because Arbitron has taken numerous steps to make sure that the all representations concerning its PPM test data do not influence customers purchasing decisions.

### D.    **PLAINTIFF'S DISPARAGEMENT CLAIM IS BASELESS**

Plaintiff's cause of action for disparagement based on Arbitron's omission of WGTW from the PPM test data is baseless.  "To state a claim for trade disparagement, a plaintiff must allege 1) a disparaging statement of fact that is untrue or a disparaging statement of opinion that is incorrect; 2) that no privilege attaches to the statement; and 3) that the plaintiff suffered a direct pecuniary loss as a result of the disparagement.  *Synygy*, 51 F.Supp. at 578-579.

First, as noted above, Arbitron has never made any statements about Brunson or WGTW, let alone any disparaging statements.  The Amended Complaint fails to allege a single disparaging statement.

Second, there is no case law to support Plaintiff's claim that the omission of WGTW from Arbitron's PPM test data could result in disparagement.  It would require a great leap of logic for the law to support a conclusion that by omission, i.e., without even saying anything, one could be liable for disparagement.  *See Lights of America, Inc. v. Consumers Union of United States, Inc.*, 2002 Cal. App. Lexis 2000 (2002) (unpublished) (see Appendix 6, attached hereto); *Lynchval Systems, Inc. v. Chicago Consulting Actuaries, Inc.*, 1996 U.S. Dist. Lexis 14568, *21 (N.D. Ill. 1996) (see Appendix 7, attached hereto).

Even if the omission of WGTW could somehow constitute a disparagement, Plaintiff's claim for trade disparagement must fail because it has not plead special damages.  *Synygy*, 51 F.Supp. at 578-579.  Here, Plaintiff only alleges that "advertisers will hesitate to advertise with WGTW TV Channel 48 as a result of not having information" (Amended Complaint, ¶38) and that this "will cause serious economic losses to a profitable and growing station" (Amended Complaint, ¶26).  As a matter of law, such allegations fall well short of the pleading requirements under Fed. R. Civ. P. 9(g) for disparagement, and fail to support Plaintiff's disparagement claim.  *Synygy*, 51 F.Supp.2d at 578.

### E.    PLAINTIFF'S AMENDED COMPLAINT FAILS TO ALLEGE FACTS SUPPORTING ITS TORTIOUS INTERFERENCE CLAIM

To state a claim for tortious interference with prospective contractual relations under Pennsylvania law, a plaintiff must allege: (1) a prospective contractual relationship between the plaintiff and a third party; (2) purpose or intent to harm the plaintiff by preventing the relationship from accruing; (3) the absence of privilege or justification on the part of the plaintiff; and (4) the occurrence of actual harm or damage to the plaintiff as a result of the defendant's conduct. *Allstate Transp. Co., Inc. v. Southeastern Pennsylvania Transp. Auth.*, 1998 U.S. Dist. LEXIS 1740, *10 (E.D. Pa. 1998) (see Appendix 8, attached hereto). Plaintiff's Amended Complaint fails to even allege any actual or prospective contractual relationship between Plaintiff and a third party, that Arbitron had an intent to harm the plaintiff, or that there was actual harm as a result of the alleged activities.

Plaintiff's claim for tortious interference with prospective contractual relations must be dismissed because the Amended Complaint fails to identify a single entity, relationship or contract which Plaintiff alleges was not entered into, or lost due to Arbitron's alleged tortious interference. Even at the pleading stage, a plaintiff may not rest a claim for tortious interference with prospective contractual relations on a "mere hope that additional contracts or customers would have been forthcoming but for defendant's interference. Rather, the Amended Complaint must allege facts that, if true, would give rise to a **reasonable probability** that **particular** anticipated contracts would have been entered into." *Rototherm*, 1997 U.S. Dist. LEXIS 10057 at *36-37 (E.D. Pa. 1997) (**emphasis added**) (citations omitted); *Allstate*, 1998 U.S. Dist. LEXIS 1740 at *14. The Amended Complaint offers only the conclusory allegation that "advertisers will hesitate to advertise with WGTW TV Channel 48 as a result of not having information." Amended Complaint, ¶ 38. As Plaintiff cannot identify any particular contract that was allegedly lost, much less establish a reasonable probability that the unidentified contract would have been entered into, its claim for tortious interference must be dismissed. *See Rototherm*, 1997 U.S. Dist. LEXIS 10057 at *36-37.

