IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BRUNSON COMMUNICATIONS, INC.,** | : |
| Plaintiff | : |
| | : NO. 02-CV-3223 |
| v. | : |
| **ARBITRON, INC.,** | : |
| Defendant | : |

### PLAINTIFF S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

### COUNTER-STATEMENT OF FACTS

Defendant s Motion and Memorandum set up numerous critical material facts, which, pursuant to Rule 12(b)(6), cannot be considered in a Motion to Dismiss, and therefore are entirely inappropriate.

Defendant s attempt to invite the Court to enter summary judgment at this stage (Defendant s Brief at 2, footnote 1) is entirely without merit, and is clearly premature, inappropriate, and in any event unsubstantiated in the face of the material disputed facts, and the lack of any discovery. The facts relied upon by Arbitron are nonfacts.

The most material statements of fact alleged by Defendant, without limitation to others, include the following:

1. Arbitron ignores and therefore asks the Court to ignore allegations in the Amended Complaint (hereinafter Complaint ) or inferable from the Complaint. It then asks the Court to decide the Motion as if there were no such facts alleged.

Arbitron asks the Court to ignore its relationship with Nielson. While vociferously and repetitively denying that Nielson controls Arbitron or vice versa, or the product (e.g.,

Defendant's Brief at 10), Arbitron nowhere denies that it has a "joint venture" (Complaint, ¶ 11), or other relationship with Nielson by which they are combined to form a monopoly on any and all viewership measurement in the Philadelphia market. Moreover, in submitting a declaration as part of the Motion, Arbitron, in referring to and stating that Nielson does not control Arbitron or vice versa, does not <u>deny</u> the allegations of the Complaint that Nielson has a financial relationship and is involved in the product. However, Arbitron then asks this Court to decide the Motion as if it had no relationship with Nielson.

Plaintiff requires discovery in order to ascertain the exact nature of the relationship, but for purposes of the Complaint, clearly it is sufficient that the Complaint alleges (and if relevant, Arbitron does not deny) that there is a relationship relating to the product at issue, the Portable People Meter (the "PPM").

Moreover, Arbitron's implication that Plaintiff's allegations are fiction is disingenuous. In fact, Arbitron specifically addressed this relationship in its Form 10-K Annual Report, filed with the Securities and Exchange Commission on March 12, 2002:

> On May 31, 2000, Arbitron entered into an agreement with Nielsen Media Research, Inc., a provider of United States audience measurement services, under which Arbitron granted Nielsen Media Research *an option to join Arbitron in the potential commercial deployment of the Portable People Meter* on a nationwide basis in the United States. *In the event Nielsen Media Research exercises the option, the parties would* [form a joint] *venture to commercially deploy and operate* [the service] *utilizing the Portable People Meter for the* [collection of] *listening and viewing information used to produce radio and television audience ratings . . .* [The ratings would be] *generated by the jointly-deployed Portable People Meter.* [Neither party would be precluded from] *creating their own media measurement services, and each company would be licensed to use the [data generated] to create measurement services for particular media. The division of revenues from Internet data* remains to be negotiated by [the parties.]

2

> parties.parties. The costs, expenses and capital expenditures for operating
> aa joint venture would be shared by Arbitron and Nielsen a joint venture would be shared
> ResearchResearch baResearch based Research based on the degree to which use of the Portable
> MeterMeter displaces costs at each comMeter displaces costs at each compaMeter displaces c
> royaltyroyalty from Nielsen Mroyalty from Nielsen Media Researoyalty from Nielsen Media
> MediaMedia Research exercMedia Research exerciMedia Research exercises its option to form t
> UniUnitedUnited States, Nielsen Media Research also has the option to
> purchasepurchase from Arbitron, at fair purchase from Arbitron, at fair valuepurchase fr
> interestinterest in all audience interest in all audience meinterest in all audience measurement b
> ofof the commercial deployment of the Portable People Meter and
> thethe technology contained in the Porthe technology contained in the Portable Pthe technolo
> the United States.

