IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

_____x
                                    :

BRUNSON COMMUNICATIONS, INC.      :
                                    :

             Plaintiff,        :

                                    : Civil Action No.:  02 CV. 3223

             v.                :

                                    :

ARBITRON, INC.                      :

                                    :

            Defendant.       :
_____x

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S
AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. RULE 12(b)(6)**

David B. Picker, Esq.
**SPECTOR GADON & ROSEN, P.C.**
1635 Market Street, 7th Floor
Philadelphia, Pennsylvania 19103
Telephone: (215) 241-8888
Facsimile: (215) 241-8844

and

Alfred Fabricant, Esq.
Marc Lieberstein, Esq.
**OSTROLENK, FABER, GERB & SOFFEN, LLP**
1180 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 382-0700
Facsimile:  (212) 382-0888

Attorneys for Defendant

Date:  September 30, 2002

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.     PLAINTIFF'S SHERMAN ACT SECTION 1
           CLAIM FAILS AS A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

           1.     Plaintiff Fails to Allege a "Group Boycott" . . . . . . . . . . . . . . . . . . . . . . . . 3

           2.     Plaintiff Fails to Define and Allege a Plausible Market . . . . . . . . . . . . . . . . . . . . 5

           3.     Plaintiff's Amended Complaint Fails To
                Allege Any Cognizable Antitrust Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.     PLAINTIFF'S SHERMAN ACT SECTION 2
           CLAIM ALSO FAILS AS A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.     PLAINTIFF'S LANHAM ACT CLAIM FAILS AS A MATTER OF LAW . . . . . . . . . 10

      D.     PLAINTIFF'S DISPARAGEMENT
           CLAIM FAILS AS A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      E.     PLAINTIFF'S TORTIOUS INTERFERENCE WITH
           PROSPECTIVE CONTRACTUAL RELATIONS CLAIM FAILS
           AS A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      F.     PLAINTIFF'S NEGLIGENCE CLAIM FAILS AS
           A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      G.     PLAINTIFF'S PROMISSORY ESTOPPEL
           CLAIM FAILS AS A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## TABLE OF AUTHORITIES

FEDERAL CASES

*Synygy, Inc. v. Scott-Levin* 51 F. Supp. 2d 570 (E.D. Pa. 1999) . . . . . . . . . . . . . . . . -10, -11-, -12-, -13-

*United States v. E.I. Du Pont de Nemours & Co,* 351 U.S. 377 (1956) . . . . . . . . . . . . . . . 6-7,-12-, -14-

*Allstate Transp. Co., Inc. v. Southeastern Pennsylvania Transp. Auth.,*
1998 U.S. Dist. LEXIS 1740, *10 (E.D. Pa. 1998) (Appendix 8) . . . . . . . . . . . . . . . . . . . . . . . . -13-

*Brunswick, Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . -8-

*Carlson v. Arnot-Ogden Memorial Hosp.*, 918 F.2d 411 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . -16-

*City of Pittsburgh v. West Penn Power*, 174 F.3d 156, (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . -14-

*Constar, Inc. v. National Distribution Centers*, 101 F.Supp.2d 319 (E.D.Pa. 2000) . . . . . . . . . . -14-, -15-

*Eastman Kodak Co. of New York v. Southern Photo Materials Co.*, 273 U.S. 359 (1927) . . . . . . . . . . 8-9

*Eichorn v. AT&T Corp.*, 248 F.3d 131,138 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-, -6-, -8-

*Eichorn v. AT&T Corp.*, 248 F.3d 147 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

*Factory Mkt., Inc. v. Schuller Intern., Inc.*, 987 F.Supp. 387 (E.D. Pa. 1997) . . . . . . . . . . . . . . . . . . -14-

*Garshman v. Universal Resources Holding, Inc.*, 824 F.2d 223 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . -3-

*Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

*L & M Beverage Co. v. Guinness Import Co.*, 1995 WL 771113, *5 (E.D. Pa. 1995) . . . . . . . . . . . . -15-

*L'Aiglon Apparel v. Lana Lobell, Inc.*, 214 F.2d 649 (3d Cir. 1954) . . . . . . . . . . . . . . . . . . . . . . . 11-12

*Larry V. Muko, Inc. v. S.W. Pa. Bldg. and Const. Trades Council*, 670 F.2d 421 n.11 (3d. Cir.), <u>cert.</u>
<u>denied</u>, 459 U.S. 916 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

*Lights of America, Inc. v. Consumers Union of United States, Inc.,*
2002 Cal. App. Lexis 2000 (2002) (unpublished) (Appendix 6) . . . . . . . . . . . . . . . . . . . . . . . . . . -12-

*Livezey v. American Contract Bridge Leagal*, 1985 U. S. Dist. Lexis 16058 (E.D. Pa. 1985) . . . . . . . -4-

*Lynchval Systems, Inc. v. Chicago Consulting Actuaries, Inc.*,
1996 U.S. Dist. Lexis 14568, \*21 (N.D. Ill. 1996) (Appendix 7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-

*Mathews v. Lancaster General Hosp.*, 87 F.3d 624 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . -4-

*Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

*Pastore v. Bell Telephone Co. of Pennsylvania*, 24 F.3d 508 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . -9-

*Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173 (3d Cir. 1988) . . . . . . . . . . . . . . . . -3-

*Pension Benefit Guaranty Corp., v. White Consol. Indus.*, 998 F.2d 1192 (3d Cir. 1993) . . . . . . . . . . -3-

*Queen City Pizza v. Domino's Pizza*, 124 F.3d 430 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

*Rototherm Corp. v. Penn Linen & Uniform Serv., Inc.*,
        1997 U.S. Dist. LEXIS 10057, \*41 (E.D. Pa. 1997) (Appendix 3) . . . . . . . . . . . . . . . . . . -3-, -13-

*The Arbitron Company v. Tropicana Product Sales, Inc.*,
        1993 U.S. Dist. Lexis 5587, \*33-34 (S.D.N.Y. 1993) (Appendix 5) . . . . . . . . . . . . . . . . . . . -10-

*Tunis Bros. Co., Inc. v. Ford Motor Co.*,
        952 F.2d 715 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

*U.S. Healthcare, Inc. v. Blue Cross Greater Phila.*, 898 F.2d 914 (3d. Cir.), cert. denied, 498 U.S. 816
(1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-

*U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 594 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . -4-

*Valley Forge Con. & Visitors Ctr. v. Visitor's Service*, 28 F. Supp. 2d 947 (E.D. Pa. 1997) . . . . . . . -14-

STATE CASES

*Commonwealth, Dept. of Trans. v. E-Z Parks, Inc.*, 620 A.2d 712 (Pa. Commw. Ct. 1993) . . . . . . . . -14-

*Creeger Brick & Bldg. Supply, Inc. v. Mid-State Bank & Trust Co.*, 560 A.2d 151 (Pa. Super Ct. 1989)-14-

*Elliot v. Clawson*, 204 A.2d 272 (Pa. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

—————————————————————————x
                                        :

**BRUNSON COMMUNICATIONS, INC.**      :

                                          :

                **Plaintiff,**        :

                                          : **Civil Action No.:  02 CV. 3223**

                    **v.**            :

                                          :

**ARBITRON, INC.**                         :

                                          :

                **Defendant.**        :

—————————————————————————x

## REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
## PLAINTIFF'S  AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. RULE 12(b)(6)

**I.**     **PRELIMINARY STATEMENT**

       Despite having amended its Complaint in an attempt to correct its severe pleading deficiencies, Plaintiff still fails to state a claim for which this Court can grant relief.  As set forth in Arbitron's Memorandum in Support of Motion to Dismiss ("Arbitron's Memo."), Plaintiff's claims are ripe for dismissal.  Plaintiff's Memorandum of Law in Opposition ("Plaintiff's Opp."), fails to respond to Arbitron's key points with legal authorities which justify allowing Plaintiff to proceed with this litigation.

       In this case, WGTW was inadvertently omitted from Arbitron's PPM test ratings survey for a few months and cannot allege or show any actual damages from this omission.  This is not surprising in light of the fact that at all times WGTW, and the other television stations in the Philadelphia area, were covered by the Nielsen ratings reports which have long been the only recognized television ratings service.  Yet, by its Amended Complaint, Plaintiff would have this Court believe that Arbitron is guilty of illegal monopolization of the television ratings business, a rather ironic accusation since Arbitron is not even in the broadcast television ratings business at all.

It would be unfair and unjust to allow Plaintiff to continue with this lawsuit where there has been no actionable wrong simply because Plaintiff is upset that WGTW was not included in the first test surveys. The PPM encoder has been up and running now at WGTW for several months and WGTW data will be included in future tests reports provided that reliable signals are received from the station. The contemplated discovery and defense of this case, particularly the anti-trust claims, would be very expensive and time consuming. The allegations of the Amended Complaint are based upon nothing more than wild speculation of conspiracies that are illogical on their face and not supported by the appropriate pleading detail. It is, therefore, wholly appropriate for the Amended Complaint to be dismissed at this time.

Plaintiff's opposition papers have not saved Plaintiff's Amended Complaint from dismissal. Plaintiff has not and cannot identify a plausible market which has suffered anti-trust injury nor has Plaintiff alleged an actionable "group boycott" -- a *per se* violation-- so as to avoid the "rule of reason analysis" which here mandates the immediate dismissal of the anti-trust claims.

Plaintiff seeks to defeat the instant motion by attempting to create the appearance that there are unresolved factual issues or by suggesting that it is inappropriate, on a motion to dismiss, for the Court to consider the documents annexed to Arbitron's moving papers. However, upon close scrutiny it becomes readily apparent that even taking all of Plaintiff's allegations as true for purposes of this motion to dismiss, Plaintiff still falls short of setting forth viable claims for relief. Plaintiff's insupportable contention that Arbitron has acquired and exercised illegal monopoly power simply because Arbitron has granted Nielsen an option to license the PPM technology (if it is ever commercially deployed) for use in Nielsen's own ratings business is absurd. It is undisputed that at all material times Nielsen has offered its own Nielsen ratings product in the Philadelphia area separate and apart from Arbitron's PPM test report. Moreover,

Arbitron's PPM technology has not been commercially deployed nor has Nielsen exercised its option to license the technology.[1]

The same PPM test survey report which Plaintiff claims omitted WGTW and is thus the underlying basis for this suit also contains the express statements that (i) WGTW (and other stations) were not encoded in time for the test report, and (ii) the express WARNING that the test data is "intended for internal business and analysis purposes only. Any use of these estimates and data for the buying, planning and/or selling of media time is strictly prohibited." See Moving Declaration of Marshall Snyder at Exhibit 1. This is an indisputably authentic document which plaintiff, itself, refers to in the Amended Complaint. As such it is entirely appropriate for this Court to consider that document even on a motion to dismiss. *See e.g., City of Pittsburgh* v. *West Penn Power,* 174 F.3d 156, 159 (3d Cir. 1998); *Pension Benefit Guaranty Corp.*, v. *White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir. 1993)

The dismissal of Plaintiff's claims is now mandated.

## II.    ARGUMENT

### A.    PLAINTIFF'S SHERMAN ACT SECTION 1 CLAIM FAILS AS A MATTER OF LAW

Third Circuit courts routinely dismiss antitrust claims on the pleadings where the plaintiff has failed to state facts sufficient to meet the prima facie elements of an antitrust claim. *Garshman v. Universal Resources Holding, Inc.*, 824 F.2d 223, 230 (3d Cir. 1987); *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 182 (3d Cir. 1988) ("A general allegation of conspiracy without a statement of the facts is an allegation of a legal conclusion and insufficient itself to constitute a cause of action. Although detail is unnecessary, the plaintiffs must plead facts constituting the conspiracy, its object and accomplishment."); *Rototherm Corp. v. Penn Linen & Uniform Serv., Inc.*, 1997 U.S. Dist. LEXIS 10057, *41 (E.D. Pa. 1997)

---

[1] In addition to the moving Declaration of Marshall Snyder which makes clear at ¶9 that Arbitron does not own or control the Nielsen Company nor does it have any ownership interest in or control over its television ratings business, the Reply Declaration of Marshall Snyder sets forth that Arbitron has never commercially deployed PPM meter nor has Nielsen exercised its option to license the right to use the PPM technology.

("[W]e should not shy away from dismissing an antitrust claim that is vague and conclusory in nature, for allegations of Section 1 conspiracy must be pled with a degree of specificity.").