In *Rototherm*, the plaintiff claimed that the defendants had breached an agreement to allow it to install its pilot system at their laundry facilities. The plaintiff in *Rototherm*, just like plaintiff in the instant action, alleged that the defendant's activities had interfered with the "economic relations between [plaintiff] and its prospective customers." *Rototherm*, 1997 U.S. Dist. LEXIS 10057 at *37. In fact, the plaintiff in *Rototherm* offered substantially more concrete prospective injuries than Plaintiff's general allegation that "advertisers will hesitate to advertise with WGTW TV Channel 48." Amended Complaint, ¶ 38. The plaintiff in *Rototherm* alleged that its "prospective customers included Government facilities as well as the private market, industrial laundries and textile retail companies ... hospitals, hotels and other commercial entities laundry [sic]." *Id.* The court, however, did not agree, finding that "such vague references to hoped-for contracts are not enough to withstand the defendants' motion to dismiss." *Id.* If the *Rototherm* plaintiff's alleged contracts were "vague references to hoped-for contracts," then Plaintiff's alleged contracts herein amount to nothing more than wishful thinking, particularly in light of the fact that all recipient of the PPM test data expressly agreed not to use the test data for commercial purposes, including any decision to buy, plan or sell media time. Snyder Decl. Exhs. 3 & 4.

Further, the Amended Complaint's allegations, as well as the undisputed facts, belie the required element of intent to interfere. Not only is Brunson's WGTW station now an active participant in the Arbitron PPM test program, but since Arbitron first learned of the omission of WGTW from its PPM test program in April 2002, Arbitron has taken numerous steps to make sure that WGTW had a PPM encoder, that the PPM encoder was properly installed and operating at WGTW's television station, and that Arbitron was receiving properly coded information from WGTW. Snyder Decl. ¶¶ 4, 5, 6 & 10. The facts plead by Plaintiff in its Amended Complaint, do not support allegations of intent. To the contrary, Arbitron assisted WGTW in correcting the problem so that Arbitron could receive properly coded information and make sure that

WGTW's PPM test data could be reported in future releases of Arbitron's PPM test survey data.  Snyder Decl. ¶ 10, Exh. 2.

Finally, in order to sustain a claim for tortious interference with prospective contractual relations under Pennsylvania law, the Plaintiff must show actual damage to itself.  *Allstate*, 1998 U.S. Dist. LEXIS 1740 at *14.  Again, Plaintiff has not plead an actual injury to itself, rather Plaintiff offers only that "advertisers will hesitate to advertise with WGTW TV Channel 48."  Amended Complaint ¶ 38.  Since Plaintiff cannot identify a single contract that was allegedly interfered with or lost, it is not surprising that Plaintiff can show no actual injuries.

### F.    <u>PLAINTIFF'S CLAIM FOR NEGLIGENCE SHOULD BE DISMISSED</u>

Plaintiff's sixth cause of action for negligence should be dismissed because Plaintiff's Amended Complaint does not allege sufficient facts to support its allegations that Arbitron owed Plaintiff a duty to "correctly and accurately record plaintiff's viewers [sic] signals through the use of defendant's equipment." In addition, Plaintiff can not identify any monetary damages that have been purportedly caused by the alleged acts of negligence.