Exhibit A at 11-12 (emphasis added). While, as stated, Plaintiff requires discovery in order to further delineate the nature of Arbitron's actual relationship with Neilson, this single quotation is clearly sufficient to require denial of summary judgment, let alone a Motion to Dismiss.

Additionally, although Plaintiff does not rely on it at this stage except to illustrate the point, the License Agreement attached to Defendant's Motion refers to a third party licensor of the "application." Although the "application" is not defined, nor is the third party provider, it could be that the third party provider is Nielson. Certainly, at this stage, it is impossible, judicially or in any other way, to conclude that Nielson is not involved, as alleged in the Complaint.

2. Arbitron loudly trumpets the "Agreement" between it and its distributees. However, by merely attaching a blank copy of this Agreement to its Motion, Arbitron asks the Court to simply accept that it was imposed on all the parties, and further asks the Court to accept that the parties were all intended to abide by the Agreement, and that the Agreement was in good faith, and not an instrument of a legal plan. Certainly, this unsigned Agreement cannot be accepted by

the Court for the representation that all distributees (recipients) of the surveys have executed it, much less were intended to abide by it.

Moreover, Arbitron implicitly asks the Court to ignore the explicit statement in the Agreement that the distributees may use the survey for presentations to clients. Arbitron apparently asks this Court to indulge the absurd notion that the recipients would be making presentations to clients other than for purposes of impressing the clients with the results of the survey, i.e., utilizing the survey results.

It is hard to imagine a scenario in which a competitor of WGTW (Channel 48, Plaintiff) would not show the survey results on the screen to the client and if confronted with WGTW, not state that WGTW did not even make the survey.

3. Arbitron asks the Court to find that the failure to include WGTW was not disparagement (Defendant s Brief at 23), but completely ignores the actual facts alleged, i.e. the Complaint s specific allegation of the disparaging statements implicit in the vice president of Arbitron s presentation to the Pennsylvania Association of Broadcasters on May 20, 2002, wherein the vice president stated that the survey was fair, accurate, and complete, despite the exclusion of WGTW. (Complaint, ¶ 32). While it is not surprising that, for purposes of this case, Arbitron would want to forget its own misstatements, it is somewhat disingenuous that a presentation would be made to the Court characterizing that no disparaging statements were made, while the disparaging statement itself is ignored.

4. Arbitron falsely asserts that no market was described, and that no monopoly was described, and point to the Nielson survey and the differing markets. Defendant s Brief, at 2. However, Arbitron s argument ignores the definition of multiple markets, and multiple product

markets. This may be regarded as argument, rather than factual dispute, but the Court cannot address the legal implications of the facts without an accurate description of the facts in the Brief.

In addition to these omissions, Arbitron omits a key question: why does it contend it did not include WGTW? Without articulation and development in discovery of this issue, clearly motive and hostility cannot be excluded. If it were innocent, it would say so.

There are other, subtler misstatements of the facts alleged in the Complaint, which will be addressed in the response to the individual arguments. In regards to the Motion to Dismiss, the facts as alleged are assumed to be true. In regards to summary judgment, the affidavit of Dorothy Brunson is attached as Exhibit C.

## **ARGUMENT**

I. THE PLAINTIFF IS ENTITLED TO RELIEF UNDER SECTION 1 OF THE SHERMAN ACT.

    A. A PER SE CLAIM IS ADEQUATELY STATED.

As Defendants acknowledge in their Brief (page 8, footnote 3), it is a per se violation of the antitrust law to engage in a group boycott. The Complaint alleges that the Defendant Arbitron accommodated the interests of Plaintiff's competitors (horizontal competitors) to diminish competitiveness in the market by excluding Plaintiff from the survey. The fact that Arbitron had its own interest for accommodating this horizontal desire is in no way relevant to the fact that it was a group boycott which Arbitron accommodated. Rossi v. Standard Roofing, Inc., 156 F.3d 452, 462-63 (3rd Cir. 1998).