      **1.**      **Plaintiff Fails to Allege a "Group Boycott"**

Plaintiff's allegations of a "group boycott" are insufficient as a matter of law as Plaintiff admits that Arbitron is not a "competitor of Plaintiff." (Plaintiff's Opp., p. 5). Under the controlling authority, a group boycott is a concerted effort by a group of competitors "at one level to protect themselves from competition **from non-group members who seek to compete at that level**. Typically, the boycotting group combines to deprive would be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates." *Larry V. Muko, Inc. v. S.W. Pa. Bldg. and Const. Trades Council*, 670 F.2d 421, 429 n.11 (3d. Cir.), *cert. denied*, 459 U.S. 916 (1982) (noting that the Third Circuit restricts application of the per se rule to only those 'classic' boycotts) (citation omitted) (**emphasis added**). Moreover, to be actionable the alleged boycott **must** be horizontal, not vertical. *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1368 (3d Cir. 1996) ("[T]he Supreme Court has instructed that vertical restraints of trade, which do not present an express or implied agreement to set resale prices, are evaluated under the rule of reason."); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 594 (1st Cir. 1993) ("[A] purely vertical arrangement, by which (for example) a supplier or dealer makes an arrangement exclusively to supply or serve a manufacturer, is not a group boycott.") (referring to *Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 212 (1959)). Thus, even if Arbitron were a competitor of plaintiff, which plaintiff concedes it is not, the simple fact that Arbitron is vertically positioned with regard to Plaintiff (admitted in Plaintiff's Opp. p.6) mandates that Plaintiff's claim must be evaluated under the "rule of reason."

When faced with similar allegations of a group boycott by non-competitors, this Court in *Livezey v. American Contract Bridge League*, 1985 U.S. Dist. LEXIS 16058, *37-9 (E.D. Pa. 1985) (copy attached hereto), granted summary judgement under the Third Circuit standard because the "evidence produced by [plaintiff] to establish a classic group boycott falls far short of what is necessary. It simply does not show

that [defendants] were [plaintiff's] competitors who stood to gain economically, or in any way by excluding him from the [relevant market].  In fact, in *Livezey*, the court expressly rejected plaintiff's argument that "a group boycott can be illegal under the antitrust laws even where the parties are not competitors of each other."  *Id.* at *39, n.6.  Finally, when deciding *Livezey* the Court did not have the concessions of the instant case, that is a plaintiff who admits that the defendant is not even a competitor.  Here, plaintiff's competitors are the other television stations in the Philadelphia area.  Plaintiff has not named or joined these competitors nor has plaintiff properly plead a group boycott by these unnamed competitors to exclude plaintiff.  Likewise plaintiff has not come forward with any non-conclusory allegations that these unnamed competitors somehow caused plaintiff's station to be excluded from the initial PPM test.

Finally, as explained in Arbitron's Memo., even if the Court were to analyze Plaintiff's allegations under the *per se* standard, Plaintiff could not succeed because an antitrust injury is a prerequisite to a Sherman Act claim under either the rule of reason or *per se* tests.  *Eichorn v. AT&T Corp.*, 248 F.3d 131,138 (3d Cir. 2001).

### 2.    Plaintiff Fails to Define and Allege a Plausible Market

In order to maintain a cause of action under either Sections 1 or 2 of the Sherman Act, the complaint must allege a plausible definition of the relevant product market in which the injury to competition occurred.  *Eichorn*, 248 F.3d at 147- 48; *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 437 (3d Cir. 1997).  Despite amending its Complaint and having the benefit of studying Arbitron's initial Motion to Dismiss, Plaintiff has still failed to define a plausible market which has sustained anti-trust injury.  In fact, Plaintiff now urges three different versions of the relevant market in its Opposition.  According to Plaintiff, the relevant market is now "the viewer sales advertising market for television advertising in the Philadelphia market;" (Plaintiff's Opp., p. 6) or "the market for measurement systems in the television viewing market in the Philadelphia area;" (Plaintiff's Opp., p.7) or maybe "the PPM product market for the same function

in the same geographical area" (Plaintiff's Opp., p.7). Plaintiff's own inability to settle on a market definition highlights the implausibility of each of these defined markets under the anti-trust laws.

As to Plaintiff's first alleged market, "the viewer sales advertising market for television advertising in the Philadelphia market" (Plaintiff's Opp., p.6), it is irrefutable that Arbitron does not offer or sell a commercial ratings product to this market. Plaintiff concedes that Arbitron is not a competitor in this market (Plaintiff's Opp., p. 5). Arbitron is not a company which buys advertising time, sells advertising time or controls the sale of advertising time in this alleged "market." At most, Arbitron has provided a test report of television and radio viewership in the Philadelphia area along with the express warning and instructions that the test results "are intended for internal business and analysis purposes only. Any use of these estimates and data for the buying, planning and/or selling of media time is strictly prohibited. ....No commercial use whatsoever is authorized." *See* Exhibit 1 to Aug. 21, 2002 Moving Declaration of Marshall Snyder Most important, it is undisputed in this case, and plaintiff concedes, that another company, Nielsen, provides a commercial television ratings product in the Philadelphia area (Am.Cplt. at ¶¶ 7 & 11). Thus, it is simply implausible that the introduction by Arbitron of the test PPM meter over the past few months has somehow given Arbitron monopoly power in plaintiff's defined market let alone caused anti-trust injury to the "market." How has this alleged marked suffered anti-trust injury as a result of Arbitron's testing of a new PPM meter when at all times the long standing Nielsen report has been commercially available to everyone in the industry? In any event the availability of at least one substitute product - - here Nielsen - - destroys Plaintiff's anti-trust theory.

With regard to Plaintiff's second alleged market, "the market for measurement systems in the television viewing market in the Philadelphia area" (Plaintiff's Opp., p. 7), this too necessitates dismissal because, again, the only available commercial television ratings service and data is offered by Nielsen, not Arbitron. Amended Complaint, ¶¶ 11 & 21. Plaintiff's contention in its opposition that Arbitron's report is used commercially does not save Plaintiff because regardless, Plaintiff has admitted that Nielsen sells its

reports in the Philadelphia viewership market.  Plaintiff's Opp., p. 9.  Plaintiff has admitted therefore that there is at least one other product available in this market, and, thus, there are "reasonable substitutes" to the Arbitron test data.

Finally, Plaintiff's third alleged narrow market definition is a single brand market: "the PPM product market for the same function in the same geographical area" (Plaintiff's Opp., p. 7).  As explained in Arbitron's moving papers, the United States Supreme Court has held that definitions of a market in terms of a single brand of product are inherently implausible.  *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956) ("The determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another.").  Following *Du Pont*, the Third Circuit explained in *Eichorn* that "[b]y defining the market so narrowly that it only includes the defendants, plaintiffs' proffered geographic and product markets are unrealistic."  *Eichorn v. AT&T Corp.*, 248 F.3d 147 (3d Cir. 2001) (quoting *Du Pont*, 351 U.S. at 395) (internal citations omitted).

Plaintiff seeks to argue that this case represents the elusive exception to the maxim against single product markets because according to Plaintiff the PPM is a higher quality product than the Nielsen rating system.  Plaintiff argues without any support that "the PPM survey is to the Nielsen survey as electronic marketing machines are to old fashioned cash registers."  This is precisely the claim that the Supreme Court rejected in *Du Pont*.  In *Du Pont*, the government argued that a single product market was appropriate because no other flexible wrapping material was of the quality or had all of the characteristics of Du Pont's cellophane.  *Du Pont*, 351 U.S. at 396.  The Court rejected the government's single product market and explained that:

> In determining the market under the Sherman Act, **it is the use or uses to which the commodity is put that control**.  The selling price between commodities with similar uses and different characteristics may vary, so that the cheaper product can drive out the more expensive. (**emphasis added**)

*Du Pont*, 351 U.S. at 396.  Thus the Supreme Court defines the market in terms of the use to which the product is put, regardless of cost or quality.  Under the Supreme Court's standard, the relevant market for tills would include electronic marketing machines as well as old fashioned cash registers and everything in between.  Thus, despite Plaintiff's argument that the PPM may be of a higher quality than the Nielsen ratings system, it is undisputed that both ratings systems would be used for the same purpose and by the same consumers.  Therefore, the relevant market must, at a minimum, include the Nielsen ratings system and any other viewership ratings systems which are put to the same use by consumers, regardless of quality or cost.

> **3.    Plaintiff's Amended Complaint Fails To Allege Any Cognizable Antitrust Injury**

Despite amending its Complaint and filing an Opposition to Arbitron's Motion to Dismiss, Plaintiff has still failed to properly plead an injury to the market as is required in order to sustain a cause of action under Sherman Act Section 1 and 2.  *Brunswick*, *Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977).  Plaintiff summarily asserts that Arbitron's actions have impaired "WGTW's ability to be competitive and operate on an equal basis with other stations in the market, thus injuring Plaintiff and restraining competition in the market for sales of television listener time." Am.Cplt.¶20;  and that "Arbitron has used its monopolist power to cause antitrust injury to plaintiff, *i.e.*, to injure plaintiff's ability to compete in the sale of advertising, thereby injuring programming." Am.Cplt. ¶ 55.  Quite simply,  Plaintiff only alleges an injury to itself, not the market as a whole.

Plaintiff takes issue with the requirement of an antitrust injury to the marketplace.  Plaintiff offers the Court the strawman argument that it is "Defendant's contention that because Plaintiff alleges injury to itself, there can be no antitrust claim" (Plaintiff's Opp., p. 8).  Plaintiff's misstatement of Arbitron's position begs the question.  Arbitron does not argue that because Plaintiff alleges injury to itself there can be no antitrust injury, rather, Arbitron urges  that because Plaintiff alleges injury **only** to itself and not to competition in the market there is no antitrust injury.  *Brunswick*, 429 U.S. at  489; *Tunis Bros.*, 952 F.2d

at 725-26; *Eichorn*, 248 F.3d at 140. Does Plaintiff seriously contend that because WGTW was omitted for a few months from a non-commercial test survey that the market suffered anti-competitive injury even though at all times WGTW and all television stations in the market were covered by the Nielsen reports which are the long recognized gold standard of television ratings reports in the United States. Finally, Plaintiff cites no cases to support its position that an antitrust injury is anything other than an injury to the market. *See Brunswick*, 429 U.S. at 489; *Tunis Bros.*, 952 F.2d at 725-26; *Eichorn*, 248 F.3d at 140.

Presumably to compensate for its lack of authority, Plaintiff makes an unintelligible argument in its Opp., p. 9, that *Eastman Kodak Co. of New York v. Southern Photo Materials Co.*, 273 U.S. 359 (1927), supports "an exception to the exception" where the product monopoly is a "market monopoly." However, *Eastman Kodak* creates no exception to the long-standing rule of law that an actionable anti-trust claim requires an injury to competition in a plausibly defined market. In fact, the key issue before the Court in *Eastman Kodak* was whether a Plaintiff could recover under the antitrust laws where the plaintiff was *in pari delicto* with the defendant (*i.e.*, had participated with defendant in the alleged monopoly).

Plaintiff urges that "viewer measurement is not a product monopoly; it is a market monopoly ... but in any event, there are two products in this monopoly, Nielsen and PPM." Plaintiff's Opp., p.9. While Arbitron has no idea what Plaintiff is arguing, something is clear: <u>according to Plaintiff</u> there are at least two products in whatever market Plaintiff is defining -- Arbitron's test PPM and Nielsen's commercial ratings service.

While Plaintiff concedes that "there are two products in this monopoly, Nielson [*sic*] and PPM" Plaintiff then leaps to the conclusory statement that "Arbitron, through its relationship with Nielson, [sic] controlled both." (Plaintiff's Opp., p.9). First, even if that statement were true, which it is not (Snyder Moving Declaration, ¶ 9), there is nonetheless a reasonable available substitute in the market for television ratings besides the PPM test report -- the Nielsen survey -- and, therefore, there has been no anti-trust injury to competition. Second, Plaintiff's contention that Arbitron controls Nielsen is simply an absurd and

insupportable proposition. As set forth in the Snyder Moving Declaration, ¶ 9: "Arbitron does not own or control the Nielsen Company nor does it have any ownership interest in or control over its broadcast television ratings business." Moreover, Nielsen has not exercised its option nor has there been a commercial deployment of the PPM. *See* Sept. 30, 2002 Supplemental Snyder Declaration, ¶¶ 3 & 4.