Pennsylvania's economic loss doctrine also precludes recovery on a negligence theory where a party, as Plaintiff here, allegedly suffers a purely economic injury that results from a business arrangement between the parties. The economic loss doctrine "prohibits recovery in tort for economic losses to which the party's entitlement 'flows only from a contract.'" *Constar, Inc. v. National Distribution Centers*, 101 F.Supp.2d 319, 322 (E.D.Pa. 2000) (quoting *Factory Mkt., Inc. v. Schuller Intern., Inc.*, 987 F.Supp. 387, 395 (E.D.Pa. 1997)). The rationale behind the economic loss doctrine is that "tort law is not intended to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." *Constar*, 101 F.Supp.2d at 322 (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3rd Cir. 1995)). Accordingly, the economic loss doctrine "permits recovery in negligence <u>only for damage to property or injury to person</u>." *State Farm Mut. Auto. Ins. Co. v. HHS Assocs., Inc.*, 1995 WL 739703, *3 (E.D.Pa. 1995) (<u>emphasis added</u>).

In the instant case, Plaintiff does not allege any injuries to persons or property, but rather a prospective economic injury based on the alleged failure of the encoder. Plaintiff alleges that a duty was created when "defendant requested permission to, and was permitted, to enter plaintiff's premises to and for the stated purpose of installing a [sic] 'encoder.'" Amended Complaint, ¶68. Thus Plaintiff alleges that a duty was created by this alleged business transaction.

Although Plaintiff attempts to disguise this as a negligence claim, Plaintiff's allegations are for an allegedly defective product. Pennsylvania courts have held that "where an allegedly defective product causes damage only to itself, and other consequential damages resulting from the loss of the product, the law of contract is the proper arena for redressing the harm because in such a case, the damages alleged relate specifically to product quality and value as to which the parties have had the opportunity to negotiate... When the product fails to conform and only economic losses result ... no additional recovery in negligence or strict liability is permitted. *Factory Market, Inc. v. Schuller Intern., Inc.*, 987 F.Supp. 387, 396 (E.D.Pa. 1997) (citations omitted). Thus, the economic loss doctrine bars Plaintiff's negligence claim.

If we assume solely for purposes of this motion to dismiss that Arbitron's employees installed the encoder at WGTW (which is not the case) and that the encoder was improperly installed, Plaintiff still has not alleged nor can it prove any resulting monetary damages.

### G. PLAINTIFF'S AMENDED COMPLAINT FAILS TO ALLEGE THAT ARBITRON MADE A PROMISE UPON WHICH PLAINTIFF RELIED TO SUPPORT PLAINTIFF'S PROMISSORY ESTOPPEL CLAIM

Plaintiff also gives lip-service to a claim for promissory estoppel, however, Plaintiff's Amended Complaint fails to allege the facts necessary to support this claims, i.e. a promise made by Arbitron upon which Brunson relied to its detriment.[6]

Promissory estoppel allows the court to enforce a party's promise that is unsupported by consideration where (1) the promisor makes a promise that he reasonably expects to induce action or forbearance by the

---

[6] The title of Plaintiff's seventh cause of action is misleading as it claims: "Breach of Contract - Promissory Estoppel." However, given that Plaintiff does not allege the existence of a contract or consideration and promissory estoppel is a subcategory of a breach of contract action, Arbitron will assume that Plaintiff's seventh cause of action is for promissory estoppel. However, to the extent that the Court may find this to be a cause of action for a breach of contract, this cause of action must be dismissed as Plaintiff fails to even allege the existence of a contract, much less consideration, or the terms of said contract or the how said contract was breached.

promisee, (2) the promise does induce action or forbearance by the promisee, (3) and injustice can only be avoided by enforcing the promise. *Carlson v. Arnot-Ogden Memorial Hosp.*, 918 F.2d 411, 416 (3rd Cir. 1990) (citing *Cardmone v. University of Pittsburgh*, 253 Pa.Super. 65, 74, 384 A.2d 1228, 1233 (1978).

Plaintiff's seventh cause of action reads, in its entirety:

> 79.    The allegations of paragraph 1 through 78 are alleged herein as if fully set forth.

> 80.    Upon gaining and being allowed entry to the Plaintiff's equipment, defendant assumed, accepted and is burdened with the duty to use a reasonable standard of care in regard to the protection of the equipment, and the proper utilization of the equipment for the purpose for which it was admitted, i.e., to provide an accurate and satisfactory transmission of plaintiff's viewership.