The Complaint sufficiently alleges a conspiracy to engage in a group boycott. Arbitron asks this Court to find that it did not have an antitrust or other illegal reason for excluding

5

Plaintiff's television station from the survey. In defining itself as a noncompetitor of Plaintiff (which Plaintiff agrees with; Plaintiff has never defined Arbitron as a competitor of Plaintiff), Arbitron creates an inference that Arbitron itself had no reason to discriminate against or exclude Plaintiff. Plaintiff agrees; however, that fact gives rise to the inference that Arbitron acted because of the wishes of Plaintiff's competitors, i.e., the larger network type stations. In failing to provide this Court with any reason for excluding Plaintiff, Arbitron suggests its own improper motives.

In these circumstances, the law is clear: a vertical party not a competitor (Plaintiff has never contended that Arbitron is a competitor of Plaintiff) may not accommodate a horizontal group boycott. Rossi, supra, at 462. The fact that Plaintiff is unable to describe the details of this interaction at this time it is not surprising. As the Courts have stated literally hundreds of times with respect to antitrust behavior:

> WeWe We musWe must be wary about dismissing an antitrust claim before the discoverydiscovery perioddiscovery period has cdiscovery period has commenced, since the pr[oof is in the] hands of the alleged conspirators.

Rototherm Corp. v. Penn Linen & Uniform Serv., Inc., 1997 U.S. Dist. LEXIS 10057 *40 (E.D. Pa. 1997) citing Hosp. Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 746 (1976) quoting Poller v. Columbia Broad., 368 U.S. 464, 473 (1962). In such cases, the parties do not signal or write their intentions. Rather, they must be obtained in discovery or inferred from circumstances. Whether this group boycott qualifies as predominately anti-competitive is not yet at issue, pending discovery. See e.g. Big Apple BMW v. BMW, 974 F.2d 138 (3d. Cir. 1992); Rossi, supra, at 464.

    B.    <u>PLAINTIFF ALLEGES A RULE OF REASON CLAIM UNDER SECTION 1.</u>

1.      THE COMPLAINT ALLEGES A RELEVANT MARKET.

The market that is alleged is the viewer sales advertising market for television advertising in the Philadelphia market. (Complaint, ¶ 12). While Defendants close their eyes to this definition, they do not contest that it is clearly sufficient to meet antitrust standards.

The Plaintiffs, in the alternative, allege a product market because of the unique characteristics of the PPM survey. The PPM survey is to the Nielson survey as electronic marketing machines are to old fashioned cash registers: there will be no old fashioned Nielson survey once the PPM survey is established. Neilson s anticipatory option clearly suggests such a likelihood. The details of the relationship may remain to be determined, however, Nielson has not, at least according to Arbitron, made contention that the Nielson survey is competitive with Arbitron s new PPM survey. This supports the contention of the unique product market, satisfying the requirements of United States v. E.I. Du Pont Nemours & Co., 351 U.S. 377 (1956) and distinguishing this case from Deep South Pepsi-Cola Bottling Co. v. PepsiCo, Inc., 1989-1 Trade Cas. (CCH) P68,560 (S.D.N.Y. 1989) (Coke not a different unique product from Pepsi, etc.). Clearly, if Arbitron has the only survey, as it contends and as the market believes (Complaint, ¶ 10), it will satisfy the requirement for a product market. In any event, the Complaint is not inadequate, because it asserts two markets, the market for measurement systems in the television viewing market in the Philadelphia area, and the PPM product market for the same function in the same geographical area.

Arbitron has failed to provide any evidence, and indeed, read carefully, has not in reality alleged that the Nielson survey is in the same league with its PPM survey. Such a statement would contradict its own description of its product. (See PPM product description on Arbitron s

7

web page, attached hereto as Exhibit B). With its own literature, Arbitron has described its PPM product as unique.

In these circumstances, the Complaint adequately alleges the product market and geographical market.

### 2. THE COMPLAINT ALLEGES AN ADVERSE EFFECT ON COMPETITION.

An antitrust injury is one that reduces competition, and obviously, also injures a competitor. There is no mutual exclusivity. If there were mutual exclusivity, i.e., if injury to a competitor was a disqualifying factor, most antitrust cases would never be brought. E.g. Rossi, supra; BMW, supra (vertical noncompetitor liable). The statute, in fact, specifically authorizes any person injured, including a competitor, to bring suit. 15 U.S.C. § 11(1). Defendant s contention that because Plaintiff alleges injury to itself, there can be no antitrust claim, is therefore frivolous, if not absurd.