**B.    PLAINTIFF'S SHERMAN ACT SECTION 2 CLAIM ALSO FAILS AS A MATTER OF LAW**

Plaintiff has failed to respond to Arbitron's motion with regard to its failure to plead facts sufficient to support a claim under Sherman Act §2, and that claim should, therefore, should be dismissed. Plaintiff has failed to even allege the necessary elements to support this cause of action. *See Pastore v. Bell Telephone Co. of Pennsylvania*, 24 F.3d 508, 512 (3d Cir. 1994). Plaintiff's allegations belie any intent to monopolize on the part of Arbitron. Again, Plaintiff's Amended Complaint merely alleges that Plaintiff has been injured, not that competition in the relevant market as a whole has been injured. Amended Complaint, ¶ 37-39. *See The Arbitron Company v. Tropicana Product Sales, Inc.*, 1993 U.S. Dist. Lexis 5587, *33-34 (S.D.N.Y. 1993) (Appendix 5). Finally, the requirement that there be a dangerous probability of achieving monopoly power under §2 of the Sherman Act can not be sustained based upon Plaintiff's own admission that "there are two products in this monopoly, Nielson [*sic*] and PPM." Plaintiff's Opp., p. 9. Plaintiff's monopolization claim is based upon nothing more than the pure conjecture that someday Arbitron might gain monopoly power in the television ratings business if the PPM is successful and replaces other means of conducting audience measurement. If such were the standard for determining monopoly power in an anti-trust suit virtually every new promising technology might support a monopolization claim. Moreover, if Nielsen exercised its option and licensed the PPM technology for television ratings it would be Nielsen, and not Arbitron, the only defendant in this case, that one could argue would enjoy monopoly power. There is no basis for the assertion that Arbitron has any interest in or control over Nielsen's ratings

business. Stated bluntly, Plaintiffs' anti-trust theories against Arbitron are baseless, illogical and without legal merit.

C.      **PLAINTIFF'S LANHAM ACT CLAIM FAILS AS A MATTER OF LAW**

As discussed in detail in Arbitron's Memo., Plaintiff's Amended Complaint fails to allege facts sufficient to make a prima facie claim under the Lanham Act. *See Synygy, Inc. v. Scott-Levin, Inc.*, 51 F.Supp.2d 570, 575 (E.D. Pa. 1999) (citing *U.S. Healthcare, Inc. v. Blue Cross Greater Phila.*, 898 F.2d 914, 922-23 (3d. Cir.), *cert. denied*, 498 U.S. 816 (1990)). Plaintiff's Amended Complaint does not allege that Arbitron made a single express statement **about Brunson or WGTW**. For this reason alone, Plaintiff's Lanham Act claim should be dismissed. Even if the Court accepted as true the allegation that actionable misrepresentations were made about Arbitron's PPM test data (and we urge that as a matter of law no actionable misrepresentations have been alleged), the Amended Complaint does not allege as the law requires that these misrepresentations resulted in an actual injury to Plaintiff. In this case, Plaintiff seeks not only monetary damages, but also injunctive relief, and hence, it must show actual damages. *Synygy, Inc.*, 51 F.Supp. at 577. The Amended Complaint is devoid of any allegations concerning actual damages that Plaintiff may have suffered from the alleged misrepresentations. In fact, Plaintiff admits that it "cannot know the full severity of the damages incurred" and that "Plaintiff has stated the nature of its injuries as best [sic] it can under these circumstances." Plaintiff's Opp., pp. 13 and 14 respectively. Yet, as of today Plaintiff has neither alleged nor come forward with any actual injury whatsoever.

Most importantly, Arbitron's conduct and statements about its PPM test data were not "commercial advertising or promotion." To support an alleged Lanham Act claim, the alleged misrepresentation must take place as part of "commercial advertising or promotion." *Id.* "Commercial advertising or promotion" requires: (1) commercial speech; (2) **by a defendant in commercial competition with the plaintiff**; (3) designed to influence customers to buy the defendant's commercial products; and that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry.

*Synygy, Inc.*, 51 F.Supp.2d at 576 (emphasis added). Plaintiff admits that "Plaintiff has never defined Arbitron as a competitor of Plaintiff." Plaintiff's Opp., p. 5. Thus, Plaintiff cannot meet the pleading requirement of a Lanham Act claim.

In an attempt to salvage this claim, Plaintiff states that the Third Circuit has somehow created an exception to this rule and cites to *L'Aiglon Apparel v. Lana Lobell, Inc.*, 214 F.2d 649 (3d Cir. 1954), for support. *L'Aiglon*, however, does not support plaintiff's argument. The issue before the court in *L'Aiglon* was whether additional requirements from the common law on "palming off" (*i.e.*, that the customer actually bought the defendant's product under the misapprehension that it was the plaintiff's product) should be read into the then newly enacted Lanham Act. The court in *L'Aiglon* chose to follow the language of the statute rather than inject additional standing requirements from the common law. Not only is *L'Aiglon* inapplicable because it does not even address the instant issue of the requirement that the parties be in commercial competition but *L'Aiglon* actually supports Arbitron's position that the statutory requirements of the Lanham Act control. As Plaintiff has admitted that it is not in competition with Arbitron and has presented no support for an exception to this requirement, Plaintiff's claim under the Lanham Act must be dismissed.

In addition, Plaintiff has not satisfied the 3rd pleading requirement of a Lanham Act claim; that the misrepresentation was designated to influence customers **to buy defendants' commercial products**. Nor could Plaintiff satisfy this requirement as it is undisputed in this case that Arbitron has no commercial PPM product for sale.

D.    **PLAINTIFF'S DISPARAGEMENT CLAIM FAILS AS A MATTER OF LAW**

Plaintiff's opposition fails to respond to Arbitron's argument and cited authorities that Plaintiff's cause of action for disparagement based solely upon Arbitron's omission of WGTW from the PPM test data is legally insupportable. "To state a claim for trade disparagement, a plaintiff must allege 1) a disparaging statement of fact that is untrue or a disparaging statement of opinion that is incorrect; 2) that no privilege

attaches to the statement; and 3) that the plaintiff suffered a direct pecuniary loss as a result of the disparagement. *Synygy*, 51 F.Supp. at 578-579.

There is no case law to support Plaintiff's claim that **the omission** of WGTW from Arbitron's PPM test data resulted in disparagement. Nevertheless, Plaintiff argues that Arbitron's alleged statements about the PPM test data constitute disparagement because disparaging remarks were "**implicit** in the presentation by Arbitron's senior Vice President, Kevin Smith." Plaintiff's Opp., p. 15 (**emphasis added**). However, the law simply does not support Plaintiff's conclusion that by omission, i.e., without even making an affirmative disparaging remark, one can be liable for disparagement. *See Lights of America, Inc. v. Consumers Union of United States, Inc.*, 2002 Cal. App. Lexis 2000 (2002) (unpublished) (Appendix 6); *Lynchval Systems, Inc. v. Chicago Consulting Actuaries, Inc.*, 1996 U.S. Dist. Lexis 14568, *21 (N.D. Ill. 1996) (Appendix 7).

Furthermore, even if Arbitron's "statements" about the PPM test data were actionable here as trade disparagement, these statements would still not justify the denial of Arbitron's motion to dismiss this claim. Plaintiff admits that it did not plead special damages as required to sustain a cause of action for disparagement under Pennsylvania law. *Synygy*, 51 F.Supp.2d at 578-579. The alleged disparaging statements were about the PPM test data (i.e., that the data was accurate and complete) and not about Plaintiff or WGTV. Plaintiff concedes that "due to the nature of the agreements between the Defendant and sellers and buyers, Plaintiff cannot know the full severity of the damages incurred." Plaintiff's Opp., p. 16. Plaintiff admits that it has not met the pleading requirements of special damages under Fed. R. Civ. P. 9(g) for disparagement, thus Plaintiff's disparagement claim is ripe for dismissal. *Synygy*, 51 F.Supp.2d at 578.

## E. PLAINTIFF'S TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS CLAIM FAILS AS A MATTER OF LAW

Under Pennsylvania law, a plaintiff may not rest a claim for tortious interference with prospective

contractual relations on a "mere hope that additional contracts or customers would have been forthcoming but for defendant's interference. Rather, the Amended Complaint must allege facts that, if true, would give rise to a **reasonable probability** that **particular** anticipated contracts would have been entered into." *Rototherm*, 1997 U.S. Dist. LEXIS 10057 at *36-37 (E.D. Pa. 1997) (**emphasis added**) (citations omitted); *Allstate*, 1998 U.S. Dist. LEXIS 1740 at *14. Plaintiff concedes in its Opposition that "Defendant contends that Plaintiff cannot identify any customer that was lost. As discussed above, due to the nature of the agreements between Defendant and the survey recipients, Plaintiff cannot specifically identify any customer it has lost." Plaintiff's Opp., p. 17. Therefore, Plaintiff admits that it cannot and did not meet the basic pleading requirements of a claim for tortious interference with prospective contractual relations.

### F.    **PLAINTIFF'S NEGLIGENCE CLAIM FAILS AS A MATTER OF LAW**

Plaintiff's negligence claim must be dismissed because Plaintiff failed to allege the basic facts necessary to show that Arbitron owed a legal duty to Plaintiff and that the Pennsylvania economic loss doctrine precludes recovery based on the facts alleged. Plaintiff's Amended Complaint, and now Plaintiff's Opp., fail to address the issue of legal duty, and for this reason alone, Plaintiff's negligence claim must be dismissed.

Furthermore, Pennsylvania's economic loss doctrine also precludes recovery on a negligence theory where a party, as Plaintiff here, allegedly suffers a purely economic injury that results from a business arrangement between the parties. The economic loss doctrine "prohibits recovery in tort for economic losses to which the party's entitlement 'flows only from a contract.'" *Constar, Inc. v. National Distribution Centers*, 101 F.Supp.2d 319, 322 (E.D. Pa. 2000) (quoting *Factory Mkt., Inc. v. Schuller Intern., Inc.*, 987 F.Supp. 387, 395 (E.D. Pa. 1997)).

In response to Arbitron's assertion of the economic loss doctrine, Plaintiff asserts that it qualifies for an exception to that rule because of the "special relationship" between Plaintiff and Arbitron. Plaintiff's cites *Valley Forge Con. & Visitors v. Visitor's Service*, 28 F.Supp.2d 947 (E.D. Pa. 1998) for support.

Notably, *Valley Forge* does not support Plaintiff's proposition that a "special relationship" is an exception to the economic loss doctrine, rather, *Valley Forge* explains that while claims for <u>negligent interference with existing or prospective contractual relations</u> are typically dismissed by Pennsylvania Courts, that some dicta supports that this claim may lie if the parties are in a "special relationship." *Valley Forge*, 28 F.Supp.2d at 952. Further, when describing what a "special relationship" was, the court explains that "[The] Plaintiff cites no case in which such a special relationship was found to exist between two parties to an arms length business contract." *Valley Forge*, 28 F.Supp.2d at 952 (citing *L & M Beverage Co. v. Guinness Import Co.*, 1995 WL 771113, *5 (E.D. Pa. 1995); *Elliot v. Clawson*, 204 A.2d 272 (Pa. 1964); *Creeger Brick & Bldg. Supply, Inc. v. Mid-State Bank & Trust Co.*, 560 A.2d 151 (Pa. Super Ct. 1989); and *Commonwealth, Dept. of Trans. v. E-Z Parks, Inc.*, 620 A.2d 712, 717 (Pa. Commw. Ct. 1993)). Here, Plaintiff's Amended Complaint alleges, at best, an arms length dealing between Arbitron and Plaintiff with respect to having WGTW included in the PPM test survey. No agreements were signed between the parties and certainly no special relationship, fiduciary duty or other obligations were assumed by Arbitron to Plaintiff. Plaintiff's defense of a "special relationship" is inapplicable to the economic loss doctrine and applies only between fiduciaries, not corporate parties to arms length dealings such as they are between Plaintiff and Arbitron.

## G.    PLAINTIFF'S PROMISSORY ESTOPPEL CLAIM FAILS AS A MATTER OF LAW

Promissory estoppel allows the court to enforce a party's promise that is unsupported by consideration where (1) the promisor makes a promise that he reasonably expects to induce action or forbearance by the promisee, (2) the promise does induce action or forbearance by the promisee, (3) and injustice can only be avoided by enforcing the promise. *Carlson v. Arnot-Ogden Memorial Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990) (citations omitted). In its Opposition, Plaintiff argues the negligence standard of care rather than to allege that Arbitron made some specific promise to Plaintiff which Plaintiff relied upon. Plaintiff attempts to address its pleading failure by arguing that "[t]his duty of care, combined with **various representations** made to the Plaintiff regarding the equipment itself, caused Plaintiff to forebear from

immediate action and unknowingly continue operations with malfunctioning equipment." Plaintiff's Opp.,

p. 20 (**emphasis added**).  Plaintiff does not even satisfy its pleading requirement, as the allegations of

"various representations .... regarding the equipment" are meaningless and do not establish a promise made

by Arbitron to Plaintiff.   In addition, the allegation that Arbitron "caused Plaintiff to forebear from

immediate action," fails to identify the detriment caused to Plaintiff in reliance on the alleged Arbitron

promise.  As Plaintiff fails to state what representation that it relied upon to its detriment, Plaintiff's cause

of action for promissory estoppel must be dismissed. *See Constar, Inc. v. National Distribution Centers*,

101 F.Supp.2d 319, 323 (E.D. Pa. 2000).

## III.    <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiff's Amended Complaint should be dismissed in its entirety for

failure to state claims upon which relief can be granted.