> 81.    Through its neglect and failure to observe the standard of care, and due to its reckless and malicious conduct, for the reasons aforesaid, defendant, and others which may become known to plaintiff through discovery and otherwise, defendant violated the duty of reasonable care, causing serious injury to the plaintiff, as aforesaid.

The above allegations do not support a claim for promissory estoppel as there is no allegation that Arbitron made any promise to Plaintiff that Arbitron expected Plaintiff to rely upon, that Plaintiff actually relied on such promise to its detriment, or that justice requires the enforcement of this undisclosed promise. In a similar case in this district,  the defendant claimed that the plaintiff, by providing employees to assist in the repair of damaged materials had promised to accept responsibility for its expenses and alleged injuries. *Constar, Inc. v. National Distribution Centers*, 101 F.Supp.2d 319, 323 (E.D.Pa. 2000).  The *Constar* Court disagreed, explaining that "[a]t best, this is, presumably, an attempt to assert an implied promise.  This argument fails.  An implied promise is insufficient to support a claim for promissory estoppel." *Constar*, 101 F. Supp.2d at 323-24.  As Plaintiff does not specifically allege a promise by Arbitron and an implied promise is insufficient as a matter of law, Plaintiff's claim for promissory estoppel must be dismissed.

## IV.    <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiff's Amended Complaint should be dismissed in its entirety for

failure to state claims upon which relief can be granted.

Dated: August 22, 2002

                                    Respectfully submitted,

                                    **SPECTOR GADON & ROSEN, P.C.**

                                    By: _____
                                            David B. Picker, Esq.
                                    1635 Market Street, 7th Floor
                                    Philadelphia, Pennsylvania 19103
                                    Telephone: (215) 241-8888
                                    Facsimile: (215) 241-8844

                                            and

                                    Alfred Fabricant, Esq.
                                    Marc Lieberstein, Esq.
                                    **OSTROLENK, FABER, GERB & SOFFEN, LLP**
                                    1180 Avenue of the Americas
                                    New York, New York 10036
                                    Telephone:  (212) 382-0700
                                    Facsimile:  (212) 382-0888

                                    Attorneys for Defendant

F:\27745\001\pleadings\DismissAmCplt_2Memo.wpd

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true copy of the foregoing **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. RULE 12(b)(6)**, and the **DECLARATION OF MARSHALL SNYDER** with exhibits, was served by first class mail, postage prepaid on this 22nd day of August, 2002 as follows:

Robert J. Sugarman, Esq.
Sugarman & Associates
11th Floor, Robert Morris Building
100 North 17th Street
Philadelphia, Pennsylvania 19103
Facsimile:  (215) 864-2501

Attorney for Plaintiff

_____

00577125.1

## TABLE OF CONTENTS

Page No.

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.   PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     A.   THE RULE 12(B)(6) STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     B.   PLAINTIFF'S SHERMAN ANTITRUST
          CLAIMS FAIL AS A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          1.   Plaintiff's Amended Complaint Fails to Allege Facts to
               Support an Antitrust Claim Under §1 of the Sherman Act . . . . . . . . . . . . . . . . . . . . . 8

               (a)   Plaintiff's Amended Complaint Fails
                     to Sufficiently Allege a Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

               (b)   Plaintiff Fails to Define and Allege a Plausible Market . . . . . . . . . . . . . . . . . . . . 12

               (c)   Plaintiff's Amended Complaint Fails To
                     Allege Any Cognizable Antitrust Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

               (d)   Plaintiff Fails to Allege Facts Necessary
                     to Support its Claim of a Group Boycott . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          2.   Plaintiff's Amended Complaint Fails to Allege Facts
               to Support a Claim Under §2 of the Sherman Act      . . . . . . . . . . . . . . . . . . . . . . . . . 18

               (a)   Plaintiff Failed to Plead Intent Sufficiently . . . . . . . . . . . . . . . . . . . . . . . . . . 19

               (b)   Plaintiff Fails to Sufficiently Plead Antitrust Injury . . . . . . . . . . . . . . . . . . . . . . 19