The case law requiring  antitrust injury  must thus be understood as requiring that there have been antitrust behavior. Plaintiff has no quarrel with this proposition. The Complaint clearly meets this test by describing a selection process by Arbitron facilitating the monopoly of the monopolistic position of the large networks and cable systems, and benefiting itself by accommodating their monopolistic objectives. (Complaint, ¶¶ 17, 18).

## II.   PLAINTIFF HAS ADEQUATELY STATED A CLAIM UNDER SECTION 2 OF THE SHERMAN ACT.

### A. PLAINTIFF SUFFICIENTLY ALLEGES THE EXISTENCE OF A MONOPOLY.

As shown in the attached exhibits, there is clear and uncontradicted (let alone conclusive) evidence showing that Defendant Arbitron and Nielson are acting together in regard to the PPM

in the Philadelphia market. Nor could there be any doubt that alone or together, they constitute a monopoly as to the provision of viewer measuring. Moreover, since advertising is purchased according to viewer measurements, there can be no doubt that they exercise virtually total control over the sale of advertising market, and thus the television station market. Their product and services are clearly an indispensable, vital component of the sale of advertising time, and therefore the operation of stations.

      B.      PLAINTIFF SUFFICIENTLY ALLEGES ANTITRUST INJURY.

As alleged in the Complaint, finally, it is clear that the monopolists have used their monopoly power to cause a negative effect on Plaintiff, by denying Plaintiff inclusion in reporting of viewer measurements, and therefore its ability to sell advertising, and therefore its ability to operate.

Defendant s behavior is clearly anticompetitive, just as any monopolist s behavior who denies access or reasonable terms to a market participant. There is no requirement that the monopolist and the injured participant be competitors. This is simply a misstatement of the law. From the first days of antitrust regulation, it has been clear that monopolists may not choose from a group of customers, so as to exclude customers from the competitor market, without justification. While an exception is made under <u>Schwinn</u> as relates to product monopolies, the viewer measurement is not a product monopoly; it is a market monopoly (an exception to the exception has been recognized where the product monopoly is a market monopoly, see <u>Eastman Kodak Co. of New York v. Southern Photo Materials Co.</u>, 273 U.S. 359 (1927)), but in any event, there are two products in this monopoly, Nielson and PPM, and Defendant Arbitron, through its relationship with Nielson, controlled both.)

9

Moreover, to the extent that an antitrust injury is required, it is an antitrust injury where a market participant is deprived of the ability to compete fairly by a monopolist exercising its monopoly power. See Dupont, 351 U.S. 377 (1956). In no case cited by Arbitron has a monopolist been excused where exercising its monopoly, for lack of antitrust injury, whatever that term means.

It is crucial to note that to the extent that the Court wishes to proceed to consider summary judgment (which Plaintiff submits is clearly premature), it is crucial in this regard, that Arbitron has advanced no reason why Plaintiff was excluded from the survey. There is no good business nonmonopolistic explanation; clearly Arbitron was aware of Plaintiff. Nor does the fact that others were excluded justify the exclusion of Plaintiff; there is no exception to antitrust violations based on the number of injured competitors. A hint of Arbitron s illegal motivation may be found in its vice president s comments to the Pennsylvania Association of Broadcasters as it was releasing its first survey: stating that the PPM survey represented an accurate description of the market place. Discovery will provide more information on the communications between Arbitron, Nielson, and the Plaintiff s competitors. Pending such discovery, however, there is clearly no basis for concluding that Defendant s actions were innocent. Therefore, there is no basis for dismissing any antitrust aspect of this case.