Dated: September 30, 2002

Respectfully submitted,

**SPECTOR GADON & ROSEN, P.C.**

By: _____
     David B. Picker, Esq.
1635 Market Street, 7th Floor
Philadelphia, Pennsylvania 19103
Telephone: (215) 241-8888
Facsimile: (215) 241-8844

and

Alfred Fabricant, Esq.
Marc Lieberstein, Esq.
**OSTROLENK, FABER, GERB & SOFFEN, LLP**
1180 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 382-0700
Facsimile:  (212) 382-0888

Attorneys for Defendant

17

## <u>CERTIFICATE OF SERVICE</u>

DAVID B. PICKER hereby certifies that a true copy of the foregoing  Defendant Arbitron,

Inc.'s **Reply Memorandum in Further Support of Motion to Dismiss the Amended Complaint,** was

served by postage-prepaid First Class U.S. Mail, on this **30**th day of **September**, 2002, upon Plaintiff's

counsel, as follows:

Robert J. Sugarman, Esq.
Sugarman & Associates
11th Floor, Robert Morris Building
100 North 17th Street
Philadelphia, PA  19103

September 30, 2002

_____
David B. Picker

F:\27745\001\pleadings\DismissReply.wpd

LEXSEE 1985 us dist lexis 16058

**JOSEPH LIVEZEY v. AMERICAN CONTRACT BRIDGE LEAGUE, et al**

**No. 82-3325**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1985 U.S. Dist. LEXIS 16058; 1985-2 Trade Cas. (CCH) P66,875*

**September 12, 1985**

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Defendants, bridge league, members of the conduct and ethics committee of a bridge association (Committee), and former partners, filed motions for summary judgment in plaintiff bridge player's action alleging group boycott and violations of § § 1 and 2 of the Sherman Act, *15 U.S.C.S, § § 1* and 2.

**OVERVIEW:** The Committee determined that the bridge player planned a party on a night specifically to disrupt a bridge game. It found the bridge player guilty of violating a bridge league's code and placed him on suspension. After appealing the Committee's decision, the bridge player filed suit. Defendants filed motions for summary judgment. The court granted the motion. The court found that the bridge league was subject to the Sherman Act because it exercised extra-judicial powers over its members and their means of producing an income was engaged in business whose activities might restrain or monopolize commercial intercourse among the states. However, it found that the bridge player's §1 claim failed because he failed to show that defendants contracted, combined, or conspired among each other, or that the conspiracy he alleged produced adverse, anticompetitive effects within the relevant product and geographical markets, or that the objective of defendants in suspending him was illegal. It also found that the § 2 claim failed because defendants disciplined the bridge player for his behavior in an effort to continue to promote pleasant playing conditions for bridge competition.

**OUTCOME:** The court granted defendants' motions for summary judgment. The court dismissed the bridge player's state law claims against the former partners without prejudice to their being filed in state court. The court entered a judgment in favor of defendants and against the bridge player.

**CORE TERMS:** bridge, game, boycott, competitor, playing, Sherman Act, franchise, summary judgment, conspiracy, tournament, antitrust, player, rule of reason, probation, bias, per se rule, non-commercial, penalty imposed, upstairs, club, anti-competitive, entity, letter written, bridge world, violating, suspended, concerted action, economically, conspired, disciplined

**CORE CONCEPTS**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Any doubts as to the existence of a genuine issue of fact and any inferences drawn from the evidence submitted must be resolved in favor of the party opposing the motion. Although summary judgment has been characterized as both a drastic and extreme remedy, it should be granted when doing so would avoid waste of time and resources of both the litigants and the court where trial would be a useless formality.

***Antitrust & Trade Law > Exemptions & Immunities***
An entity's status as a non-profit organization does not in and of itself exempt it from the Sherman Act. Nor does the fact that the entity in question is one usually thought to be non-commercial in nature end the inquiry.

***Antitrust & Trade Law > Sherman Act***
Section 1 of the Sherman Act provides that every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce along the several States, or with foreign nations, is declared to be illegal. *15 U.S.C.S. § 1.* The Sherman Act has been interpreted as prohibiting only unreasonable restraints of trade. Four elements must be present to establish a § 1 violation: (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason***
A per se rule is applied when the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal***
To establish a group boycott that is illegal per se, one must present evidence that there has been a concerted action by his economic competitors to exclude him from the market.

***Antitrust & Trade Law > Sherman Act***
The burden is upon the antitrust plaintiff to present direct or circumstantial evidence that reasonably tends to prove that the defendants have had a conscious commitment to a common scheme designed to achieve an unlawful objective.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason***
Under the rule of reason, the inquiry is whether the challenged agreement is one that promotes competition or one that suppresses competition. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. The rule of reason analysis requires an examination of the facts peculiar to the business to which the restraint is applied, its condition before and after the restraint was imposed, the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason***
Under the rule of reason analysis, the question is whether the restrictions actually implemented is fairly necessary in the circumstances of the particular case, or whether the restrictions exceeds the outer limits of restraint reasonably necessary to protect the defendant.

***Antitrust & Trade Law > Sherman Act***
Section 2 of the Sherman Act provides that every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several States, shall be deemed guilty of a misdemeanor *15 U.S.C.S. § 2.*

***Antitrust & Trade Law > Sherman Act***
To establish the offense of an attempt to monopolize under § 2 of the Sherman Act, plaintiff must show; (1) a specific intent to monopolize; and (2) the consequent dangerous probability of success within the relevant geographic and product markets. In proving specific intent, a mere intention to prevail over rivals or improve market positions is insufficient. Even an intent to perform acts that can be objectively viewed as tending toward the acquisition of monopoly power is insufficient, unless it also appears that the acts are not predominately motivated by legitimate business aims. Direct evidence of specific intent need not be shown; it may be inferred from predatory or exclusionary conduct.

**COUNSEL:**
[*1]

Steven M. Kramer, Esq. Suite 409, The Warwick 17th & Locust Sts., Phila, PA 19103 for Plaintiff.

Abraham C. Reich, Esq. 2000 Market St., 10th

Floor Phila, PA 19103 for American Contract Bridge League & (*)

      (*) Kenneth Chatzinoff, Dolores Close, Raymond Raskin, Harvey Cohen, T. Craig Robinson, A. Freeman Mason, Charles Gray, Earnest Philips.

Nicholas Emper, Esq. Legal Arts Bldg, 334 W. Front Bldg. PO Box 319, Media, PA 19063 for Thomas Urso, Nancy Corcoran, Robert & Lola Divins.

Ronald J. Klimas, Esq. Legal Arts Bldg., 344 W. Front St. P.O. Box 319, Media, PA 19063 for Robert & Lola Divins.

**OPINIONBY:**
GILES

**OPINION:**

MEMORANDUM

GILES, J.

Joseph Livezey, in his amended complaint, accuses the American Contract Bridge League (ACBL), eight individuals who were members of the Conduct and Ethics Committee of the Philadelphia Contract Bridge Association (PCBA), his former partners Robert and Lola Divins, Nancy Corcoran and Thomas Urso of conduct tantamount to a group boycott. Livezey asserts that the purpose of this alleged group boycott was to eliminate him from competition in professional contract bridge tournaments and in operating contract bridge franchises to "personally benefit **[*2]** the defendants and co-conspirators economically." Amended Complaint, P33. Livezey further claims that defendants, by their actions, have violated § § 1 and 2 of the Sherman Act, *15 U.S.C. § § 1* and 2. Plaintiff also claims, by pendent jurisdiction, that the Divinses slandered and libelled him.

Defendants have filed motions for summary judgment. Each contends that Livezey' s evidence is insufficient to prove the existence of a conspiracy or an attempt to monopolize. They also contend that (1) courts have recognized a need for self-regulatory organizations; (2) the individual defendants did not violate the antitrust laws when they filed complaints against Livezey with the ACBL; and (3) the ACBL

did not violate the antitrust laws when it found Livezey and the Divinses were represented by counsel. Defendants' contentions are well taken and for the reasons which follow, their motions for summary judgment will be granted.

FACTS

The ACBL, a non-profit corporation with about 200,000 members, promotes the playing of duplicate bridge for members and non-members throughout the United States, Mexico and Canada. The members of the ACBL are also members of one of the 325 local units of the ACBL, **[*3]** of which the PCBA is one. Each of the local units is an independent self-governing membership, association or corporation which has jurisdiction over a given geographical area. ACBL membership is open to anyone of good moral character. Members can be disciplined or expelled only for violation of the Code of Disciplinary Regulations or conviction of a crime involving moral turpitude.

The ACBL, in addition to having 325 local units, is divided into twenty-five geographical districts, each electing a director to the National Board of Directors of the ACBL by vote of the units within the district. Members of the National Board of Directors serve without pay. Their responsibilities include (1) electing the national officers including the chairman of the board, the president and the treasurer, all of whom serve without pay and (2) meeting three times a year to determine the policy and make all major decisions concerning the ACBL and its operations. The National Board of Governors consists of three members and two alternate members, all of whom serve without pay. They are elected by units from each of the twenty-five districts. The ACBL also has a staff of employees directed by the executive **[*4]** secretary and general manager which operates under the supervision of the officers and directors of the ACBL.

No cash prizes, merchandise or financial benefits of any consequence are awarded or permitted to be given to successful players in tournaments and games run or sanctioned by the ACBL. Instead, Master Points are awarded to players who win or finish high in tournaments or events. Players may also receive a trophy or certificate evidencing their win in ACBL tournaments. The ACBL has developed a standard method of awarding fractional and full Master Points in all games under its auspices. Although prize

money is never awarded, bridge experts are sometimes paid for playing as partners of a sponsor in a tournament, and they are considered to be playing as "professionals." The ACBL does not negotiate any contracts between professionals and sponsors, is not involved directly or indirectly in such contracts and does not participate in the fees which are paid such professionals. However, the ACBL does award bridge franchises. A bridge franchise is the right to conduct bridge games under ACBL auspices in exchange for a certain amount of money.

In 1975 the ACBL adopted its Code of Disciplinary [*5] Regulations, the stated purpose being "to provide a fair hearing to every member charged" with misconduct or an infraction of the laws of duplicate contract bridge and to ensure that the member receives due process to the fullest possible extent. Under the Code, a member charged with misconduct receives written notice of the date, time and place of the hearing, is furnished with written charges, has the right to be represented by counsel, has the right to produce evidence on his own behalf and to be present when evidence is produced against him, and has the right to be present during the entire hearing. The Code lists and defines the various sanctions which include "reprimand," "censure," "suspended sentence with probation," "suspension," "expulsion," and "exclusion from events." It also explains the appeal procedures. A disciplined member may appeal rulings imposed by his/her unit to the District as a matter of right. The ACBL Board of Directors hears appeals in certain instances, enumerated in the Code, one being a reversal or modification by a District of a Unit ruling.

Livezey considers himself, and is generally considered by the bridge world, a bridge professional. To be so considered, [*6] one must play and/or teach bridge for remuneration. Livezey has been teaching bridge at adult evening schools, to private groups and at country clubs for several years. He estimates that his yearly income from playing and teaching bridge was about $10,000 before he was suspended by the ACBL. n1 Not only is Livezey known as a bridge professional, he is considered to be a national bridge figure.

n1 Even though that suspension has been stayed pending the outcome of this litigation, Livezey claims that his reputation has been tarnished by the ACBL action and he

consequently has lost teaching positions he previously had, resulting in reduced income.

Livezey has been a member of the ACBL for about eighteen years. He testified during his deposition that he believes that there is a need for rules and regulations for the playing of bridge and that someone who fails to abide by the rules and regulations should be appropriately disciplined. In fact, he has, on more than one occasion, filed complaints against fellow bridge players for violation of the Code. Although the majority of his complaints had to do with infractions occurring at the bridge table during a tournament rather than accusations [*7] of unethical conduct, at least one of his complaints resulted in a player being placed on probation for one year.