               (c)   Plaintiff's Allegations Belie Any Probability of Monopoly . . . . . . . . . . . . . . . . . . 20

     C.   PLAINTIFF'S LANHAM ACT CLAIM SHOULD BE DISMISSED
          BECAUSE THE ARBITRON PPM TEST DATA IS NOT A
          COMMERCIAL SERVICE NOR USED FOR COMMERCIAL PURPOSES . . . . . . . . . . 20

               (a)   The Amended Complaint Does Not Allege Arbitron
                     Made Any False Statements About Brunson or WGTW . . . . . . . . . . . . . . . . . . . . 21

**TABLE OF CONTENTS (continued)**

<u>Page No.</u>

(b)    Failure to Include WGTW in the PPM Test
<u>Does Not Constitute a Lanham Act Violation</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

(c)    The Alleged Deception Is Immaterial, Unlikely to Influence
<u>Purchasing Decisions and/or Result in Declining Sales to Plaintiff</u> . . . . . . . . . . . . . . 22

(d)    Arbitron's Conduct and Statements About Its PPM Test
<u>Data Were Not "Commercial Advertising or Promotion"</u> . . . . . . . . . . . . . . . . . . . . . . 22

D.    <u>PLAINTIFF'S DISPARAGEMENT CLAIM IS BASELESS</u> . . . . . . . . . . . . . . . . . . . . . . . 23

E.    PLAINTIFF'S AMENDED COMPLAINT FAILS
TO ALLEGE FACTS SUPPORTING ITS TORTIOUS
<u>INTERFERENCE CLAIM</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

F.    <u>PLAINTIFF'S CLAIM FOR NEGLIGENCE SHOULD BE DISMISSED</u> . . . . . . . . . . . . . 27

G.    PLAINTIFF'S AMENDED COMPLAINT FAILS TO ALLEGE THAT
ARBITRON MADE A PROMISE UPON WHICH PLAINTIFF RELIED
<u>TO SUPPORT PLAINTIFF'S PROMISSORY ESTOPPEL CLAIM</u>      . . . . . . . . . . . . . . 28

## <u>TABLE OF AUTHORITIES</u>

<u>Page No.</u>

<u>Cases</u>

*Allstate Transp. Co., Inc. v. Southeastern Pennsylvania Transp. Auth.*,
    1998 U.S. Dist. LEXIS 1740, *10 (E.D. Pa. 1998) (Appendix 8) . . . . . . . . . . . . . . . . . . . 24, 25, 26

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Cardmone v. University of Pittsburgh*,
    253 Pa.Super. 65, 74, 384 A.2d 1228 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Carlson v. Arnot-Ogden Memorial Hosp.*,
    918 F.2d 411 (3rd Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*City of Pittsburgh v. West Penn. Power Co.*,
    147 F.3d 256 (3d Cir 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Commonwealth of Pennsylvania v. PepsiCo, Inc.*,
    836 F.2d 173 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

*Constar, Inc. v. National Distribution Centers*,
    101 F.Supp.2d 319 (E.D.Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Deep South Pepsi-Cola Bottling Co. v. PepsiCo, Inc.*,
    1989-1 Trade Cas. (CCH) ¶ 68,560 1989 U.S. Dist. LEXIS 4639, 18-19 (S.D.N.Y. 1989)
    (Appendix 4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13-14

*Duquesne Light Co. v. Westinghouse Elec. Corp.*,
    66 F.3d 604 (3rd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*,
    637 F.2d 105 (3d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

*Eichorn v. AT&T Corp.*,
    248 F.3d 131 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8n. 12, 13, 14-15, 18

## TABLE OF AUTHORITIES (continued)

Page No.