III.    THE PLAINTIFF HAS STATED A CLAIM UNDER THE LANHAM ACT.

To establish a Lanham Act claim for false representation, a Plaintiff must show that:

> (1)(1) the Defendant has made false(1) the Defendant has made false o(1) the Defendant has mad oror her s or anoor her s or another s por her s or another s products or services; (2) t deceptiondeception or at least a tendency deception or at least a tendency to deception or at lea thethe intethe intended audthe intended audience; (3) the deception is material in that it is likelylikely to influence purchasilikely to influence purchasing likely to influence purchasin

10

goodsgoods traveled in interstate commgoods traveled in interstate commercgoods travele likelihlikelihoodlikelihood of injlikelihood of injury to the Plaintiff in terms of declining sales loss of good will.

U.S. Healthcare, Inc. v. Blue Cross Greater Phila., 898 F.2d 914, 922-923 (3d. Cir.), cert. denied, 498 U.S. 816 (1990).

  B. ARBITRON MADE FALSE STATEMENTS AS TO ITS PRODUCT AND SERVICES.

As alleged in the Complaint, during the fourth quarter 2001, Arbitron conducted a test and announced that the launch of the test would be an open and equally competitive process that would accurately and creditably measure the performance of the entire market. Complaint, ¶ 15. Furthermore, appearing at a meeting of the Pennsylvania Association of Broadcasters on May 20th, 2002, after having acknowledged to Plaintiff that the survey was improper in having excluded WGTW-TV Channel 48, Kevin Smith, Senior Vice President of Arbitron, represented that the survey was fair, accurate and complete. Complaint, ¶ 32. Arbitron s survey was not, in fact, a fair and accurate measurement of the performance of the entire market. Arbitron omitted the WGTW-TV Channel 48 Brunson Comm. Inc. signal in the survey data even though it has close to 30% cumulative audience reach. In short, knowing of its inaccuracy and competitive unfairness and the exclusion of WGTW-TV 48, Defendant publicized to the industry and the public that the survey was accurate, creditable and fair. Complaint, ¶ 31.

Arbitron s statements are clearly actionable under § 43(a) of the Lanham Act. As stated by the Third Circuit Court in U.S. Healthcare:

> .. . . a statement is actiona. . . a statement is actionable under. . . a statement is actionable misleadmisleading,misleading, pmisleading, partially incorrect, or untrue as a result of failur disclose a material fact.

898 F.2d at 921 citing 2 J. McCarthy, *Trademarks and Unfair Competition* § 27:7B (2d ed. 1984). Arbitron prominently concealed from the public that WGTW-TV Channel 48 had been

11

inappropriately excluded from the survey. Rather, Arbitron s representations to the public that its PPM test reflected the entire market constituted blatantly false and misleading statements, not to be excused by a mere footnote, as Arbitron would have the Court believe. The footnote, in fact, only perpetuates Arbitron s misrepresentation: by only disclosing the fact of the omission in the footnote, Arbitron did not correct the false impression that the omission of WGTW-TV Channel 48 was so unimportant, the potential results so inconsequential, that the omission did not affect the accuracy of the survey.

   C.   ARBITRON SARBITRON S MISREPRESENARBITRON S MISREPRESENTAARBITRON
        INJURY TO THE PLAINTIFF.

By failing to include WGTW-TV Channel 48 viewership in its survey, Arbitron guaranteed that no usage of WGTW-TV Channel 48 viewership would be reported in the survey, impairing WGTW s ability to be competitive and operate on an equal basis with other stations in the market. As known to Arbitron, because of the intense competition in the Philadelphia market for the declining television station revenue, inclusion in the survey was more critical for an independent station like WGTW, because WGTW s competitors would be projected as the only  real  on-air commercial service in the market, and WGTW-TV Channel 48, due to its unusual ownership and independence, would be unable to convince customers and others that WGTW was worth considering because of lack of critical data to support its representations, and would be unable to prove its viability. All of these results, known to Arbitron, will cause serious economic losses to a profitable and growing station.