In 1976 Livezey was involved in a disciplinary proceeding in New York. He and his partner were accused of playing the same hand twice. Although Livezey denied recognizing the hand as having been played already, the Conduct and Ethics Committee ("C&E Committee") decided he was too experienced a player not to have recognized it. The C&E Committee disqualified Livezey' steam from the event and placed Livezey on probation for three months. Livezey did not appeal the reprimand.

In July of 1981, Livezey entered into a business partnership with Lola Divins and a real estate partnership, centering on the joint ownership through mortgage, of a building ("the Aston building"), with both Bob and Lola Divins. Sometime in late August or early September, Lola Divins and Livezey began having disputes over the operation of the partnership. Initially, the disputes centered on the financial arrangements with respect to the building. Livezey agreed to pay the Divinses' share of the September mortgage with the understanding that they would repay him. Instead, they filed a suite in state [*8] court for an accounting and for a partition of sale of the real estate. The disputes then escalated to include the bridge aspects of their partnership. Even though Livezey already had a bridge franchise at the Aston building and it is against ACBL policy to grant two franchises at the same address, the ACBL did grant Lola Divins a franchise at the Aston building. This mistake occurred because Lola Divins failed to put the exact address for the place of the franchise on her application. Livezey complained to Alan Oaks, Operations Manager for the ACBL, about the

granting of a franchise to Lola Divins at the Aston building. Even though Oaks agreed that granting two franchises at the same address was contrary to ACBL rules, he told Livezey that the matter was essentially out of the hands of the ACBL because the dispute boiled down to one over rights to the building.

Once a franchise was granted to Lola Divins, she began holding games on the same nights as Livezey. This could be done because there were two floors. However, the upstairs level was a little larger and more pleasant than the downstairs level. Lola Divins managed to hold many of her games upstairs by arriving before Livezey **[*9]** to set up for the games. At a meeting, where an unsuccessful attempt was made to work out the problems that had developed between Lola Divins and Livezey, Livezey informed her that he had rented out the upstairs to Barbara Hill for a non-bridge holiday party to begin at 6:00 p.m. on December 29, 1981, a Tuesday night. Tuesday nights had become one of Lola Divins' regular bridge nights, a fact of which Livezey was aware.

The Hill party began as scheduled at about 6:00 p.m. When the Divinses arrived to set up for the bridge game, they found the upstairs usurped by the party. The Divinses removed chairs and a coffee pot from the upstairs and proceeded to hold the bridge game downstairs, which was cold and smoke filled, while the party continued upstairs. There was music and dancing at the party, which many of the bridge players found disturbing. Threatening comments were exchanged. The police were called several times. Finally an ambulance was called because an elderly woman, with a history of heart problems, who was attending the bridge game became ill. Shortly thereafter, the party disbanded.

Tom Urso, one of the individuals who attended the Divins bridge game on December 29th wrote **[*10]** a letter to the C&E Committee complaining about the party. In this letter he charged, among other things, that (1) "[t]he Livezeys' decision to have a party for family and friends in the place and during the time period reserved for Lola Divins' s[sic] weekly bridge game was made with the sole intention of disrupting the bridge game; (2) Anne Livezey made a racial/ethnic slur; and (3) the people at the party stomped on the floor making it difficult to hear downstairs. Urso letter, ACBL Ex. 6 to Livezey Deposition. The letter was signed by several people who had attended the Divins bridge game including

Bob Divins.

On January 13, 1982, John Marks, President of the PCBA, wrote to Alan Oaks regarding the Livezey-Divins matter. n2 Oaks responded in a letter dated January 21, 1982 that he was already familiar with the matter through conversations with Livezey and Divins and later through conversations with Jane Segal. Oaks indicated that it would be inappropriate for someone from the national office to attend the hearings because it was a local matter He then stated: "I will assure you that the League will back up the committees 100% on whatever action is taken." He concluded by saying **[*11]** that "this situation appears to be a very serious matter" and he was happy it was being handled by Marks' unit, which had proven itself very capable in the past. Plaintiff's Opposition to Motion for Summary Judgment, Ex. A.

> n2 Neither Marks nor the PCBA is listed as a defendant in the action now pending before this court. However, Livezey argues that under *American Society of Mechanical Engineers v. Hydrolevel Corp., 456 U.S. 556 (1982),* the PCBA and John Marks acted with the apparent authority of the ACBL and thus the ACBL is liable for their acts. Because this court finds the record contains no evidence that the PCBA or any of its members violated section 1, (see discussion, infra) plaintiff's apparent authority argument is moot. Although Oaks is not listed as a defendant, the ACBL is and it will be assumed for purposes of this motion that Oaks, as Operations Manager for the ACBL, acted as the ACBL's agent.

The C&E Committee convened a hearing on February 20, 1982 to consider charges against Livezey (violation of §§ 2.6 and 2.11 of the Code), Anne Livezey (violation of §§ 2.6 and 2.11 of the Code), Joe Livezey, Sr. (violation of § 2.6 of the Code), Tom Urso (violation **[*12]** of § 2.6 of the Code), Bob Divins, Sr. (violation of §§ 2.11 and 2.12 -- the later violation having occurred on a different occasion) and Bob Divins, Jr. (violation of § 2.6 of the Code). n3 All partie were given proper notice and allowed to be represented by counsel. At the beginning of the hearing, Livezey objected to the presence of Jane Segal. Since Segal was not a member of the C&E Committee and was not going to testify, Livezey saw no reason for her to be there. He

also felt that she was out to get him because of a previous incident and that she could exercise undue influence over the C&E Committee. Despite Livezey's objections, Segal was permitted to stay. She did not participate in the closed meeting where the Committee made its decision.

> n3 Section 2.6 makes "[a]nti-social behavior at the site of an ACBL sanctioned game or tournament" grounds for discipline. Section 2.11 makes "[a]ctions unbecoming a member of the ACBL, e.g., improper actions at the time and site of a tournament, including parking lots, elevators, restaurants, hotels" grounds for discipline. Section 2.12 makes "[i]nfluencing or attempting to influence an entrant to withdraw from any ACBL event" grounds for discipline. [*13]

The hearing was extremely long, lasting over fifteen hours. Thirty-three witnesses were scheduled to testify. However, seven of the Divinses' witnesses did not testify after the two attorneys representing the Divinses and Livezey stipulated that the testimony of these witnesses was that the noise they heard from the party was continuous, loud stomping. Two of Livezey's witnesses were taken out of turn to accommodate their schedules. The rest of the Livezey witnesses testified towards the end of the hearing. Four of Livezey's witnesses left before they had the opportunity to testify because of the length of the hearing. Letters submitted by two individuals supporting Livezey were not accepted into evidence by the C&E Committee. In all, sixteen people testified on behalf of the Divinses and ten people testified on behalf of the Livezeys. During a short recess which began at 8:15 p.m., Ken Chatzinoff, a C&E Committee member, approached Livezey's attorney and suggested that time could be saved if the charges against the Divinses and Tom Urso were dropped since there did not seem to be a case against them. Many of the Divinses witnesses and only two of Livezey's witnesses had been heard [*14] by the C&E Committee at the time Chatzinoff made this statement. Livezey's attorney felt that Chatzinoff's statement revealed his predisposition in favor of the Divinses and Urso inasmuch as he had made this determination without having heard much of Livezey's evidence. However, she did not speak to the Chairman of the C&E Committee about Chatzinoff's statement. Indeed, the Chairman was not made aware of the statement until the C&E Committee's decision

was appealed.

Halfway through the hearing, Livezey's attorney requested a continuance because she was exhausted and a couple of Livezey's witnesses had already left. This request was denied after a poll was taken and it was discovered that the C&E Committee and witnesses could not be reassembled until two weeks later because of conflicting schedules. In a closed meeting, the Committee made its decision promptly following conclusion of the testimony in the matter. This decision making took about one hour.

The C&E Committee dismissed the case against Bob Divins, Jr. While it found Bob Divins, Sr. and Tom Urso not guilty of the charges brought against them, it sent cautionary letters to both. Joe Livezey, Sr, was found not guilty of the [*15] charge against him. The C&E Committee found Anne Livezey guilty of violating § 2.6 of the Code for uttering an ethnic slur. She was suspended for one month and placed on probation for twelve months thereafter. It found Livezey not guilty of violating § 2.6 but guilty of violating § 2.11. In a 9-0 decision it determined that the party was planned that night specifically to disrupt the bridge game. Although Livezey had every right to hold a party in the building, Livezey's being a club manager, a certified director and a national bridge figure conferred upon him certain obligations. The disruption suffered by the bridge players because of the party was, in the Committee's opinion, inexcusable. It consequently placed him on suspension for six months to be followed by a two year probation.

Livezey appealed the decision to the District 4 Judiciary Committee. The District Committee decided that the Committee below had correctly found Livezey guilty of a violation. However, it reduced the penalty to censure and three month's probation because:

(1) The C&E Committee may have given undue weight to the 1976 New York incident;

(2) The C&E Committee did not give appropriate weight [*16] to the business differences between Livezey and the Divinses; and

(3) The petition setting forth the charges against Livezey was couched in especially strong, vituperative language and may have had a prejudicial

impact on the C&E Committee.

The C&E Committee appealed the District Committee's modification of the penalty imposed on Livezey to the Appeals & Changes Committee of the ACBL. Livezey cross-appealed. However, had the C&E Committee not appealed the District Committee's decision, Livezey would not have appealed the decision at all. He would have been happy to let the matter rest. Both the C&E Committee and Livezey presented their positions to the Appeals Committee via letter. The Appeals Committee reinstated the penalty imposed on Livezey by the C&E Committee.

Livezey then filed this lawsuit. He named as defendants Tom Urso, Nancy Corcoran, the Divinses, the ACBL and all of the members of the C&E Committee except Peter Weglarski, who apologized to Livezey after the hearing.

### SUMMARY JUDGMENT STANDARD

Summary judgment may be granted

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [*17] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56; *Hollinger v. Wagner Mining Equipment Co., 667 F.2d 402, 405 (3d Cir. 1981).* See also, *Continental Insurance Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982).* Any doubts as to the existence of a genuine issue of fact and any inferences drawn from the evidence submitted must be resolved in favor of the party opposing the motion. *Continental Ins. Co., 682 F.2d at 438,* quoting *Hollinger, 667 F.2d at 405* (other citations omitted). Although summary judgment has been "'[c]haracterized as both a 'drastic' and ' extreme' remedy,'" it should be granted when doing so would "' avoid waste of time and resources of both the litigants and the Court where trial would be a useless formality.'" *Associated Film Distribution Corp. v. Thornburgh, 520 F. Supp. 971, 977 (E.D. Pa. 1981),* rev'd on other grounds, *683 F.2d 808 (3d Cir. 1982),* quoting *Hollinger v. Wagner Mining Equipment Corp., 505 F. Supp. 894, 896-98 (E.D. Pa. 1981).*

Plaintiff argues strenuously that summary judgment is inappropriate in antitrust actions, especially [*18] where motive and intent are at issue. The Supreme Court has cautioned that "' summary procedures should be used sparingly in complex litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.' " *Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc., 394 U.S. 700, 704 (1969),* quoting *Poller v. Columbia Broadcasting System, 368 U.S. 464, 473 (1962).* Nonetheless, this cautionary instruction does not preclude the granting of summary judgment in all antitrust actions. See *Lupia v. Stella D'Oro Biscuit Co., 586 F.2d 1163, 1166 (7th Cir. 1978),* cert. denied, *440 U.S. 982 (1979); Harold Friedman, Inc. v. Kroger Co., 581 F.2d 1068, 1071, 1080 (3d Cir. 1978).* As the Third Circuit stated in *Harold Friedman, supra,* "' the question whether summary judgment is appropriate in any case is one to be decided on the particular facts of that case. ...' " *Id. at 1080,* quoting *First National Bank of Arizona v. Cities Service, Co., 391 U.S. 253, 259 (1968).* Despite plaintiff' s arguments that this is a case in which motive and intent are at issue, he has put nothing in the record [*19] to support his allegations that defendants conspired to put him out of business. See discussion infra. Thus, as in *Lupia, supra,* the issue is not the intent of defendants but "whether plaintiff has alleged any facts demonstrating a violation that ' fits within the requirements for an antitrust recovery, a question of law that can be answered by the court." *Id. at 1166.* In addition, the adequacy of the procedural safeguards afforded plaintiff by the ACBL is a question of law. See *Cooney v. American Horse Shows Association, 495 F. Supp. 424, 432 n.5 (S.D.N.Y. 1980).* In concluding that this case is an appropriate one for summary judgment, this court notes that:

[T]he very nature of antitrust litigation would encourage summary disposition of such cases when permissible. Not only do antitrust trials often encompass a great deal of expensive and time consuming discovery and trial work, but also, ... the statutory private antitrust remedy of treble damages affords a special temptation for the institution of vexatious litigation .... If a trial would serve no useful purpose, summary judgment is proper.