*Factory Mkt., Inc. v. Schuller Intern., Inc.,*
987 F.Supp. 387 (E.D.Pa. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Garshman v. Universal Resources Holding, Inc.,*
824 F.2d 223 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 18

*Kelco Disposal, Inc. v. Browning-Ferris Industries, Inc.,*
845 F.2d 404 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Klor's, Inc. v. Broadway-Hale Stores,*
359 U.S. 207 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Larry V. Muko, Inc. v. S.W. Pa. Bldg. and Const. Trades Council,*
670 F.2d 421 (3d. Cir.), *cert. denied,* 459 U.S. 916 (1982) (citation omitted) . . . . . . . . . . . . . . . . 16

*Lights of America, Inc. v. Consumers Union of United States, Inc.,*
2002 Cal. App. Lexis 2000 (2002) (unpublished) (Appendix 6) . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Lynchval Systems, Inc. v. Chicago Consulting Actuaries, Inc.,*
1996 U.S. Dist. Lexis 14568, *21 (N.D. Ill. 1996) (Appendix 7) . . . . . . . . . . . . . . . . . . . . . . . . 24

*Mathews v. Lancaster General Hosp.,*
87 F.3d 624 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Mogul v. General Motors Corp.,*
391 F. Supp. 1305 (E.D. Pa. 1975), *aff'd,* 527 F.2d 645 (3d Cir. 1976) . . . . . . . . . . . . . . . . . . . . 12

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
465 U.S. 752 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Morse v. Lower Merion School Dist.,*
132 F.3d 902 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Northwest Wholesale Stationers v. Pacific Stationery & Printing Co.,*
472 U.S. 284 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

## TABLE OF AUTHORITIES

**Page No.**

*Oreck Corp. v. Whirlpool Corp.*,
    579 F.2d 126 (2d Cir.), *cert. denied*, 439 U.S. 946 S.Ct. 340, 58 L.Ed.2d 338 (1978) . . . . . . . . . 15

*Pastore v. Bell Telephone Co. of Pennsylvania*,
    24 F.3d 508 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*Queen City Pizza v. Domino's Pizza*,
    124 F.3d 430 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

*Re-Alco Industries, Inc. v. National Center for Health Education, Inc.*,
    812 F. Supp. 387 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 15

*Rossi v. Standard Roofing, Inc.*,
    156 F.3d 452 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Rototherm Corp. v. Penn Linen & Uniform Serv., Inc.*,
    1997 U.S. Dist. LEXIS 10057, *41 (E.D. Pa. 1997) (Appendix 3) . . . . . . . . . . . . . . . . . . . . . 8, 25

*Rutman Wine Co. v. E. & J. Gallo Winery*,
    829 F.2d 729 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*State Farm Mut. Auto. Ins. Co. v. HHS Assocs., Inc.*,
    1995 WL 739703, *3 (E.D.Pa. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Synygy, Inc. v. Scott-Levin, Inc.*,
    51 F.Supp.2d 570 (E.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-23

*The Arbitron Company v. Tropicana Product Sales, Inc.*,
    1993 U.S. Dist. Lexis 5587, *33-34 (S.D.N.Y. 1993) (Appendix 5) . . . . . . . . . . . . . . . . . . . . . 19

*Tunis Bros. Co., Inc. v. Ford Motor Co.*,
    952 F.2d 715 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

*U.S. Healthcare, Inc. v. Blue Cross Greater Phila.*,
    898 F.2d 914 (3d. Cir.), *cert. denied*, 498 U.S. 816 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
    986 F.2d 589 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## TABLE OF AUTHORITIES (continued)

**Page No.**

*Unisource Worldwide, Inc. v. Heller*,
   1999 U.S. Dist. LEXIS 8530, *8 (E.D. Pa. 1999) (Appendix 2) . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

*United States v. E.I. Du Pont de Nemours & Co.*,
   351 U.S. 377 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13


**Federal Statutes**

15 U.S.C. § 1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-18

15 U.S.C. § 2  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-20


**Federal Rules of Civil Procedure**

Fed. R. Civ. Proc. Rule 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2n.

Fed. R. Civ. Proc. Rule 8(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fed. R. Civ. Proc. Rule 9(g)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Fed. R. Civ. Proc. Rule 12 (b)(6)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

**Secondary Sources**

Black's Law Dictionary (6th Ed. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17