In its brief, Arbitron repeatedly claims that the PPM data is not to be used to buy, plan or sell media, and due to these limitations, Plaintiff cannot support even a likelihood of injury (i.e. if the survey is not to be relied on by the recipient competing stations, advertisers and agencies, then it cannot be any sort of influencing factor in their marketing decisions). E.g., Defendant s Brief, at 22. This is a fact, not to be considered on Motion to Dismiss, but, in its Form 10-K Annual Report (Exhibit A), Arbitron reports an entirely different story:

12

> Arbitron expects that its Portable People Meter will provide a reliable, accepted local audience measurement service for the cable industry. Arbitron also envisions that the Portable People Meter data *could be linked to consumer/client databases* enhance local/national spot sales efforts; value cable networks, regional sports and origination channels; provide valuable insights and demographics of cable networks; deliver targeted schedul recommendations for cross-channel promotional campaigns; maximize the promotional and advertising sales power of l provide in-depth information on the electron subscribers for media planning.

Exhibit A, at 11-12 (emphasis added).  Arbitron makes no acknowledgement of such plans in its brief, and also ignores the explicit statement in its attached Agreement that the distributees may use the survey for presentations to clients.  Arbitron instead apparently asks this Court to indulge the absurd notion that the recipients would be viewing the survey, even making presentations to its clients with the survey, other than for purposes of actually utilizing the survey results.

Defendant contends that the Complaint lacks allegations concerning actual damages. Indeed, due to the nature of the agreements between the Defendant and the sellers and buyers, Plaintiff cannot know the full severity of the damages incurred.  Sellers and buyers who have used the survey to influence advertising decisions simply cannot admit the survey's influence, without opening themselves up to potential liability.  Moreover, damages to the station can only be quantified by hindsight.  However, the damage caused by excluding a major broadcast station in a market that is so numbers-intensive is irrefutable.  The Philadelphia market is merciless and highly competitive.  Complaint, ¶ 26.  In addition, combination alliances such as Viacom, Disney and NBC make the challenge of generating market share difficult as is.  By compounding

13

this already intense situation so as to imply that WGTW has no ratings, Arbitron has unjustifiably relegated WGTW to second-rate status. Complaint, ¶¶ 20, 28, 38. Hence, Plaintiff has stated the nature of its injuries as best it can under these circumstances. The Lanham Act does not require a plaintiff to wait. L Aiglon Apparel Co. v. Lana Lobell, Inc., 214 F.2d 649, 651 (3rd Cir. 1954) (persons likely to be injured entitled to protection).

### C. ARBITRON S CONDUCT AND STATEMENTS QUALIFY AS COMMERCIAL ADVERTISING OR PROMOTION.

The Lanham Act applies only to claims of false representations in commercial advertising or promotion. Commercial advertising or promotion, for purposes of the Lanham Act, consists of:

> (1) commercial speech; (2) by a Defendant competition with the Plaintiff; (3) designed to to buy Defendant s commercial prod disseminated to the relevant purchasing public to c advertising or promotion within the industry.

Synergy, Inc. v. Scott-Levin, Inc., 51 F.Supp. 2d 570, 576 (E.D. Pa. 1999). Defendant s Brief focuses on the second prong of the above test, insisting that Arbitron is not a direct competitor of the Plaintiff. However, the Third Circuit has not limited standing under the Lanham Act to only direct competitors, but instead has followed a congressional intent to give a broad class of suitors *injured or likely to be injured* by such wrong the right to relief in the federal courts. L Aiglon, 214 F.2d at 651 (emphasis added). Here, as demonstrated supra, the Plaintiff was injured and is likely to be injured by Arbitron s false statements and thus is entitled to relief under the Lanham Act.

14

Additionally, although Arbitron may not itself be a direct competitor of the Plaintiff, as demonstrated supra, Arbitron is involved with entities that certainly are in direct competition with the Plaintiff. By serving the interests of the large networks and cable systems and excluding Plaintiff from the survey, Arbitron hoped to bolster its rapport and ensure the future sales of PPM test data with these large companies.

Because Plaintiff makes a prima facie showing that the Arbitron misrepresentations took place as part of commercial advertising or promotion, Plaintiff's claims under the Lanham Act should not be dismissed.