*Mid-South Grizzlies v. National Football* [*20]

*League, 550 F. Supp. 558, 564 (E.D. Pa. 1982),* aff'd, *720 F.2d 772 (3d Cir. 1983),* cert. denied, *104 S.Ct. 2657 (1984),* quoting *Lupia, supra at 1167.*

Application of the Sherman Act to the ACBL

The ACBL and members of the C&E Committee first contend that they are entitled to summary judgment on grounds that the ACBL is a non-commercial entity and, as such, is not subject to the Sherman Act. In support of this position, defendants rely heavily on a statement made by the Supreme Court in *Apex Hosiery Co. v. Leader, 310 U.S. 469, 493:*

The end sought [by enactment of the Sherman Act] was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury.

(footnote omitted). Defendants then cite several other cases where the courts, in determining that the Sherman Act did not apply in the particular instance at hand, relied upon the statement in Apex Hosiery. However, scrutiny of Apex Hosiery and the **[*21]** other cases relied upon by defendants reveals that the courts have focused not so much on whether the entity itself was non-commercial, but on whether the entity' activity was non-commercial. See *Council for Employment & Economic Energy Use v. WHDH Corp., 580 F.2d 9 (1st Cir. 1978),* cert. denied, *440 U.S. 945 (1979)* (activity in question was basically political which is not within the purview of the Sherman Act -- citing *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 137); Marjorie Webster Jr. College v. Middle States Assn. of Colleges & Secondary Schools, 432 F.2d 650* (D.C. Cir.), cert. denied, *400 U.S. 965 (1970)* (defendant' s chief activity, and the activity at issue, was the accrediting of educational institutions, a non-commercial activity); *Selman v. Harvard Medical School, 494 F. Supp. 603, 621 (S.D.N.Y. 1980),* aff'd 636 F.2d 1204 (2d Cir. 1980) (plaintiff challenged "a distinctly non-commercial aspect of the practice of the 'learned professions,' to wit: admissions criteria"); *Missouri v. Nat'l Organization for Women, Inc., 467 F. Supp. 289 (W.D. Mo. 1979),*

aff'd 620 F.2d 1301 (8th Cir.), cert. denied **[*22]**, *449 U.S. 842 (1980)* (defendant' boycott occurred in a political, no commercial context); *Miller & Son Paving, Inc. v. Wrightstown Township Civic Assn, 443 F. Supp. 1268 (E.D. Pa. 1978),* aff'd 595 F.2d 1213 (3d Cir.), cert. denied, *444 U.S. 843 (1979)* (defendant' activities political in nature); *Jones v. Nat'l Collegiate Athletic Assn, 392 F. Supp. 295 (D. Mass. 1975)* (defendant' role in setting eligibility standards for intercollegiate athletics was part of the educational program of a major university and plaintiff failed to show any nexus between this activity and commercial activities in which defendant might engage).

More recently, the Supreme Court made clear that an entity' status as a non-profit organization does not in and of itself exempt it from the Sherman Act. *American Society of Mechanical Engineers v. Hydrolevel Corp., 456 U.S. 556, 576 (1982).* Nor does the fact that the entity in question is one usually thought to be non-commercial in nature end the inquiry. See *Goldfarb v. Virginia State Bar, 421 U.S. 773, 787 (1975).* As the Court stated in Goldfarb: "[T]he Sherman Act ' on its face ... shows a carefully studied attempt to bring **[*23]** within the Act every person engaged in business whose activities might restrain or monopolize commercial intercourse among the states.' "*Id. at 788,* quoting *United States v. South-Eastern Underwriters Assn, 322 U.S. 533, 553 (1944).* Thus, in determining if the ACBL is subject to the Sherman Act the question really is whether the activity being challenged is commercial in nature and has the propensity to be anti-competitive. Both questions, with respect to the ACBL, must be answered in the affirmative.

Although the ACBL does not award cash or like prizes, it derives benefits from its Master Point scoring system and from the influence it exercises generally in the bridge world, both of which generate dues paying members, and from awarding franchises, which it does for a fee. Generally speaking, then, the ACBL' activities are not purely non-commercial in nature. See *American Society of Mechanical Engineers, supra at 576.* Turning to the activity challenged here, a member suspended by the ACBL can no longer serve as a club manager or club director. Consequently, the ACBL holds considerable power over the livelihood of professional bridge players who rely primarily on playing **[*24]** in and

running bridge games for their income. By its Disciplinary Code, the ACBL has the ability to suspend and expel members. Thus, it has the ability to engage in anti-competitive behavior. In sum, the ACBL, as a national organization which exercises extra-judicial powers over its members and, in certain instances, their means of producing an income, is "engaged in business whose activities might restrain or monopolize commercial intercourse among the states." *Goldfarb, supra at 787* (citations omitted). Consequently, it is not exempt from the Sherman Act. See *Bridge Corp. of America v. American Contract Bridge League, 428 F.2d 1365 (9th Cir. 1970),* cert. denied, *401 U.S. 940 (1971); Cokin v. American Contract Bridge League, 1983-1 Trade Cases P65,367 (S.D. Fla. 1981).*

Section 1 Claims

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce along the several States, or with foreign nations, is declared to be illegal." *15 U.S.C. § 1.* The Sherman Act has been interpreted as prohibiting only unreasonable restraints of trade. *Nat'l Collegiate Athletic Assn. v. Bd. of* **[*25]** *Regents of the Univ. of Oklahoma, 104 S.Ct. 2948, 2959 (1984).* In the Third Circuit, four elements must be present to establish a section 1 violation:

(1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.

Tunis Brothers Co. v. Ford Motor Co., No. 84-1318, slip op. at 12 (3d Cir. May 30, 1985), citing *Martin B. Glauser Dodge Co. v. Chrysler Corp., 570 F.2d 72, 81-2 (3d Cir. 1977),* cert. denied, *436 U.S. 913 (1978).*

Usually, what has come to be known as the rule of reason should be applied to determine whether the alleged section 1 violation has indeed occurred. BEcause analysis under the rule of reason often requires "incredibly complicated and prolonged economic investigation into the entire history of the industry involved," the Supreme Court determined that there are some instances where

there are certain agreements **[*26]** or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

*Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5 (1958).* Under this analysis, certain practices, such as group boycotts, are illegal per se. See *Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207 (1959); Fashion Originators' Guild of America, v. Federal Trade Comm'n, 312 U.S. 457 (1941).* BEcause the per se rule is so sweeping in scope, it is used sparingly. For example, the Supreme Court recently noted that "judicial inexperience with a particular arrangement counsels against extending the reach of per se rules." *Bd. of Regents, supra at 2960 n.21.* The Court stated "a per se rule is applied when ' thepractice facially appears to be one that would always or almost always tend to restrict competition and decrease output.' "*Id. at 2960,* quoting *Broadcast Music, Inc. v. CBS, 441 U.S. 1, 19-20 (1979).* Although the ACBL acts as an extra-judicial body, its **[*27]** practice does not facially appear to be one that would always tend to restrict competition. On the contrary, its very purpose is to promote fair competition among its members. Its Code of Disciplinary Regulations furthers that purpose by providing that a member accused of wrongdoing shall receive notice of a hearing, may be represented by counsel, may present witnesses and may appeal the decision. Moreover, the evidence shows that the C&E Committee abided by the Code in conducting the Livezey hearing. In some circuits, the very fact that Livezey received a hearing accompanied with such procedural safeguards would weaken his claim of a group boycott considerably, if not destroy the claim altogether. See *McCreery Angus Farms v. American Angus Assn, 379 F. Supp. 1008* (S.D. Ill.), aff'd, *506 F.2d 1404 (7th Cir. 1974)* (Association's actions a group boycott because it had a complete monopoly and it failed to afford members with even minimal procedural safeguards); *Blalock v. Ladies Professional Golf Assn, 359 F. Supp. 1260 (N.D. Ga. 1973)* (per se rule applied because plaintiff suspended by her competitiors [sic] who acted with

complete unfettered, subjective discretion and **[\*28]** failed to provide her with a hearing); *Denver Rockets v. All-Pro Management, Inc., 325 F. Supp. 1049, 1065 (C.D. Cal. 1971)* (the requirement of a hearing acts as a check on illegitimate self-regulation and provides antitrust court with a record from which it can determine whether the self-regulation is justified, necessary and sufficiently limited).

Nevertheless, Livezey argues strenuously that he was the victim of a group boycott. He relies heavily on the Third Circuit decision, *Larry v. Muko, Inc. v. Southwestern Pennsylvania Building and Construction Trades Council, 670 F.2d 421* (3d Cir.), cert. denied, *459 U.S. 916 (1982),* which, interestingly enough, restricts application of the per se rule to classic boycotts:

Generally, the application of the per se rule has been limited to those ' classic boycotts in which a group of business competitors seek to benefit economically by excluding other competitors from the marketplace. ' The crucial element' in such boycotts, ...' is an effort to exclude or cause disadvantage to one or more competitors by cutting them off from trade relationships which are necessary to any firm trying to compete.

*id. at* **[\*29]** *429-30,* quoting L. Sullivan, Handbook on the Law of Antitrust 260 (1977). Thus, in the Third Circuit, to establish a group boycott that is illegal per se, one must present evidence that there was a concerted action by his economic competitors to exclude him from the market. See *Malley-Duff & Associates v. Crown Life Ins. Co., 734 F.2d 133, 140 (3d Cir. 1984),* cert. denied, *105 S.Ct. 564 (1985).*

Livezey alleges, consistent with the Third Circuit's statement in Larry V. Muko, Inc., that the defendants were his competitors. n4 The evidence does show that five of the C&E Committee members, Craig Robinson, Earnest Philips, Harvey Cohen, Raymond Raskin and Freeman Mason were qualified or certified directors at the time of the hearing. It also shows that Freeman Mason was, at some time in the past, a club owner. However, other factual evidence in the record destroys the notion that these men were plaintiff' s economic competitors. For example, Freeman Mason ceased being a club owner in Philadelphia in April of 1981, long before the disciplinary hearing took place in February of 1982.

Supplemental Aff. of A. Freeman Mason, Jr. Moreover, Mason does not play or teach **[\*30]** bridge or direct bridge games or tournaments as a means to make money. Id. Earnest Philips has not directed any bridge games for money since 1977. Supplemental Aff. of Earnest L. Philips. Harvey Cohen has not made any money as a director of bridge game for approximately ten years and before that, the money he made in that capacity was minimal, based on directing games at his synagogue. Supplemental Aff. of Harvey S. Cohen. Charles Gray has earned approximately $1,000 in ten years for directing bridge games. Generally, he acts as a bridge director as a favor to someone or for charity. Supplemental Aff. of Charles Gray. Craig Robinson has not earned any money directing bridge games for at least six years. Before that, he directed bridge games sporadically and as a favor to other people, his total earnings not exceeding $200. Supplemental Aff. of T. Craig Robinson. Raymond Raskin is currently acting as a bridge director, as he has since 1979. However, since 1979 he has earned only several hundred dollars in this capacity. Raskin also teaches bridge at night school, earning approximately $500 per year for doing so. He has not obtained, nor does he intend to obtain, any additional teaching **[\*31]** positions since the disciplinary proceeding against Livezey. Supplemental Aff. of Raymond L. Raskin.

n4 He also argues that the C&E Committee members were biased against him, that the hearing was a sham, used only for purposes of excluding him from bridge competition, and that the sanctions imposed against him were much more severe than sanctions imposed against those guilty of more grievous conduct -- demonstrating that the sanctions were imposed in an arbitrary and discriminatory manner. Because this court finds that there is no evidence supporting Livezey' s claim that he was excluded by his business competitors, who would have benefitted economically by his exclusion, and thus no group boycott, his claims regarding the hearing and the discipline will be considered under the rule of reason analysis.