IV. <u>PLAINTIFF STATED A CLAIM FOR DISPARAGEMENT.</u>

A claim for trade disparagement requires: 1) a disparaging statement of fact that is untrue or a disparaging statement of opinion that is incorrect; 2) that no privilege attaches to the statement; and 3) that the Plaintiff suffered a direct pecuniary loss as a result of the disparagement. <u>Synergy</u>, 51 F.Supp. at 578-9. Defendant argues that it did not make a single disparaging statement about Brunson or WGTW. This is simply not true; Arbitron has unfairly and falsely disparaged Plaintiff's product, i.e. by misrepresenting its listening audience and importance in the market.

Defendant completely ignores the Complaint's specific delineation of the disparaging statements implicit in the presentation by Arbitron Senior Vice President, Kevin Smith, to the Pennsylvania Association of Broadcasters on May 20, 2002, wherein the Smith knowingly and intentionally represented that the survey was "fair, accurate and complete." Complaint ¶ 32. WGTW-TV is a multi-million-dollar revenue generating television station with close to 900,000

15

viewing households. With the omission of such a substantial market participant from its survey, Arbitron's final published data was seriously faulty. Yet, by assuring recipients that the survey was indeed fair, accurate and complete, Smith grossly misrepresented the accumulated data. As noted above, Smith's statements conveyed the false impression that the omission of WGTW-TV Channel 48 was so unimportant, the potential results so inconsequential, that the omission did not affect the accuracy of the survey.

Defendant next contends that the Complaint lacks allegations concerning special damages. As discussed above, due to the nature of the agreements between the Defendant and sellers and buyers, Plaintiff cannot know the full severity of the damages incurred. Sellers and buyers who have used the survey to influence advertising decisions simply cannot admit the survey's influence, without opening themselves up to potential liability. Moreover, damages to the station can only be quantified by hindsight. However, the damage caused by excluding a major broadcast station in a market that is so numbers-intensive is irrefutable. The Philadelphia market is merciless and highly competitive. Complaint, ¶ 26. In addition, combination alliances such as Viacom, Disney and NBC make the challenge of generating market share difficult as is. By compounding this already intense situation so as to imply that WGTW has no ratings, Arbitron has unjustifiably relegated WGTW to second-rate status. Complaint, ¶¶ 20, 28, 38. Hence, as discussed earlier, Plaintiff has stated the nature of its injuries as best it can under these circumstances.

V.  <u>PLAINTIFF STATES A VALID CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS.</u>

To state a valid toriuous interference claim, a Plaintiff must allege: (1) a prospective contractual relationship between the Plaintiff and a third party; (2) purpose or intent to harm the

16

Plaintiff by preventing the relationship from accruing; (3) the absence of privilege or justification on the part of the Plaintiff; and (4) the occurrence of actual harm or damage to the Plaintiff as a result of the Defendant s conduct. <u>Allstate Transp Co., Inc. v. Southeastern Pennsylvania Transp. Auth.</u>, 1998 U.S. Dist. LEXIS 1740 (E.D. Pa. 1998).  The Complaint alleges that Plaintiff was denied the opportunity to sell various customers advertising, due to having been excluded from the universe of surveyed viewership as represented by Defendant.  Complaint, ¶¶ 37-38.  Prior to the May 19 release, Defendant well knew that Plaintiff was being excluded, and yet intentionally proceeded to describe the survey as complete, thereby  intentionally  causing Plaintiff to lose prospective business.

Defendant contends that Plaintiff cannot identify any customer that was lost.  As discussed above, due to the nature of the agreements between the Defendant and the survey recipients, Plaintiff cannot specifically identify any customer it has lost.  Media sellers and buyers who have used the survey to influence advertising decisions simply cannot admit the survey s influence, without opening themselves up to potential liability.  However, it is undeniable that Arbitron has impaired WGTW s ability to be competitive and operate on an equal basis with other stations on the market.  Consequently, Defendant has improperly interfered with Plaintiff s likely and prospective contractual relations.