Plaintiff does not rebut these affidavits with any admissible evidence from which anti-competitive motive can be inferred. Indeed, during his deposition, Livezey testified he did not know if Robinson, Gray, Philips or Cohen earned money by playing or

teaching bridge or if they owned franchises. Livezey Dep. at 40-43. Although Livezey knew that Raskin plays bridge for a fee, he did [*32] not know if he did so on a regular basis and he believed that Raskin does not make his living playing bridge. Id. According to Livezey, Mason now lives in California. Id. at 46. Livezey later submitted a supplemental affidavit in which he charged that each member of the C&E Committee was a direct competitor of his during the hearing because they each played bridge against him at tournaments. However, it has already been established that the ACBL does not award cash prizes or the like. Thus, playing bridge competitively is not a means of benefitting economically. To be Livezey' competitors for section 1 purposes than, bridge would have to be the C&E Committee members' principal source of income. According to the record, such is simply not the case.

Livezey points to a letter written by Robinson to other C&E Committee members as evidence of Robinson' attempts to interfere with Livezey' business relationships. Plaintiff' Ex. F; Plaintiff' Supplemental Aff. at P2. Robinson' letter requested input from other C&E Committee members for a letter that he was writing to Livezey expressing concern about the number of recorder slips filed against Livezey complaining about his actions [*33] at the bridge table. n5 Robinson' letter indicated that the letter to Livezey would be copied to his partners. This letter evidences Robinson fulfilling his duties as a member of the C&E Committee. It contains absolutely nothing from which it can be inferred that Robinson was as an economic competitor of Livezey' s.

> n5 Livezey relies on the letter not only as evidence of anti-competitive behavior, but also as evidence of bias against him. The issue of bias will be discussed under the rule of reasons analysis.

The National Appeals and Charges Committee was composed of Leo Spivack, an investment broker, William Gross, a practicing attorney, Edgar Theus, a retired attorney and Richard Hewitt, a practicing attorney. Aff. of Leo J. Spivack. Moreover, Livezey does not maintain that any of the National Committee members were his competitors. Thus, the undisputed evidence shows that none of the members of the National Committee that voted to reinstate the penalty imposed by the C&E Committee on Livezey

were his economic competitors.

Finally, there is absolutely no evidence that Tom Urso or Nancy Corcoran were Livezey' economic competitors. About the only person in this matter that [*34] can be considered Livezey' competitors, are the Divinses. However, since there is no evidence that they engaged in a concerted action with the other defendants to exclude Livezey, see discussion, infra, the group boycott claim fails as to them as well.

Not only does plaintiff lack evidence of the C&E Committee members as his economic competitors, his evidence of a conspiracy is wholly inadequate. The burden is upon "the antitrust plaintiff [to] present direct or circumstantial evidence that reasonably tends to prove that the [defendants] ' had a conscious commitment to a common scheme designed to achieve an unlawful objective.' "*Malley-Duff & Associates, supra at 142,* quoting *Monsanto Co. v. Spray-Rite Service Corp.,   U.S.   , 104 S.Ct. 1464, 1471 (1984)* (citations omitted).

There is no evidence that Urso, Corcoran, the Divinses and the C&E Committee conspired against Livezey. Instead, the evidence shows that Urso had every reason to author a letter complaining about the party and the noise resulting therefrom. Moreover, the letter contained many signatures and most of the individuals who signed the letter were not named as defendants in this [*35] action. Although for purposes of this motion, the Divinses are Livezey' s competitors, there is no evidence that they engaged in concerted action with other defendants to exclude Livezey from the ACBL. They did sign Urso' letter. However, they too had legitimate reasons for doing so. inasmuch as it was their bridge game that was disrupted by the party. The record contains absolutely no facts from which it can be inferred that the Divinses conspired with the C&E Committee. Indeed, when addressing the conspiracy aspect of his claim, Livezey shifts away from the acts of the Divinses to those of Jane Segal, who was not even named as a defendant in this action. For example, Livezey focuses the court' attention on a letter written by Segal as evidence of her bias against Livezey. As chairman of the PCBA' sClub Committee, she informed Oaks that on February 20, 1982, the Club Committee "found Mr. Livezey guilty of thoughtlessly disturbing and disrupting a game." Plaintiff' Supplemental Memorandum, Plaintiff' Ex. V. The Club Committee recommended that Livezey

be suspended for three months and placed on probation for two years, and that this sentence be served concurrently with the C&E Committee **[*36]** sentence. Given that Segal was the Chairman of the Club Committee, the sentence recommended by the Club Committee was less severe than that imposed by the C&E Committee, and the Club Committee recommended that the sentences be served concurrently rather than consecutively, this letter does not show bias on the part of Segal.

Examples of the other evidence which Livezey contends supports his theory that he was the victim of a conspiracy follows: (1) the C&E Committee members attended parties given by Jane Segal where they "roasted" Livezey (Livezey Dep. at 151); (2) Raskins told Livezey things were really bad for him before the hearing took place (id.); (3) Robinson hates Livezey and has called Livezey a "cheat" (id.); (4) Philips told Livezey that he (Livezey) had been caught cheating in New York (id.); (5) Jane Segal told Livezey she intended to diver him out of business (Livezey Aff. at P17, Plaintiff' Ex. L.); and (6) Segal competes with Livezey as a teacher of bridge and she recommended to the C&E Committee that Livezey be suspended. These are nothing more than unsubstantiated allegations and hearsay, which do not suffice as evidence of a conspiracy. *Mid-South Grizzlies* **[*37]** *v. Nat'l Football League, 550 F. Supp. 558, 569 (E.D. Pa. 1982),* aff' d *720 F.2d 772 (3d Cir. 1982),* cert. denied, *104 S.Ct. 2657 (1984).* As the Third Circuit cautioned in *In re Japanese Electronic Products Antitrust Litigation, 723 F.2d 238, 304 (3d Cir. 1983)* "[t]here are ... limits beyond which reasonable inference-drawing degenerates into groundless speculation, limits having due process aspects." (footnote omitted).

Livezey places special significance on a letter written by Alan Oaks to John Marks, President of the PCBA at the time of the disciplinary hearing, in which Oaks assured Marks "that the League will back up the committees 100% on whatever action is taken." Plaintiff' Ex. A. The only inference to be drawn from this letter is that whether the committees found Livezey guilty of a violation or not guilty of a violation, the League would support their decision. Moreover, the record evidence reveals that Oaks had no communication with the National Appeals and Charges Committee regarding Livezey' s appeal. Affidavit of Leo J. Spivack. Oaks was not a member

of the National Committee and there is no evidence that he exercised any influence over it.

The evidence **[*38]** produced by Livezey to establish a classic group boycott falls far short of what is necessary. It simply does not show that Urso, Corcoran, the members of the C&E Committee or the members of National Appeals and Charges Committee were Livezey' competitors who stood to gain economically, or in any way by excluding him from the ACBL. n6 Nor is there admissible evidence of a conspiracy or concerted action among these defendants and the Divinses to exclude Livezey. Plaintiff' reliance on *Blalock v. Ladies Professional Golf Assn., 359 F. Supp. 1260 (N.D. Ga. 1973)* is misplaced. The Blalock court relied on existing Fifth Circuit precedent which did not restrict the application of the per se illegality to classic group boycotts. The court in Blalock reasoned that "the touchstone of per se illegality has been the purpose and effect of the arrangement in question. Where exclusionary or coercive conduct has been present, the arrangements have been viewed as ' naked restraints of trade,' and have fallen victim to the per se rule.' *Id. at 1265,* quoting *E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee, 467 F.2d 178, 187 (5th Cir. 1972),* cert. **[*39]** denied, *409 U.S. 1109 (1973).* Consequently, the Fifth Circuit applied the per se rule to a wider range of activities than the Third Circuit currently allows. Accordingly, this court will apply a rule of reason analysis to determine if there has been a section 1 violation.

n6 Plaintiff cites *Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982)* for the proposition "[t]hat a group boycott can be illegal under the antitrust laws even where the parties are not competitors of each other." Plaintiff' s Supplemental Memorandum in Opposition to Motion for ACBL Defendants for Summary Judgment. Plaintiff' reliance on McCready is completely misplaced. In McCready, the Supreme Court addressed the issue whether a consumer challenging the Blue Shield policy of reimbursing her for bills from psychiatrists, but not from psychologists, had standing to bring an antitrust action under § 4 of the Clayton Act, *15 U.S.C. § 15.* In holding that she did have standing, the Court held that McCready, as a consumer, could be injured by

an anti-competitive scheme on the part of Blue Shield and thus may be entitled to damages under the antitrust laws. McCready does not address the elements necessary to make out a claim of a group boycott and neither directly nor inferentially overrules *Larry v. Muko, Inc., supra.* **[*40]**

Under the rule of reason, the inquiry "is whether the challenged agreement is one that promotes competition or one that suppresses competition. "' The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.' *Nat'l Society of Professional Engineers v. United States, 435 U.S. 679, 691 (1978)* (citation omitted). The rule of reason analysis requires an examination of

the facts peculiar to the business to which the restraint is applied, its condition before and after the restraint was imposed, the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

*Fleer Corp. v. Topps Chewing Gum, Inc., 658 F.2d 139, 148 (3d Cir. 1981),* cert. denied, *455 U.S. 1019 (1982);* quoting *Chicago Bd. of Trade v. United States, 246 U.S. 231, 238 (1918).*

Livezey himself admits there is a need for rules and regulations for the playing of bridge. Livezey Dep. at 23. He also **[*41]** believes that someone who fails to abide by the rules and regulations should be appropriately disciplined. More importantly, Livezey was afforded a hearing, he was given adequate notice of the hearing, he was represented by counsel throughout the hearing, and he was allowed to call witnesses, two of whom were allowed to testify out of turn to accommodate [sic] their schedules. In addition, the C&E Committee explained the reasons for its decision. C&E Committee Minutes of February 20, 1982 Meeting, ACBL Ex. 7. The majority of the Committee concluded that Livezey held the party specifically to disrupt the bridge game. The Committee also felt that although Livezey had a right to occupy the building and hold a party where he did, he had obligations to the ACBL as a club manager, certified director and a nationally known

bridge entity. Given these obligations, the Committee felt "the disruption perpetrated on the fifty-two bridge players, including two tables of novices was inexcusable." Id. The minutes indicate that the Committee, in deciding how to discipline Livezey, took into consideration the disciplinary action taken against him at the regional tournament in New York City. **[*42]**

This is not a situation such as that before the Supreme Court in *Silver v. New York Stock Exchange, 373 U.S. 341 (1963)* where the Court held that defendant was guilty of violating section 1 under a rule of reason analysis because the plaintiff was afforded no hearing and no explanation for defendant' actions. The Supreme Court indicated that where a self-policing organization initiates action that will have the effect of excluding a member or outsider, providing notice, a hearing and an explanation for the action helps effectuate "antitrust policies by discouraging anticompetitive applications" of rules which cannot be justified otherwise. The fact that Livezey was afforded a hearing with so many procedural safeguards weakens not only his group boycott theory, but, also, his section 1 claim under a rule of reason analysis.

Nevertheless, Livezey feels that the hearing he received was unfair and the discipline imposed upon him was applied in an arbitrary and discriminatory manner. As evidence that the hearing was in reality a "sham," Livezey points to the bias of some of the C&E Committee to grant the continuance requested, his inability to call important witnesses, intentional **[*43]** conduct by defendants to delay the hearing, the C&E Committee' s refusal to accept written statements on Livezey' behalf, despite the Code of Discipline permitting it to do so, the bias of Livezey' s accusors and the Divinses and, finally, it taking the National Committee only five minutes to reinstate the penalty imposed by the C&E Committee on Livezey. n7

n7 Livezey' sassertions of bias of his accusors and the Divinses barely merits attention. It has already been established that Livezey was engaged in a dispute with the Divinses. Thus, it almost goes without saying that the Divinses and Livezey were undoubtedly biased against each other. However, there is absolutely no evidence in the record, other than plaintiff's

unsubstantiated hearsay, that the Divinses exercised influence over anyone filing a complaint against Livezey or over the C&E Committee. Moreover, people attending the Divinses' bridge game had a legitimate reason to file a complaint against Livezey given the noisy conditions caused by the party under which they tried to play bridge.

Although Livezey did not object, prior to the hearing, to any of the members serving, and all of the C&E Committee members agreed they **[*44]** could serve without prejudice, Livezey claims the members were biased against him. Plaintiff's Ex. N. As evidence of this bias, Livezey directs the court's attention to (1) a letter written by Robinson to other C&E Committee members (already discussed, supra); (2) Mason's having filed a recording slip complaining about Livezey's "psyching" at the bridge table; (3) a suggestion made by Kenneth Chatzinoff during a bread midway through the disciplinary hearing proceedings that the charges against the Divinses and Tom Urso be dropped; and (4) a 1976 letter written by John Marks, President of the PCBA, in which he voiced his disgust that Livezey had received a light penalty for the New York incident.