VI.     <u>PLAINTIFF STATES A CLAIM FOR NEGLIGENCE.</u>

Plaintiff s Complaint sufficiently alleges that Arbitron owed Plaintiff a duty to correctly and accurately record Plaintiff s viewership through the use of Arbitron s equipment.  In its brief, Defendant cites to the economic loss doctrine as a reason for dismissal, neglecting to acknowledge the numerous exceptions to this general rule.  One such group of exceptions is based on the special relationship between the tortfeasor and the business deprived of economic expectations.  A special relationship is one involving confidentiality, the repose of special trust or fiduciary responsibilities.  <u>Valley Forge Convention & Visitors Bureau v. Visitor s Services, Inc.</u>, 28 F.Supp.2d 947 (E.D. Pa. 1998).  It generally involves a situation where, due to the respective strength and weakness of the parties, one has the power to take advantage over the other.  <u>Estate of Evasew</u>, 526 Pa. 584 (1990).

Here, Defendant entered Plaintiff s premises for the purpose of installing an  encoder, thereby directly and knowingly assuming an obligation to correctly and accurately install and monitor the equipment and to correctly and accurately record Plaintiff s viewer signals through the use of Defendant s equipment.  Defendant was fully aware that Plaintiff needed to rely upon Defendant to inform it of any defect, malfunction, or other interference with the transmission of adequate and timely information, and/or any defect in the equipment or its installation.  Notably, Defendant Arbitron was a possessor, user, and beneficiary on Plaintiff s land, property, and information.

Arbitron is a large corporation that generates information specifically designed to provide advertisers with information with which choose clients.  As such, Arbitron is certainly in a position to take advantage of small, independent television stations.  Additionally, as discussed above, Arbitron was aware of its special relationship with WGTW, most notably with how instrumental inclusion in its survey would be in order for the small, independent station to remain a competitive force in the Philadelphia market.  Yet, even with the knowledge of its

17

potential impact on WGTW, Arbitron repeatedly neglected to inform the Plaintiff in a timely fashion of defects in the equipment, installation, and resulting signal transmission. Complaint, ¶ 73. As a result, Plaintiff was excluded from the survey, incurring damages to its reputation and loss of advertising sponsorship. Thus, because Arbitron was more concerned with serving the large networks and cable stations, it clearly breached its duty of care to the Plaintiff.

VII.     PLAINTIFF STATES A VALID CLAIM FOR PROMISSORY ESTOPPEL.

A cause of action under promissory estoppel arises when a party relies to his detriment on the intentional or negligent representations of another party, so that in order to prevent the relying party from being harmed, the inducing party is estopped from showing that the facts are not as the relying party understood them to be. Constar, Inc. v. National Distribution Centers, 101 F.Supp.2d 319 (E.D. Pa. 2000). Promissory estoppel is applied to enforce a promise where there is no binding contract. Carlson v. Arnot-Ogden Mem l. Hosp., 918 F.2d 411 (3d. Cir. 1990). Here, despite the absence of an express contract, Plaintiff clearly relied on the representations of the Defendant.

Upon gaining entry to the Plaintiff s equipment, Defendant assumed, accepted and was burdened with the duty to use a reasonable standard of care in regard to the protection and proper utilization of the equipment for the purpose for which it was admitted. Complaint, ¶ 80. This duty of care, combined with various representations made to the Plaintiff regarding the equipment itself, caused Plaintiff to forbear from immediate action and unknowingly continue operations with malfunctioning equipment. As a result of its misplaced reliance on Defendant, Plaintiff was excluded from Arbitron s test data, incurring the damages to its reputation and loss of advertising sponsorship discussed above. Therefore, because Plaintiff has adequately alleged a claim for promissory estoppel, the claim should not be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant s Motion to Dismiss in its entirety, and likewise deny the Motion for Summary Judgment. In the alternative, if the pleading is inadequate, Plaintiff requests leave to amend.

Respectfully submitted,

_____
ROBERT J. SUGARMAN
Counsel for Plaintiff

SUGARMAN & ASSOCIATES
 11th Floor, Robert Morris Building
100 North 17th Street
Philadelphia, PA 19103
(215) 864-2500

18

September 16, 2002

19

Case 2:02-cv-03223-MMB    Document 19-3    Filed 09/16/2002    Page 19 of 19