The Robinson letter evidences nothing more than Robinson carrying out his C&E Committee responsibilities. There is nothing in the letter to indicate that Robinson felt anything towards Livezey other than concern. Mason was one of several people to file a recording slip charging Livezey with the act of "psyching." Plaintiff's Ex F. The evidence shows that Mason filed this complaint only once. While it is unclear when he made the complaint, it appears that it was sometime between 1975 and **[*45]** 1979, quite a bit before the Livezey hearing.

Kenneth Chatzinoff made the allegedly biased statement to Beth Palmer, Livezey's attorney. Beth Palmer Letter of Appeal to the District Committee at 2, ACBL Ex. 13. She did not notify anyone that he had made this statement until she appealed, on Livezey's behalf, the C&E Committee's decision. Philips' Response to Livezey's Appeal, ACBL EX. 14. Although plaintiff contends that only the Divinses' witnesses had been heard when Chatzinoff made his statement, the record shows that two of Livezey's witnesses had already testified. Beth Palmer Statement at 1, ACBL Ex. 13. Moreover, the record shows that the C&E Committee made a unanimous decision with respect to Livezey and there is no contention that Chatzinoff exercised any influence over the other Committee members.

The 1976 letter written by John Marks is totally irrelevant. Aside from the fact that the letter was written in 1976 and the Livezey hearing occurred in 1982, Marks was not a member of the C&E Committee when it held the Livezey hearing. As president of the PCBA, he did attend the hearing. However, he did not participate in the closed session where the C&E Committee considered **[*46]** the charges and evidence and made its decisions. Moreover, Marks was not named as a defendant and Livezey has not alleged that Marks exercised influence over the C&E Committee.

Although a shorter hearing may have been possible, the Committee's rationale for proceeding rather than adjourning and reconvening on another day, as was requested by Livezey's attorney, cannot be said to be arbitrary or unreasonable. The Committee explained, in responding to Livezey's appeal to the District Committee, that a majority of the Committee could not be reconvened until a week or two later and that such an "interval was too long a time and fraught with potential for compromise, memory lapses and other complications that would prevent the Conducts and Ethics Committee from rendering a proper decision." ACBL Ex. 14. In addition, the Divinses helped to shorten the hearing by agreeing to have seven of their witnesses stipulate their testimony rather than actually testify. Such action is hardly evidence of an intentional concerted action to delay the hearing. Plaintiff placed nothing in the record, aside from unsubstantiated hearsay, to support his allegation that there was an intentional attempt to delay **[*47]** the proceedings.

Livezey contends that because of the length of the hearing, several of his "important" witnesses, Edwin Wolf, Matilda Haas, Linda Hennel and Don Phillips, left before having the opportunity to testify. Livezey Dep. at 130. Livezey has indicated that Mr. Wolf would have testified about the Solis meeting, something about which Mary Wolf, Edwin's wife, did testify. Livezey did not know what Mrs. Haas planned to say at the hearing. He surmised that she would have testified about the occasions when Livezey held his bridge games downstairs while the Divinses held theirs upstairs. Both Mrs. Hennel, Livezey's sister, and Mr. Phillips planned to testify

about their recollections of the December 29 incident. Several of Livezey's other witnesses testified about that event. Thus, the testimony of the witnesses who did not testify would, for the most part, have been cumulative of testimony that was heard by the Committee.

Two people wanted to submit written statements in behalf of Livezey for consideration by the C&E Committee. The Code of Disciplinary Regulations permits but does not require the acceptance of such statements by the C&E Committee. The Committee was well within [*48] its rights when it rejected the letters. Moreover, there is no showing that Sue Ayman's statement would have been helpful to Livezey. She attributed the racial/ethnic slur to Robert Divins. It was Livezey's mother, not Livezey, who was found to have uttered the racial/ethnic slur. Ayman's statement contained nothing regarding Livezey's actions at the party helpful to Livezey. In fact, her statement indicates that she was invited to the party by Livezey, not Barbara Hill. Livezey's active participation in inviting guests could undoubtedly have bolstered the C&E Committee's conclusion that Livezey purposefully held the party to disrupt the bridge game.

The crux of plaintiff's real complaint is the severity of the discipline imposed. Indeed, had the C&E Committee not successfully appealed the District Committee's reduction of the penalty to censure and three months probation, Livezey would not have brought this antitrust action. Livezey Dep. at 165. The District Committee distinctly found that: (1) "Livezey planned and held a party on December 29, 1981 knowing that it would coincide in time and place with a regularly scheduled franchised club duplicate;" and "(2) [t]he party interfered [*49] with the running of the duplicate and the enjoyment of the participants. The fact that some twenty of the participants were sufficiently concerned to sign a petition and appear to testify over many hours strongly suggests that the interference was more than minor." ACBL Ex. 15. Thus, the District Committee's reduction of the penalty imposed was not based on a determination that Livezey was innocent of violating the Code. Nor was it based on a determination that the C&E Committee conducted the hearing in an improper manner. The District Committee reduced the penalty because it felt that C&E Committee gave undue weight to the 1976 incident and did not give appropriate weight to the

differences between the Divinses and Livezey. The District Committee's findings are important because Livezey maintains that it was not part of the alleged conspiracy.

Assuming that the National Appeals and Charges Committee took only five minutes to reinstate the C&E Committee's penalty, this length of time is immaterial. The issue to be decided was whether the penalty imposed by the C&E Committee was appropriate. Because there was no question that Livezey was guilty of violating the Code, the decision boiled [*50] down to whether the C&E Committee acted correctly in penalizing Livezey. Since there was no evidence that the C&E Committee acted inappropriately, the National Committee's decision was quite simple.

Under the rule of reason analysis, the question is "whether the restrictions actually implemented is 'fairly necessary' in the circumstances of the particular case, or whether the restrictions 'exceed[s] the outer limits of restraint reasonably necessary to protect the defendant.' "*Fleer Corp., supra at 151-52 n.18, quoting American Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1248-49 (3d Cir. 1975).* To begin with, the evidence amassed against Livezey certainly supports the C&E Committee's determination of Livezey's guilt. Neither appellate committee quarreled with this finding. Nevertheless, Livezey supplies instances in which ACBL members, determined to be guilty of "offenses" which he characterizes as more shocking than his, received far less severe sanctions. However, Livezey ignores the context in which these other offenses occurred juxtaposed to that in which his occurred. First, most of the instances to which Livezey points were first offenses. His was a second [*51] offense. Second, the individuals to whom Livezey points were found guilty of offenses that affected, at the most, four other people. Livezey, on the other hand, was found guilty of disrupting a bridge game involving over twenty people, many of whom were novices. Perhaps most importantly, there is nothing in the record to show that these other offenders held positions in the bridge world comparable to Livezey's. The C&E Committee, in meting out the penalty to Livezey, placed special significance on his position as a certified director, club operator and national bridge figure. Given the extent of the effect of Livezey's actions and his position in the bridge world, the penalty imposed on Livezey can be characterized as 'fairly necessary.'

This is especially so inasmuch as the ACBL works to encourage fair competition and pleasant playing conditions so that newcomers to the game of bridge will be encouraged to continue playing.

Plaintiff has no evidence that "defendants contracted, combined or conspired among each other" or that the conspiracy he alleges "produced adverse, anticompetitive effects within the relevant product and geographic markets" or that the objectives of defendants [*52] in suspending plaintiff were illegal. See Tunis Brothers Co., supra at 12. Thus, he cannot satisfy the criteria necessary in the Third Circuit to establish a section 1 violation.

Section 2 Claim

Plaintiff also asserts a claim under section 2 of the Sherman Act which provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several States, ... shall be deemed guilty of a misdemeanor ...." 15 U.S.C. § 2. The fact that the ACBL holds a monopolistic position in the bridge world is not, in itself, enough to establish a section 2 violation. See Hartley v. American Quarter Horse Assn., 552 F.2d 646, 654 (5th Cir. 1977); Deesen v. Professional Golfers' Assn. of America, 358 F.2d 165, 171 (9th Cir.), cert. denied, 385 U.S. 846 (1966); Cooney v. American Horse Shows Assn., 495 F. Supp. 424, 433 (S.D.N.Y. 1980). The Third Circuit recently explained that:

To establish the offense of an attempt to monopolize under section 2, plaintiff must show; (1) a specific intent to monopolize; and (2) the consequent dangerous probability of [*53] success within the relevant geographic and product markets. ... In proving specific intent, a mere intention to prevail over rivals or improve market positions is insufficient. Even an intent to perform acts that can be objectively viewed as tending toward the acquisition of monopoly power is insufficient, unless it also appears that the acts were not 'predominately motivated by legitimate business aims.' ... Direct evidence of specific intent need not be shown; it may be inferred from predatory or exclusionary conduct ...."

Pennsylvania Dental Assn v. Medical Service Assn. of Pennsylvania, 745 F.2d 248, 260-61 (3d Cir. 1984), cert. denied, 105 S.Ct. 2021 (1985) (citations omitted). Plaintiff here relies on the evidence supplied to support his claim of a group boycott specifically, and section 1 violation generally, to establish inferentially the specific intent necessary to prove a section 2 violation. Given that both plaintiff's group boycott and general section 1 claim have been rejected, plaintiff's section 2 claim fails as well. See id. Equally detrimental to plaintiff's section 2 claim, is this and other courts' determination that the ACBL's purpose [*54] and effect in the bridge world, is the promotion and not restraint of competition. See Bridge Corp. of America v. American Contract Bridge League, 428 F.2d 1365, 1370 (9th Cir. 1970), cert. denied, 401 U.S. 940 (1971); Cokin v. American Contract Bridge League, 1983-1 Trade Cases P65,367 at 70,205 (S.D. Fla. 1981). The undisputed evidence shows that defendants acted not to exclude plaintiff to enhance their position, but rather disciplined plaintiff for his behavior in an effort to continue to promote pleasant playing conditions for fair bridge competition.

Because the defendants' motions for summary judgment are being granted, disposing of the federal claims, the state law claims against the Divinses, which are in this court solely under pendent jurisdiction, are being dismissed as well.

An appropriate order follows.

ORDER

AND NOW, this 12th day of September, 1985, for the reasons stated in the accompanying memorandum, it is hereby ORDERED that defendants' motions for summary judgment are GRANTED. Plaintiff's state law claims against the Divinses are DISMISSED without prejudice to their being filed in state court.

JUDGMENT ORDER

AND NOW, this 12th day of September, [*55] 1985, it is hereby ORDERED that JUDGMENT is entered in favor of defendants and against plaintiff.

F:\27745\001\pleadings\DismissReply.wpd

Alfred R. Fabricant, Esq.
Marc A. Lieberstein, Esq.
OSTROLENK, FABER, GERB & SOFFEN, LLP
1180 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 382-0700
Facsimile:  (212) 382-0888


        - and -


David B. Picker, Esq.
Bruce Bellingham, Esq.
SPECTOR, GADON & ROSEN, P.C.
Seven Penn Center, 1635 Market Street, 7th Floor
Philadelphia, Pennsylvania 19103
Telephone: (215) 241-8888
Facsimile: (215) 241-8844


Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

——————————————————————————x
                                                        :
**BRUNSON COMMUNICATIONS, INC.**                        :
                                                        :
                        **Plaintiff,**                  :
                                                        : **Civil Action No.:  02 CV. 3223**
                        **v.**                          :
                                                        :
**ARBITRON, INC.**                                      :
                                                        :
                        **Defendant.**                  :
——————————————————————————x


**REPLY DECLARATION OF MARSHALL L. SNYDER IN FURTHER SUPPORT OF
DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**



                I, **MARSHALL L. SNYDER**, hereby declare the following to be true and correct under

penalty of perjury:

00584518.1

1.    I am the Executive Vice President of Arbitron, Inc. and President of Worldwide Personal People Meter Development at Arbitron.  I submit this Declaration in support of Arbitron's Motion to Dismiss and to supplement my August 21, 2002 Declaration filed in this action.

2.    As is shown in the Arbitron Form 10-K (Defendant's Exh. A), Arbitron granted Nielsen Media Research an option to join Arbitron in the potential commercial deployment of the Personal People Meter (PPM).

3.    Nielsen has not exercised this option.

4.    There has been no commercial deployment of the PPM anywhere within the United States of America.

5.    The PPM encoder is installed at WGTW and is now working properly.  WGTW data will be included in future test reports provided that WGTW continues to properly encode its data in accordance with Arbitron's standards.


Date: September 30, 2002                                      _____
                                                                                         Marshall L. Snyder