IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRUNSON COMMUNICATIONS, INC.    :    CIVIL ACTION
                                :
                v.              :
                                :
ARBITRON, INC.                  :    NO. 02-3223

MEMORANDUM

Baylson, J.                                          December 31, 2002

Plaintiff Brunson Communications, Inc., owner of Channel 48, WGTW-TV, a small
television station serving the Philadelphia area, alleges that Defendant, in the business of
measuring television viewing by the public, is liable under several causes of action: Sherman
Act antitrust violations, unfair competition under the Lanham Act, disparagement of commercial
products, tortious interference with prospective contractual relations, negligence and promissory
estoppel. Defendant moves to dismiss the entirety of the Amended Complaint pursuant to
Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be
granted. For the reasons which follow, Defendant's Motion will be granted without leave to
amend as to the antitrust and Lanham Act claims, and two of the common law claims. As to
claims for negligence and disparagement, the Motion will be granted without prejudice to
Plaintiff's right to file a Second Amended Complaint.

I.    Procedural History

Plaintiff filed its original Complaint on May 24, 2002. After Defendant moved for
dismissal, Plaintiff filed an Amended Complaint with factual materials attached. Defendant

thereafter filed the present Motion to Dismiss the Amended Complaint and also attached factual

materials.  Following oral argument on Defendant's Motion, the Court allowed the parties a

period of limited discovery to ascertain the nature and extent of Defendant's reports about its

measurement of Plaintiff's penetration of the Philadelphia television market.

The parties then submitted affidavits and other evidentiary materials.  While it appears

that the contents of Defendant's surveys, discussed below, are largely undisputed, it is clear that

Plaintiff and Defendant assert different views as to the nature of certain verbal statements made

by Defendant or its representatives regarding those surveys.  *See infra* Part III.  Because the

material submitted by the parties is not conclusive, it will not be considered in determining the

legal sufficiency of the Amended Complaint.[1]

## II.    Jurisdiction and Legal Standards

This Court has jurisdiction over Plaintiff's Sherman Act claims pursuant to 28 U.S.C. §§

1331 and 1337, and over Plaintiff's Lanham Act claim, which arises under federal law.  *See* 28

U.S.C. § 1331.  With respect to Plaintiff's four common law claims, this Court has jurisdiction

---

[1]  Rule 12(b) provides that if

> on a motion asserting the defense numbered (6) to dismiss for
> failure of the pleading to state a claim upon which relief can be
> granted, matters outside the pleading are presented to *and not*
> *excluded by the court*, the motion shall be treated as one for
> summary judgment and disposed of as provided in Rule 56, and all
> parties shall be given reasonable opportunity to present all material
> made pertinent to such a motion by Rule 56.

Fed. R. Civ. P. 12(b) (emphasis added).  However this Court has "complete discretion to
determine whether or not to accept any material beyond the pleadings that is offered in
conjunction with a 12(b)(6) motion."  *Stauske v. Healtheast, Inc.*, No. 91-cv-1265, 1991 U.S.
Dist. LEXIS 8603, at *2 (E.D. Pa. June 24, 1991) (Cahn, J.) (*quoting* 5 Wright & Miller, *Federal*
*Practice and Procedure* § 1366 (1966)).

pursuant to 28 U.S.C. § 1332, in that Plaintiff has alleged diversity of citizenship and an amount in controversy in excess of $100,000. *See* Amended Complaint ¶ 1-3; *Suber v. Chrysler Corp.*, 104 F.3d 578, 583 (3d Cir. 1997) ("Once a good faith pleading of the amount in controversy vests the district court with diversity jurisdiction, the court retains jurisdiction even if the plaintiff cannot ultimately prove all of the counts of the complaint or does not actually recover damages in excess of [the jurisdictional amount]").

All relevant events alleged in the Amended Complaint occurred in Pennsylvania. Accordingly, this Court will apply Pennsylvania law in determining the legal sufficiency of Plaintiff's four common law claims. *See* 28 U.S.C. § 1652.

When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court may look only to the facts alleged in the complaint and its attachments. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1251, 1261 (3d Cir. 1994). The Court must accept as true all well pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. *Angelastro v. Prudential-Bache Sec., Inc.*, 764 F.2d 939, 944 (3d Cir. 1985). A Rule 12(b)(6) motion will be granted only when it is certain that no relief could be granted under any set of facts that could be proved by the plaintiff. *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir. 1988).

## III.    Allegations of the Amended Complaint

Plaintiff alleges the following facts, which, for the purpose of deciding the instant motion, will be viewed in the light most favorable to Plaintiff. Channel 48, WGTW TV, is a television station owned by Plaintiff, broadcasting within the Philadelphia area. *See* Amended Complaint ¶ 6-7. WGTW is a "small corporation" and "independent of all networks and cable systems." *Id.*

Defendant Arbitron, Inc. is in the business of "constructing and operating measurement systems that monitor listeners and viewers for usage by radio, cable and more recently television stations, and purchasers of advertising time from television stations." *Id.* ¶ 9. Defendant has developed a new technology for measuring television viewership, known as the personal people meter ("PPM"). *Id.* ¶ 10. This PPM technology

> operates by embedding an inaudible signal in the transmitter of the various stations. It then places a receiving device on the person of individuals to detect and record when he is watching television sets tuned to only those stations whose signals which [*sic*] have been imbedded by Arbitron.

*Id.* Plaintiff asserts that Arbitron's PPM technology "hereinafter will supplant any other system because of its superior accuracy and reliability." *Id.* ¶ 49.

According to the Amended Complaint, prior to Defendant's development of PPM, another entity, Nielsen Media Research ("Nielsen"), had the only television viewership measurement system. *Id.* ¶ 11. Plaintiff alleges that Nielsen and Arbitron have "entered into a corporate financial relationship by which Nielsen and Arbitron are related in regard to the new system, the details of which are not known to plaintiff." *Id.* Plaintiff claims that Nielsen is an owner or joint venturer in the PPM project. *Id.* Without specifying any details of the alleged relationship between Arbitron and Nielsen, Plaintiff asserts that together the two companies enjoy a monopoly in the TV viewership measurement market. *Id.* at ¶ 12.

Sometime in 2001, Arbitron began a "test" program to introduce its PPM technology into the Philadelphia market. *Id.* at ¶ 14-15. Plaintiff alleges that Defendant embedded its PPM signal only in the transmitters of Plaintiff's competitors – the larger networks and cable systems – omitting Plaintiff's station from the PPM survey data. *Id.* at ¶ 17. According to Plaintiff,

Arbitron then began to release periodic PPM survey data to advertising agencies, advertisers, television stations and other media sources. *Id.* at ¶ 25. At the time of its PPM test, in the fourth quarter of 2001, Defendant "announced" that the PPM data would "accurately and creditably measure the performance of the entire market." *Id.* at ¶ 15. Moreover, according to the Amended Complaint, on May 20, 2002, at a meeting of the Pennsylvania Association of Broadcasters, Kevin Smith, a Senior Vice President of Arbitron, represented that the PPM survey was fair, accurate and complete. *Id.* at ¶ 32. Plaintiff suggests that these statements were false and malicious. *Id.* at ¶ 17, 32.

Further, Plaintiff alleges, without specifying any details, that the exclusion of Plaintiff from the PPM test was a "boycott imposed at the request of plaintiff's competitors." *Id.* at ¶ 19. Plaintiff claims that Defendant's omission of WGTW from the survey impaired Plaintiff's ability to compete in the market for sales of advertising time, in that advertising agencies would be unable to confirm from the survey that WGTW had a measurable viewership. *Id.* at ¶ 20, 26.

The Amended Complaint asserts that Arbitron had "many meetings" with the larger stations "while designing and pre-testing the system," without inviting Plaintiff. ¶ 34. As a result, Arbitron failed to inform Plaintiff, prior to the test, that inclusion in the survey required the embedding of a signal into WGTW's transmitter. *Id.* at ¶ 21. Allegedly, Defendant only informed Plaintiff's competitors of this requirement, causing Plaintiff to believe that no action on its part was necessary. *Id.* Plaintiff did not learn of the embedding requirement until April 2002, at which time Arbitron visited WGTW to install a PPM encoder. *Id.* ¶ 23, 68. By then the initial PPM survey was substantially completed. *Id.* Plaintiff suggests that, despite its full knowledge of the detrimental effects the omission would have on WGTW, Arbitron refused to reconstruct

the PPM survey to include WGTW. *Id.* at ¶ 29. Nor would Arbitron "prominently" inform the

public that WGTW had improperly been omitted. *Id.* at ¶ 34. Plaintiff claims that Defendant's

motive in omitting Plaintiff was

> to obtain the benefits of working with the larger networks,
> plaintiff's competitors, who have most of the outlets in the
> markets. Therefore its pursuit of profits caused it to knowingly
> give preferential treatment to plaintiff's competitors and exclude an
> independent non-network station that did not have the market
> power of the competitors.

*Id.* at ¶ 35. Though a PPM signal was eventually embedded in WGTW's transmitter in April

2002, *id.* at ¶ 24, the Amended Complaint asserts that Defendant "intentionally and/or

negligently" caused defective encoding of the signal. *Id.* at ¶ 36. This resulted in the continued

omission of WGTW from the PPM surveys until at least June 2002, and further injured

Plaintiff's ability to compete. *Id.*

**IV.    Counts I and II of the Amended Complaint Do Not State a Claim under
the Antitrust Laws upon which Relief Can Be Granted**

A. <u>Count I – Sherman Act, Section One</u>

Plaintiff's Amended Complaint substantially expanded upon the original Complaint.

Not only did Plaintiff add to its Amended Complaint new counts of negligence and promissory

estoppel, but Plaintiff also broadened its antitrust allegations. Whereas the original Complaint

contained only a single antitrust count under Sherman Act Sections One and Two, the Amended

Complaint broke down the two Sherman Act sections into two separate counts, and substantially

expanded the antitrust claim.

The two antitrust counts of the Amended Complaint contain a panoply of antitrust

theories that are so broadly described, as to make it difficult to understand how Plaintiff has been

injured by anything forbidden by the antitrust laws.  Plaintiff has made allegations of

monopolization, refusal to deal, group boycott, "combining and coordinating" and exclusion of

Plaintiff.  The breadth of the Section One charging paragraphs with some factual content about

Plaintiff or Defendant can be seen from these verbatim quotes:

> 43.  Defendant Arbitron has and has utilized its monopoly power,
> in and with an agreement and financial participation of Nielsen
> over the data markets, and on information and belief, marketing
> participation of Nielsen and in concert with plaintiff's competitors,
> in the sales of time market [sic] in Philadelphia, to promote and
> effect the exclusion of plaintiff from the advertising sales or
> broadcasting viewing in the Philadelphia SMSA listener market,
> through a refusal to deal with plaintiff, by conducting, providing
> and promoting its survey, with plaintiff excluded, in restraint of
> trade in interstate commerce, in violation of the Sherman Act
> Section 1.
>
> 45.  Arbitron (with Nielsen) enjoys monopoly powers in the
> providing of viewer measurement in the relevant market, i.e,
> Philadelphia area television viewing market, which is a well
> recognized market for television viewers and advertisers.  It is
> defined by the reach of signals of stations, and the service areas of
> the cable systems.  It includes a radius of about sixty miles from
> City Hall, Philadelphia.
>
> 48.  Through their monopoly over viewer measurement, in the
> Philadelphia market, Arbitron/Nielsen exercise market control over
> competitors in the viewing market.
>
> 49.  Though [sic] its proprietary imbedded system which herein
> after will supplant any other system because of its superior
> accuracy and reliability (when employed fairly) Arbitron has
> monopoly power over the Philadelphia viewer measurement
> market.
>
> 50.  By combining and coordinating with plaintiff's competitors to
> exclude plaintiff from the survey, and through falsely representing
> it as complete defendant sponsored, and practiced a group boycott,
> and participated with plaintiff's competitors in a program to
> exclude plaintiff from the Philadelphia television advertising sales

> market, injuring competition for the sale of advertising and
> delivery of programming, contrary to Section 1, antitrust injury.
> [sic]

Section One of the Sherman Act, prohibits "every contract, combination in the form of

trust or otherwise, or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.[2]  Defendant

asserts that Count I must be dismissed because Plaintiff fails to sufficiently allege a conspiracy, a

plausible market, a cognizable antitrust injury, or a factual basis to support its claim of an

antitrust violation by Defendant.

    *1.  Concerted Action*

The "very essence" of a Section 1 claim is "the existence of an agreement."  *Alvord-Polk,*

*Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir. 1994).  Unilateral activity by a single

person or entity will not suffice.  *See Fisher v. Berkeley*, 475 U.S. 260, 266 (1986).  The Supreme

Court has explained that even if a single company's conduct has "the same economic effect as

concerted action might have, there can be no liability under Section One in the absence of

agreement."  *Id.*

The Third Circuit has long held that a Section 1 plaintiff "must plead the facts

constituting the conspiracy, its object and accomplishment."  *Black & Yates v. Mahogany Ass'n*,

129 F.2d 227, 231 (3d Cir. 1942).  Moreover, a "general allegation of conspiracy without a

statement of the facts is an allegation of a legal conclusion and insufficient of itself to constitute

a cause of action."  *Id.*  Accordingly, only "allegations of conspiracy which are particularized . . .

---

[2]Although Plaintiff's first count alleges violations of Section 1, it also uses phrases, such
as "monopoly power" which are, strictly speaking, Section 2 concepts, *see* § B *infra*.  However,
consistent with principles of liberal construction of the complaint, the court will ignore these
technical misstatements.

will be deemed sufficient." *Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988). *See* cases collected in ABA Section of Antitrust Law, *Antitrust Law Developments* (5th Ed. 2002), Vol. 1, p. 3, n. 14.

To adequately allege the element of concerted activity, a plaintiff must do more than insert the word "conspiracy" into his pleading. As the Third Circuit has stated, the "allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act." *Garshman v. Universal Resources Holding Inc.,* 824 F.2d 223, 230 (3d Cir. 1987).

In *Garshman*, plaintiffs were partners in an entity engaged in oil and gas exploration. Defendant Universal Resources Holding, Inc. was a producer of natural gas. Plaintiffs and Universal had entered into an agreement whereby plaintiffs would drill wells in return for payment and assignment of certain rights. The drilling was to take place on land owned by Columbia Gas Transmission Corporation ("Transmission"). Transmission had also contracted to purchase, through Universal, 75 percent of the gas produced from the wells.

Subsequently the demand for natural gas declined. As a result, Transmission found itself contractually obligated to purchase more gas through Universal than it could resell. Under pressure to renegotiate, Universal agreed to change the price provisions in its contracts with Transmission. This resulted in a decreased return from the wells, harming plaintiffs' economic interests under the drilling contract. *See Garshman*, 824 F.2d at 225-27.

Plaintiffs sued on antitrust, tort and contract grounds. Universal filed a crossclaim against Transmission and its parent corporation, Columbia Gas System ("System"), also raising antitrust grounds. In its Sherman Act, Section One claim, Universal alleged that System and

Transmission had "entered into one or more agreements, contracts or conspiracies, and have engaged in concerted action with other entities, which agreements are in restraint of trade and are unreasonable, to achieve the anti-competitive and unlawful actions and effects as alleged in this crossclaim." *Id.* at 230.  The district court dismissed Universal's Section One count for failure to state a claim.

The Court of Appeals affirmed, observing that Universal had identified neither the "contracts," nor the "other entities," nor the "anti-competitive and unlawful actions and effects" involved.  *Id.*  The court held that the "allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act." *Id.*  Moreover, the price-renegotiation contracts undertaken by Transmission did not result in price increases to consumers or in the market generally.  Universal's allegations failed to suggest an adverse effect upon competition in any relevant market.  Therefore the claim was properly dismissed. *See Garshman*, 824 F.2d at 231.

The Circuit's affirmation of the dismissal of the antitrust claims in *Garshman* (without leave to amend) is precedent for the dismissal here.  The Section 1 claim in this case is similarly deficient of the necessary facts.

In the *PepsiCo* case, the Commonwealth of Pennsylvania brought a *parens patriae* antitrust action, alleging that a soft drink maker and two of its bottlers had conspired to eliminate horizontal competition between resellers of the soft drink product. *See PepsiCo*, 836 F.2d at 175.  The state alleged that the three defendants purposefully withheld the product from certain resellers so that the resellers could not compete with the bottlers.  According to the

-10-

Commonwealth's amended complaint, defendants had engaged in the following practices in furtherance of this conspiracy:

> using a coding identification system to trace and monitor soft drink sales; fining bottlers when their product is shipped out of their territory; refusing to deal with resellers who engage in transshipping; refusing to deal with resellers who buy from or sell to other resellers; threatening termination of resellers who engage in such sales; and limiting sales to resellers to the amount the reseller needs solely for its own retail sales, in order to prevent that reseller from wholesaling.

*Id.* The district court dismissed the Section One count for failure to state a claim, and the Third Circuit affirmed.

The Court of Appeals noted that under the Soft Drink Interbrand Competition Act, because only a horizontal conspiracy was actionable, the state's pleading burden was higher than in a typical antitrust case. *Id.* at 181. As to the sufficiency of the amended complaint, the court first observed that the state's allegations "consistently refer to conduct by `defendants and their co-conspirators' – not otherwise identified." *Id.* The court continued:

> Equally significant is the fact that Pennsylvania did not allege any meetings between [the defendant bottlers], any communications between them, or any other means by which their alleged conspiracy came about. This notwithstanding that in this circuit, "[o]nly allegations of conspiracy which are particularized . . . will be deemed sufficient." *Garshman v. Universal Resources Holding, Inc.*, 641 F.Supp. 1359, 1370 (D.N.J.1986), *aff'd* 824 F.2d 223 (3d Cir.1987) (*quoting Kalmanovitz v. G. Heileman Brewing Co.*, 595 F.Supp. 1385, 1400 (D.Del.1984), *aff'd*, 769 F.2d 152 (3d Cir.1985)). Instead, all that appellant was apparently prepared to plead was a naked conclusion dropped into the amended complaint, reciting a bare-bones assertion that there had been a "horizontal" conspiracy.

*Id.*

The *PepsiCo* court found that the Commonwealth's allegations "did not come close to adequately pleading conduct amounting to" a price fixing agreement, a horizontal[3] restraint of trade, or a group boycott.[4]  The court therefore affirmed the dismissal with prejudice in that the Commonwealth had already amended its complaint once, with leave of court.  *See id.* at 180.

> a.    *Group Boycott*

Although Plaintiff does allege a group boycott, here again the conclusory allegation is devoid of details.  A horizontal group boycott involves entities at the same level of the market structure conspiring amongst themselves, with "a purpose either to exclude a person or group from the market, or to accomplish some other anti-competitive objective, or both."  *PepsiCo Inc.*, *supra* 836 F.2d at 183 (*quoting De Filippo v. Ford Motor Co.*, 516 F.2d 1313, 1318 (3d Cir. 1975)).  Group boycott cases usually involve joint efforts at persuading suppliers or customers to refuse to deal with a certain competitor.  *See, e.g., Northwest Wholesale Stationers Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 294 (1985).  Aside from the conclusory phrase "group boycott," the Court concludes that Plaintiff has not adequately plead Defendant participated in an illegal group boycott.

> b.    *"Hub-and-Spoke"*

Courts have refused to find a horizontal conspiracy, where a single entity or person

---

[3]As discussed below, for purposes of determining whether concerted action is unreasonable, courts usually analyze the alleged combination as either "horizontal" (between or among competitors on the same level of business) or "vertical" (between entities operating on different levels, e.g., manufacturer and distributor).

[4]  If the Commonwealth had succeeded in demonstrating any of these types of anticompetitive conduct, the defendants may have lost the protection they otherwise would have had under the Soft Drink Interbrand Competition Act of 1980, 15 U.S.C. §§ 3501-3503.  *See PepsiCo, Inc.* 836 F.2d at 175.

engages in separate vertical conspiracies with multiple parties, who do not conspire amongst themselves horizontally. *See, e.g., Dickson v. Microsoft Corp.,* 309 F.3d 193, 2002 U.S. App. LEXIS 22466, at *17-24 (4th Cir. 2002); *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 590 (8th Cir. 1987). *Cf. Kotteakos v. United States,* 328 U.S. 750, 752, 769 (1946) (holding, in non-antitrust criminal conspiracy case, that jury instruction should have explained "vital difference" between one conspiracy, in which all defendants conspired amongst each other, and numerous separate conspiracies between each defendant and one "common key figure"). Courts analyze such "hub-and-spoke" scenarios under the rule of reason. *See Dickson*, 2002 U.S. App. LEXIS 22466, at *17-24 (finding plaintiff alleged merely "separate vertical conspiracies" or "a wheel without a rim," rather than single horizontal conspiracy; applying rule of reason because anticompetitive effect "not obvious"); *Lomar,* 824 F.2d at 590 (refusing to apply *per se* rule where plaintiff did not allege suppliers conspired "among themselves," but rather that one distributor "separately coerced each of the suppliers into boycotting" plaintiff, thus forming "a rimless, spoked wheel"). Plaintiff's allegations that Arbitron met with and agreed with most of the larger television stations to exclude Plaintiff from its viewer measurement studies more resembles a "hub-and-spoke" style of conspiracy than a horizontal group boycott. As noted in *Antitrust Law Developments, supra*, pp. 24-5:

> Some conspiracies have elements of both horizontal and vertical agreements. An example of such a hybrid is the "hub-and-spoke" conspiracy.
>
> * * * * *
>
> Although some of the earlier hub-and-spoke cases have suggested at least the theoretical possibility that an actionable conspiracy might be found where there were hub and spokes but no rim, more

> recent cases require that a plaintiff must present evidence sufficient
> to allow the inference of an agreement constituting the rim of the
> conspiracy.  (Footnotes omitted).

As explained above, under any theory, Plaintiff has not alleged the essential statutory element of concerted activity.

With these precedents as guideposts, we review the antitrust allegations in the Amended Complaint.  In the instant case, Plaintiff has identified none of the entities which allegedly conspired with Defendant.  While Plaintiff need not necessarily supply names of all alleged conspirators, the cases cited above require an antitrust plaintiff to supply more detail to make out a Section One claim.  The facts alleged in the Amended Complaint are extremely vague and do not sufficiently describe any contract, combination or conspiracy between Arbitron and the larger TV stations.

The Amended Complaint never answers the common-sense question as to why Plaintiff's competitors, who allegedly already dominate the market, would seek the exclusion of a single, small, independently-owned station from Arbitron's test-runs of the new PPM technology. Further, though the Amended Complaint alleges a "boycott imposed at the request of plaintiff's competitors," *id.* ¶ 19, Plaintiff has not provided a single detail as to when, why, or how the conspirators decided upon this alleged boycott.  The most that Plaintiff alleges is that Arbitron had "many meetings" with the larger stations "while designing and pre-testing the system."  *Id.* ¶ 34.  Thus, while Plaintiff's Amended Complaint is extremely broad in charging Section One antitrust liability, it falls far short on the facts.

Aside from the dearth of specific allegations, the Court also concludes that the Amended Complaint fails to sufficiently allege concerted activity for the simple reason that the supposed

conspiracy "makes no economic sense." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Supreme Court has found that "antitrust law limits the range of permissible inferences from ambiguous evidence in a Section One case." *Id.* at 588. Where a defendant had no rational motive to join a conspiracy, and defendant's conduct is as consistent with permissible competition as with illegal conspiracy, the plaintiff's unspecific allegations do not support an inference of antitrust conspiracy. *See Antitrust Law Developments*, *supra*, p. 8. Thus, as the court in *Matsushita* explained, if the defendants "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *475* U.S. at 596-97. In such a case, where an inference of conspiracy is "implausible," the court should dispose of the Section One claim without submitting the conspiracy issue to a jury. *Id.* at 594. Accordingly, in *Matsushita*, upon finding that the alleged conspiracy would have been "economically senseless," the Court found summary judgment proper. *Id.* at 598.

Though *Matsushita* was decided in the context of a motion for summary judgment, its reasoning, nevertheless, has been used to decide motions to dismiss and suggests that Plaintiff's Section One claim should be dismissed.[5] The sparse facts set forth in the Amended Complaint

---

[5] *See, e.g., DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999) (affirming Rule 12(b)(6) dismissal where complaint alleged "highly implausible" conspiracy) (*aff'd* 2 F. Supp. 2d 226, 230 (D.R.I. 1998) (*quoting Matsushita*'s "rational economic motive" language in dismissing complaint)); *United Magazine Co. v. Murdoch Mag. Distrib.*, 146 F. Supp. 2d 385, 402 (S.D.N.Y. 2001) (holding that because "plaintiffs' alleged conspiracy to engage in predatory pricing is entirely unnecessary and makes no economic sense, plaintiffs fail to state a claim under section 1"); *Cancall PCS v. Omnipoint Corp.,* No. 99-CIV-3395, 2000 WL 272309, at *7 n.4 (S.D.N.Y. 2000) ("Although *Matsushita* involved a motion for summary judgment, not a motion to dismiss, here, the plaintiffs have pled facts which, even if true and viewed in the light most favorable to plaintiffs, cannot support a claim for predatory pricing, and the Court will therefore dismiss any such claim at this stage."). *Cf. Car Carriers v. Ford Motor*

are not sufficient to support an inference that defendants acted conspiratorially.  Accepting all of

the facts of the Amended Complaint as true, the conspiracy theorized by Plaintiff is, for several

reasons, economically implausible.  Plaintiff, a television station, suggests no logical reason why

Defendant, which is allegedly dominant in the viewer measurement market, would conspire with

Plaintiff's competitors, the larger stations, in order to exclude Plaintiff from Defendant's PPM

tests.  If Defendant is, in fact, dominant in the viewer measurement market, to exclude Plaintiff's

data would absolutely contradict Defendant's business purpose and jeopardize the credibility of

its measurements.  At oral argument, Plaintiff's counsel suggested that Arbitron's motive in

excluding WGTW was "to accommodate [WGTW's] competitors."  Transcript of Motion to

Dismiss Hearing (Oct. 8, 2002) at 35.  Counsel added that WGTW is "small potatoes in th[e]

market.  We are the classic kind of competitor who the standard competitors would just as soon

not have in the market." *Id.* at 36.  Plaintiff's argument makes a gigantic leap from omission of

Plaintiff's data in a market survey, to exclusion of Plaintiff from the television market.  However,

the other deficiencies in Plaintiff's Amended Complaint do not require the Court to decide

whether Plaintiff's allegation that merely omitting Plaintiff's data from Defendant's viewer

measurement reports could result in liability under the antitrust laws for excluding Plaintiff as a

competitor in the overall television market.  However, it is hard to understand how even

purposely eliminating Plaintiff's data from Defendant's reports for a six-month period could

---

*Co.,* 745 F.2d 1101, 1109-10 (7th Cir. 1984) (pre-dating *Matsushita,* yet holding dismissal was
appropriate where complaint set forth no facts showing anti-competitive effect and alleged
conspiracy was "inherently implausible" – as it suggested defendant Ford "conspired to injure
itself"); *Salts v. Moore*, 107 F. Supp. 2d 732, 742-43 (N.D. Miss. 2000) (granting Rule 12(c)
motion for judgment on the pleadings where plaintiffs failed to establish inference of conspiracy,
in part due to lack of rational economic motive to conspire).

conceivably cause Plaintiff to be excluded as a competitor in the overall *Philadelphia* television market.  It is of public notice that as of the date of today's Order, Plaintiff is fully functioning as a television station.

Plaintiff's brief in opposition to Defendant's Motion to Dismiss on this ground  has offered no rational explanation for any desire on the part of the larger stations to see Plaintiff omitted from Arbitron's tests.  Nor has Plaintiff suggested any plausible reason why Arbitron would willingly compromise the integrity of its own measurements.   Assuming that Defendant sought to establish sound business relationships with the larger stations, such a desire would not, reasonably, entice Arbitron to eliminate Plaintiff's station from its PPM measurements – thereby corrupting its own product.

Accordingly, this Court finds that Plaintiff has not alleged concerted action, which is the core element of any Sherman Act, Section One claim.  *See Fuentes*, 946 F.2d at 198.

### 2.  Restraint of Trade

Even though the Court concludes Plaintiff has not adequately pleaded concerted action, this Memorandum will also examine whether Plaintiff has pleaded a restraint of trade, and concludes it has not.  Though the language of Section One of the Sherman Act could conceivably encompass a broader array of activity, the Supreme Court has limited its application to agreements which *unreasonably* restrain trade.  *See Standard Oil Co. v. United States*, 221 U.S. 1, 66 (1911).  This principle has come to be known as the "rule of reason."  *See National Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 690 (1978) (noting "the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition").

-17-

In order to plead a claim that a defendant's practices violate the rule of reason under

Section One of the Sherman Act, a plaintiff must allege four "elements":

> (1) that the defendants contracted, combined or conspired among
> each other; (2) that the combination or conspiracy produced
> adverse, anti-competitive effects within the relevant product and
> geographic markets; (3) that the objects of and the conduct
> pursuant to that contract or conspiracy were illegal; and (4) that the
> plaintiffs were injured as a proximate result of that conspiracy.

*Rossi  v. Standard Roofing, Inc.,* 156 F.3d 452, 464-65 (3d Cir. 1998).

Plaintiff alleges a restraint of trade only once, in paragraph 43, and only in the most

conclusory terms.  Plaintiff never alleges how trade has been restrained, or how the market in

which Plaintiff does business has become less competitive due to the actions of Defendant.

The Supreme Court has explained that, in determining the reasonableness of a restraint,

the "true test of legality is whether the restraint imposed is such as merely regulates and perhaps

thereby promotes competition or whether it is such as may suppress or even destroy

competition."  *Board of Trade of City of Chicago v. United States,* 246 U.S. 231, 238 (1918).

> a.    Per Se Rule

This Court's inquiry as to the legality of a defendant's actions must be guided by the rule

of reason, unless "the challenged action falls into the category of `agreements or practices which

because of their pernicious effect on competition and lack of any redeeming virtue are

conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to

the precise harm they have caused or the business excuse for their use.'"  *Northwest Wholesale*

*Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 289 (1985) (*quoting*

*Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)).  Thus, where a defendant's

conduct is "manifestly anticompetitive," a court may adopt a *per se* rule of illegality, bypassing

an inquiry under the rule of reason. *Continental T. V. v. GTE Sylvania*, 433 U.S. 36, 50 (1977).

Courts have found such conduct as price fixing, tying arrangements, reciprocal dealing

agreements and resale price maintenance to be *per se* unreasonable restraints of trade. *See, e.g.,*

*Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 166 (3d Cir.1979). Group boycotts are also

often treated as *per se*, but the *per se* rule is not employed until courts have "considerable

experience with the type of challenged restraint" at issue. *Broadcast Music, Inc. v. Columbia*

*Broadcasting System, Inc.*, 441 U.S. 1, 20 n.33 (1979).

Plaintiff's labeling of certain conduct as a group boycott does not necessitate *per se*

treatment. *See FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 458 (1986) (declining to apply

boycott "pigeonhole;" observing that *per se* approach "has generally been limited to cases in

which firms with market power boycott suppliers or customers in order to discourage them from

doing business with a competitor"); *Rossi  v. Standard Roofing, Inc.,* 156 F.3d 452, 463 (3d Cir.

1998) (noting that labeling alleged refusal to deal as "group boycott" does not have "a talismanic

effect, automatically bringing the case under the *per se* rubric"). Rather, Supreme Court

precedent "limits the *per se* rule in the boycott context to cases involving *horizontal agreements*

*among direct competitors*." *NYNEX*, 525 U.S. at 135 (emphasis added).

As noted above, Plaintiff has not adequately alleged any agreement *among* competitor

television stations to boycott Plaintiff. The Amended Complaint claims only that Defendant

Arbitron – the only named Defendant – conspired with certain unnamed stations, with the aim of

excluding Plaintiff's station from the PPM surveys. Though Plaintiff states, "[o]n information

and belief, the exclusion was a boycott imposed at the request of plaintiff's competitors,"

-19-

Amended Complaint ¶ 19, Plaintiff never contends, let alone provides any required details, that the competitor stations *jointly* agreed to request WGTW's exclusion.[6]

Because Plaintiff's claims do not allege any price-fixing, a per se group boycott, or other activities condemned as per se illegal, but are so broad and diffuse, and no factually similar antitrust claims have been found reported, there is no basis on which to conclude that the per se rule applies in this case.

b.      *Relevant Market*

Without a per se theory on which to proceed, Plaintiff must allege a restraint of trade with actual competitive harm or diminution of competition in a relevant market in order to proceed in a case under the rule of reason. *FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986),

---

[6] Plaintiff places much emphasis on the Third Circuit's decision in *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 462 (3d Cir. 1998). There, the plaintiff, a price-cutting distributor, alleged that his full-price competitors had joined together and persuaded their mutual suppliers not to sell to him. The Court of Appeals concluded that the plaintiff's allegations should be analyzed using the *per se* framework.

> [T]he economic impact of their actions – driving a *price-cutting* competitor out of business – is clear. . . . Importantly, all of this [conspiratorial] activity was done against the backdrop of [the competitors'] dissatisfaction with Rossi's *price-cutting* proclivities, and thus an inference can be drawn that the conspiracy was at least partially conceived as a *price restraint.*
>        For these reasons, we find it implausible that the alleged behavior by the defendants would "enhance overall efficiency and make markets more competitive," *Northwest Wholesale Stationers*, 472 U.S. at 294.

*Id.* at 464 (emphasis added). The conspiracy alleged in *Rossi* was not completely horizontal, in that the plaintiff's theory involved both horizontal and vertical components, *i.e.*, the distributors who competed with Rossi and the suppliers who allegedly acquiesced in the boycott. In the instant case, even if this Court were to find horizontal, as well as vertical components, there is no allegation of price cutting, or any other impact on price, whatsoever. For that reason, the *Rossi* decision, though insightful, does not bear directly on these facts.

*Eichorn v. AT&T Corp.*, 248 F.3d 131, 147-8 (3d Cir. 2001). Plaintiff alleges no details of actual competitive harm, but alleges a relevant product market as follows:

> 14.  This product is a product (a) in the television viewer measurement market, (b) a product utilized and also creates a new product market, i.e., imbedded direct measuring, whereby no reporting by the viewer is required (unlike the Nielsen system). Defendant enjoys a monopoly in both markets.

The above-cited paragraph describes Defendant's own product, which cannot itself be a relevant market for antitrust purposes.  *Tunis Bros Co. v. Ford Motor Co.*, 952 F.2d 715 (3d Cir. 1992).  Another attempt to define a market in the Amended Complaint, paragraph 45, is quoted above.  There is absolutely no allegation of diminution in competition in the overall market, which is necessary to state a claim for restraint of trade under the rule of reason.  *Angelico v. Lehigh Valley Hospital Inc.*, 184 F.3d 268 (3d Cir. 1999).

### c.    Horizontal or Vertical Conduct

Restraints of trade are typically categorized as either "horizontal" or "vertical."  A horizontal restraint stems from an agreement "among competitors at the same level of distribution," whereas a vertical restraint arises from an agreement between "entities operating at different levels of the market structure, such as manufacturers and distributors."  *Yeager's Fuel v. Pennsylvania Power & Light Co.*, 953 F. Supp. 617, 654 (E.D. Pa. 1997) (*quoting* Black's Law Dictionary 737, 1563 (6th ed. 1991)).  As already discussed, there are no sufficient allegations to charge a horizontal restraint.  The Supreme Court has held that a "vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels."  *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998).  There are no such allegations.

As to the remaining requirements for a violation of Section One, Arbitron's business

decisions cannot be said to have had illegal objectives.  The alleged relationship between

Defendant and Nielsen is confusing if not contradictory.  According to the Amended Complaint,

¶¶ 15-17, Arbitron's PPM surveys were a "test" of the new technology.  Assuming that Arbitron

did, in fact, choose to encode only the larger network stations for participation in that test,

Plaintiff's own allegations establish this was for a short period of time, and Plaintiff has not

adequately alleged any actual past or ongoing adverse impact on competition.

When ruling on a Motion to Dismiss an antitrust claim as vague as Plaintiff's, this Court

must consider the costs that would be imposed on the defendant if forced to undertake discovery,

but must also recognize the dilemma of the plaintiff, who may be unable to provide details of the

alleged conspiracy without the opportunity to obtain evidence and information from the alleged

conspirators themselves.  *See, e.g, Advanced Lifeline Serv's, Inc. v. Northern Health Fac., Inc.,*

No. 97-cv-3757, 1997 WL 763024, at *8 (E.D. Pa. Dec. 9 1997).  As the Supreme Court has

explained,

> We have held that "a complaint should not be dismissed for failure
> to state a claim unless it appears beyond doubt that the plaintiff can
> prove no set of facts in support of his claim which would entitle
> him to relief" . . . . And in antitrust cases, where "the proof is
> largely in the hands of the alleged conspirators" . . . dismissals
> prior to giving the plaintiff ample opportunity for discovery should
> be granted very sparingly.

*Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976) (citations omitted).  Yet,

the Court has, on several occasions, found antitrust allegations to be "insufficient as a matter of

law," and therefore subject to dismissal.  *E.g. Associated Gen. Contractors of Calif., Inc. v.*

*California State Council of Carpenters,* 459 U.S. 519, 545 (1983).

As this District Court has observed, "there is no *per se* rule that antitrust claims are not

subject to summary disposition, and courts have not hesitated to dismiss antitrust claims at the

pleading stage in proper cases." *Alpern v. Cavarocchi*, No. 98-cv-3105, 1999 U.S. Dist. LEXIS

5929, at *4 (E.D. Pa. April 29, 1999). Over two decades ago, this Court, in dismissing a Section

One claim, reasoned that, where the complaint

> offers only uncertain clues as to plaintiff's theory of liability and the
> facts which would support a finding of Sherman Act liability... [i]t
> is simply not fair to the defendants, and it would be an onerous
> imposition on the judicial process, to permit litigation to go forward
> on the basis of such conclusory and speculative allegations.

*Pao v. Holy Redeemer Hosp.*, 547 F.Supp. 484, 491 (E.D. Pa. 1982).

Based on the allegations of the Amended Complaint, this Court finds that Plaintiff can

prove no set of facts in support of its Sherman Act, Section One claim that would entitle it to

relief. *See Hospital Bldg. Co.*, 425 U.S. at 746. Accordingly, Count I must be dismissed.

B. <u>Count II – Sherman Act, Section Two</u>

Plaintiff next asserts a violation of Section 2 of the Sherman Act, which applies to

"[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any

other person or persons, to monopolize any part of" interstate commerce. 15 U.S.C. § 2. Count II

of the Amended Complaint claims that Defendant, through "acquisition combinations with

Nielsen, *intentionally became and is a monopolist* in the Philadelphia viewer measurement

market." *Id.* at ¶ 53 (emphasis added). Alternatively, Plaintiff asserts that Arbitron, "through its

combination with Nielsen, is *attempting* to monopolize" that same market. *Id.* at ¶ 54 (emphasis

added). Further, Plaintiff contends that Arbitron has used its monopoly power to injure Plaintiff,

specifically, injuring WGTW's ability to compete in the sale of advertising time. *Id.* at ¶ 55.

Defendant asserts that Count II should be dismissed because Plaintiff fails to sufficiently

plead intent, antitrust injury, or facts suggesting a probability of monopoly.  This Court will consider Plaintiff's claims of monopolization and attempted monopolization in turn.

     *1. Monopolization*

To state a claim of monopolization under Section 2, a plaintiff must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 249 n.27 (3d Cir. 2001) (*quoting United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966)).  The facts as pled by Plaintiff cannot fulfill either of these elements.

As to the first element, the Supreme Court has defined monopoly power as the power "to control prices or exclude competition."  *United States v. E. I. Du Pont de Nemours & Co.,* 351 U.S. 377, 392 (1956).  Courts are reluctant to find monopoly power where the defendant business controls less than fifty percent of the given market.  *See, e.g., Ideal Dairy Farms v. John Labatt, Ltd.,* 90 F.3d 737, 749 (3d Cir. 1996) (finding control of 47% of the New Jersey market, "without concrete evidence of anticompetitive behavior," did not show monopoly power); *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 201 (3d Cir. 1992) ("As a matter of law, absent other relevant factors, a 55 percent market share will not prove the existence of monopoly power."); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984) (stating "absent special circumstances, a defendant must have a market share of at least fifty percent before he can be guilty of monopolization"); *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2nd Cir. 1945) (Hand, J.) (stating "it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three is not"); *Yeager's Fuel v. Pennsylvania Power &*

*Light Co.*, 953 F. Supp. 617, 654 (E.D. Pa. 1997) (holding "market share of 31% is insufficient as a matter of law to establish monopoly power").

Returning to *Garshman*, *supra*, in its Sherman Act, Section Two claim, Universal alleged that Transmission possessed monopoly power in the gas resale market for the middle Atlantic region. *See id.* at 228. Universal further claimed, *inter alia*, that Transmission had unlawfully maintained its monopoly to fix, stabilize or set the price of natural gas in interstate commerce; had denied Universal equal access to the pipeline network in order to secure price concessions from producers; had used its economic power to breach existing contracts in order to reduce payment liability; and had conditioned the purchase of natural gas upon price concession agreements extorted from Universal and other gas producers. As a result of these alleged antitrust violations, Universal was unable to meet its contract with plaintiffs and other companies, was forced to incur unforseen expenses, and suffered damage to its good will and competitive position. *See id.*

In dismissing the Section Two count for failure to state a claim, the district court found that Universal could prove no set of facts which would entitle it to relief. Rather, "the most that Universal could attempt to prove is that, faced with a constricting market and falling resale prices for natural gas, System and Transmission reacted by demanding successfully price concessions from their suppliers." *Id.* at 229. The Court of Appeals affirmed, explaining that under the undisputed economic structure of the industry, :

> Monopolization arose, if at all, solely out of System's and Transmission's ownership of the underlying leasehold rights. It is that ownership which permitted Transmission to demand that gas be sold only to it. It is that ownership which permitted Transmission to threaten to exclude from future exploration those producers unwilling to renegotiate. . . . . There is no contention that System and Transmission owned such a proportion of the underlying

> leaseholds for natural gas that they were in any position to prevent
> the exploration and the production of new gas.

*Id.*

In the present case, Plaintiff has not alleged any particular percentage of any relevant market controlled by Arbitron.  In Count II, Plaintiff incorporates all prior paragraphs, and the relevant market is described as the "Philadelphia viewer measurement market."  However, this failure to allege a substantial market share is not itself fatal to Plaintiff's monopolization claim.  Rather, this Court may consider other factors tending to show monopoly power, apart from market share.  These factors include "the strength of competition, probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand." *Crossroads Cogeneration Corp. v. Orange & Rockland Utils.*, 159 F.3d 129, 141 (3d Cir. 1998) (*quoting Barr Laboratories, Inc. v. Abbott Laboratories*, 978 F.2d 98, 112 (3d Cir. 1992)).  However, the Amended Complaint contains no allegations whatsoever related to any of these factors.

The Third Circuit has affirmed the dismissal of a Section Two claim where the plaintiff alleged 100 percent market share, yet failed to allege facts related to any of the other factors relevant to a finding of monopoly power.  *See Crossroads*, 159 F.3d at 141.  In *Crossroads*, the defendant, O&R was "virtually the sole retail provider of electric power to residential, commercial, and industrial customers" in each county in which it operated.  *Id.* at 132.  The plaintiff, an independent producer of electricity, asserted breach of contract and antitrust claims, based on O&R's refusal to purchase energy from the plaintiff.  In dismissing the Section Two claim, the district court wrote:

-26-

> Plaintiff fails, as a matter of law, to sufficiently allege monopoly power. Plaintiff merely states that defendant is the sole provider of electricity to certain customers in the counties it services. . . . Plaintiff fails to allege such necessary facts as defendant's market share in the markets in which plaintiff is a competitor or that barriers that exist which prevent plaintiff's entry into such markets. These deficiencies in the Complaint mandate dismissal of plaintiff's Sherman Act claims.

*Id*. at 141. The Court of Appeals affirmed the dismissal of the Section Two claim, holding as follows:

> We agree with the district court's reasoning.
>
> Alleging market share alone is not sufficient to state a claim under the Sherman Act. Monopolization or threatened monopolization *requires something more*, which *may include* "the strength of competition, probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand." *Barr Labs*, 978 F.2d at 112. Crossroads *has not alleged any of these factors*. Nor is it likely that it could have done so. Crossroads admits that it acts as a competitor to O&R in selling its excess capacity in O&R's service area, and it provides no reason why it is prevented from doing so in the future. *The complaint simply fails to allege anything to suggest monopolization* by O&R cognizable by the Sherman Act.

*Id*. at 141-42 (emphasis added).

Citing *Crossroads*, this Court has dismissed a Section Two claim where the complaint provided no factual allegations concerning either the alleged relevant market or the defendant's relationship to or power in that market. *See Alpern v. Cavarocchi*, No. 98-cv-3105, 1999 U.S. Dist. LEXIS 5929, at *8 & n.7 (E.D. Pa. April 29, 1999).

In the present case, Plaintiff has not only failed to allege any facts regarding Arbitron's market share, but also, none of the other factors associated with monopoly power. The Amended Complaint states that Nielsen and Arbitron have "entered into a corporate financial relationship

-27-

by which Nielsen and Arbitron are related in regard to the new system, the details of which are not known to plaintiff."  Amended Complaint ¶ 11.  Plaintiff, later in the pleading, alleges that Arbitron's "acquisition combinations" with Nielsen somehow confer monopoly power upon Arbitron.  *Id.* ¶ 53.  Yet, Plaintiff makes no attempt to explain how this unspecified business relationship renders Arbitron a monopolist in the Philadelphia viewer measurement market.

Plaintiff also asserts that Arbitron's PPM technology "hereinafter will supplant any other system because of its superior accuracy and reliability."  Amended Complaint ¶ 49.  Of course, the fact that Arbitron's product, due to its alleged superiority, may "hereinafter" replace all competition, does not mean that Arbitron has actual monopoly power at this time.  *Cf. Pastore v. Bell Telephone Co. of Pennsylvania*, 24 F.3d 508, 513 (3d Cir. 1994) (affirming summary judgment against plaintiffs who, in their claim of attempted monopolization, "confined their discussion to defendants' *future* entry into the market").

Even if Plaintiff has suffered some market deprivation or loss of profits, that does not make an antitrust case.  The deficiencies in Plaintiff's market definition were noted above. Arbitron's alleged dominant role in the viewer measurement market may make the omission of Plaintiff's data from the Arbitron reports the "cause" of Plaintiff's deprivation, but the absence of other specific allegations necessary for a monopoly claim to proceed does not allow imposition of antitrust liability on Arbitron.  The penalties for antitrust violations are severe, and it is good social policy as well as a legal requisite to require specific allegations, which clear precedent demand, before allowing an antitrust case to proceed.[7]

---

[7]  As a recent economic commentator noted, "The antitrust laws and antitrust enforcement institutions are not designed or well suited to identify and "fix" all market imperfections that lead markets to depart from textbook models of perfect competition.  Neither the state of economic

Because Plaintiff has failed to allege facts which would support a finding of monopoly power, Plaintiff cannot satisfy that core element of monopolization.

### 2. *Attempted Monopolization*

Nor has Plaintiff set forth a claim of attempted monopolization. (¶ 54). To sustain an attempted monopolization theory a plaintiff must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Plaintiff's allegations support none of these elements.

With respect to the third element, this Court cannot, based on the facts as pled, discern a "dangerous probability" that Arbitron will achieve monopoly power. Generally, there is a "presumption that attempt does not occur in the absence of a rather significant market share." *Pastore v. Bell Telephone Co. of Pennsylvania*, 24 F.3d 508, 513 (3d Cir. 1994) (*quoting* 3

---

science, nor the capabilities of public and private policy enforcement institutions, would make it feasible or desirable for antitrust policy to seek to identify a wide range of market imperfections, and associated firm behavior and market structures, and then to evaluate each case to determine whether some way can be found to improve economic efficiency by changing the structure of the market or constraining firm behavior. This kind of micromanagement of firms and markets cannot be successful because it would involve enormous transaction costs.

U.S. antitrust policy is primarily a deterrence system not a regulatory system. That is, antitrust policy and the associated enforcement hierarchy are not, in general, designed broadly to scrutinize, screen, or approve firm behavior or market structures throughout the economy. Instead, antitrust policy relies on administrative and case law developed through public and private antitrust enforcement actions to develop a set of "antitrust legal rules" which businesses are expected to internalize into their decisions. The incentives firms have to understand and adhere to antitrust rules derive from the potential costs of treble damage actions, administrative restrictions on their behavior, other equitable relief (e.g., divestiture), and for certain infringements (e.g., price fixing), fines and prison terms all weighted by the probability of getting caught and convicted."

Joskow, "Transaction Cost Economics, Antitrust Rules, and Remedies", *Journal of Law, Economic and Organization* (April 2002).

Phillip Areeda & Donald F. Turner, Antitrust Law ¶ 831 at 336 (1978)).  As the Court of Appeals

has explained, "a dangerous probability of monopoly may exist where the defendant firm

possesses a significant market share when it undertakes the challenged anticompetitive conduct."

*Barr Laboratories*, 978 F.2d at 112 (*quoting International Distrib. Ctrs, Inc. v. Walsh Trucking

Co.*, 812 F.2d 786, 791 (2d Cir. 1987)).

 In *Pastore*, the Court of Appeals affirmed a grant of summary judgment against the

plaintiffs who, in their claim of attempted monopolization, "confined their discussion to

defendants' *future* entry into the market."  24 F.3d at 513.  Plaintiffs, who were in the business of

installing a "unique" security network, alleged that their former client had attempted to

monopolize the market for that same type of network.  *Id*. at 512.  The defendants submitted an

affidavit stating that they were not "engaged" in the relevant market.  *Id.* at 513.  Plaintiffs

submitted no evidence to show that defendants had entered the market; indeed, they merely

suggested that defendants were "intent upon entering" or "poised to enter" the market.  *Id.*  In

affirming summary judgment for defendants, the Third Circuit held that "[w]ithout any share in

the relevant market as described by plaintiffs, there can be no inference that defendants hold

sufficient economic power in that market to create a dangerous probability of monopoly."  *Id.*

 Though *Pastore* was decided in the context of a motion for summary judgment, its

holding is applicable to the present motion to dismiss.  The facts alleged do not suggest that

Arbitron has gained control over an appreciable portion of the market for television viewer

measurement in Philadelphia.  Rather, the Amended Complaint states that Arbitron has only

"recently" entered the television viewing measurement market.  Amended Complaint ¶ 9.

Plaintiff also claims that Arbitron's PPM technology "hereinafter will supplant any other system

because of its superior accuracy and reliability." *Id.* ¶ 49.  As noted above, this cannot be an antitrust violation.

This Court has recently dismissed a Section Two claim where the plaintiff stated only a "conclusory allegation" as to the probability of monopolization.  *Fresh Made, Inc. v. Lifeway Foods, Inc.*, 01-cv-4254, 2002 WL 31246922, at *8 (E.D. Pa. Aug. 9, 2002).  In *Fresh Made*, plaintiff, a maker of dairy products, alleged that its competitor's gross annual revenues were five times as large as plaintiff's, and that it had used its influence to threaten distributors and food markets who did not agree to its demands.  *Id.*  Yet plaintiff's amended complaint failed to "allege the overall size of the proposed market, identify [defendant's] percentage share of the proposed market, identify other participants and competitors in the market, or allege what percentage of [defendant's] gross annual revenues are derived from the proposed market."  *Id.* Accordingly, this Court found that the allegations regarding the relative size of the parties did not sufficiently demonstrate a dangerous probability of achieving monopoly power.  *Id.*

The facts set forth by Plaintiff offer no guidance as to Arbitron's probability of achieving market power.  Accordingly, Plaintiff cannot satisfy the dangerous probability element.  With respect to the remaining elements of attempted monopolization, the allegations fail to demonstrate any specific intent to monopolize, much less predatory or anticompetitive conduct.

The specific intent element requires more than "a mere intention to prevail over rivals or improve market position."  *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n of Pa.*, 745 F.2d 248, 261 (3d Cir. 1984).  While acknowledging that Nielsen remains an active competitor in the market, Plaintiff provides no explanation whatsoever as to how Arbitron's unspecified

-31-

"combination" with Nielsen furthers the attempted monopolization.[8]  Amended Complaint ¶ 54.

Count II merely states, in conclusory language, that Arbitron and Nielsen's business relationship, coupled with Arbitron's recent PPM tests (which, of course, omitted WGTW), renders Arbitron an attempted monopolist.  Such bald and unsubstantiated assertions cannot satisfy Plaintiff's pleading burden.  *See Fresh Made,* 2002 WL 31246922, at *8.

Plaintiff has not stated a viable claim under Section 2 of the Sherman Act.  Accordingly, Count II must be dismissed.

### 3.  Whether to Allow Further Amendment

The Court is well aware of the line of Third Circuit decisions requiring District Courts to allow plaintiffs to amend defective complaints.  *See Shane v. Fauver*, 213 F.3d 113 (2000).  However, many Third Circuit decisions have also affirmed dismissals of antitrust complaints without leave to amend *[Garshman supra, PepsiCo. supra]*.  In this case, this Court has determined not to allow Plaintiff to amend further the antitrust claims for the following reasons:

1.    Plaintiff has already amended its antitrust claims once, and despite oral argument raising the issues discussed in this Memorandum, Plaintiff has still not satisfied the legal requirements, or requested further leave to amend.

2.    The nature of the industry, and the absence of any rational economic theory to support Plaintiff's Complaint, indicate that it would be futile for Plaintiff to make

---

[8]  It is not clear from the Amended Complaint whether Plaintiff wishes to also make a claim of conspiracy to monopolize under Section Two  Nevertheless, the facts alleged do not support such a claim.  To properly state a conspiracy to monopolize claim a plaintiff "must allege facts constituting the conspiracy, its period and object, and what the alleged participants did to achieve the conspiracy's object."  *Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n,* 855 F.Supp. 108, 110 (E.D. Pa. 1994), *aff'd* 107 F.3d 1026 (3d Cir. 1997).  Plaintiff has made no effort to describe the supposed "combination," other than the vague allegation that Nielsen and Arbitron have "entered into a corporate financial relationship by which Nielsen and Arbitron are related in regard to the new system, the details of which are not known to plaintiff." Amended Complaint ¶ 11.

further amendment.  *See* F.R.Civ. P. 15.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d. Cir. 1997).

C.  Count III – Lanham Act, § 43(a)

Plaintiff's next theory is raised under the Lanham Act.  Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides:

> (a) Civil action.
>
>   (1) *Any person* who, on or *in connection with any goods or services*, or any container for goods, *uses in commerce any* word, term, name, symbol, or device, or any combination thereof, or any *false designation of origin, false or misleading description of fact, or false or misleading representation of fact*, which–
>
>   (A) *is likely to cause confusion*, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
>   (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (emphasis added).  As courts have recognized, § 43(a) "creates a federal cause of action for unfair competition, even absent a federal registered trademark." *Williams v. Curtiss-Wright Corp.*, 691 F.2d 168, 172 (3d Cir. 1982).  Generally, the statute "provides a private remedy to a commercial plaintiff who meets the burden of proving that its commercial interests have been harmed by a competitor's false advertising." *Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 230 (3d Cir. 1990).  Courts have refused to interpret § 43(a) more broadly than necessary, so as to "eliminate frivolous claims and prevent flooding

the federal courts with Lanham Act claims contrary to the type envisioned by Congress." *Thorn v. Reliance Van Co.*, 736 F.2d 929, 933 (3d Cir. 1984).

In the present case, Plaintiff alleges that Arbitron has "knowingly and maliciously misrepresented , knowingly [*sic*] the characteristics and qualities of plaintiff's goods, services and activities, whereby plaintiff has been substantially damaged." Amended Complaint ¶ 58. Specifically, Plaintiff claims that Arbitron misrepresented the quality of WGTW's services through both its omission of WGTW from the PPM test data, and through its representations to the industry that the PPM data were, nevertheless, accurate. *Id.* ¶ 59. Plaintiff's theory seems to be that advertisers, noticing WGTW's absence from the PPM test reports, which Arbitron had touted as accurate, would thereby assume that WGTW had no ratings worth measuring.

Defendant raises several arguments as to why this count should be dismissed. However, this Court must first consider the threshold question of whether Plaintiff has standing to bring a § 43(a) claim. The "dispositive question" as to   43(a) standing is whether the plaintiff "has a *reasonable interest* to be protected against false advertising." *Thorn*, 736 F.2d at 933 (emphasis added). The Court of Appeals has set forth the following five factors to consider in analyzing standing under § 43(a), borrowing the five factors established by the Supreme Court for standing in antitrust cases:

> (1) The nature of the plaintiff's alleged injury:  Is the injury "of a type that Congress sought to redress in providing a private remedy for violations of the [Lanham Act]"?

> (2) The directness or indirectness of the asserted injury.

> (3) The proximity or remoteness of the party to the alleged injurious conduct.

(4) The speculativeness of the damages claim.

(5) The risk of duplicative damages or complexity in apportioning damages.

*Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 233 (3d Cir. 1998) (*citing Associated Gen. Contractors of Calif., Inc. v. California State Council of Carpenters,* 459 U.S. 519 (1983) (discussing antitrust-standing)).

In the instant case, four of the five factors weigh against Plaintiff's standing.  As to prong one, it is significant that Arbitron and Plaintiff are not competitors.  As the *Conte* court put it, "while there may be circumstances in which a non-competitor may have standing to sue . . . *the focus* of the Lanham Act is on `commercial interests [that] have been harmed by a *competitor's false advertising*.'"  *Id.* at 234 (emphasis added) (*quoting Granite State Ins. Co. v. AAMCO Transmis. Inc*., 57 F.3d 316, 321 (3d Cir. 1995)).  None of Arbitron's alleged actions can be reasonably construed as false advertising.

Arbitron's release of test PPM reports, omitting any measurements for WGTW, bears no resemblance to advertising activity.  Plaintiff also claims that, recently, at a meeting of the Pennsylvania Association of Broadcasters, Kevin Smith, a Senior Vice President of Arbitron, represented that the PPM survey was fair, accurate and complete.  *Id.* at ¶ 32.  Even if this vague, generic remark were, in fact, advertising, it conveys no specific content which could be considered false.  The Amended Complaint does not assert that Smith or any other Arbitron representative ever mentioned WGTW in any context.  Yet Plaintiff suggests that an advertising agency viewing Arbitron's PPM reports, or hearing Smith's statements regarding their accuracy, would naturally conclude that WGTW's ratings are too minute to affect the test's accuracy.  This

theory is, at most, wild speculation.  Assuming that a media professional, reading the PPM test surveys, would draw any conclusion about a station that was not covered in the surveys, such conclusion would not necessarily be that WGTW had insubstantial ratings.  Indeed, as Plaintiff acknowledges, Nielsen has long operated a television viewership measurement system, *Id.* ¶ 11, which would allow another view of Plaintiff's viewer penetration.  Thus, the mere omission of WGTW from Arbitron's purportedly accurate reports would not impact Plaintiff's ability to compete, nor detract from Plaintiff's good will.  *See Conte,* 165 F.3d at 234. Any loss suffered by Plaintiff as a result of these alleged statements by Arbitron is not the type of loss which the Lanham Act was intended to redress.

As to the second and third standing prongs, Plaintiff's alleged injury is extremely indirect, and Plaintiff's business is only remotely connected to Arbitron's PPM test monitoring.  As to the fourth prong, the alleged damages are highly speculative; Plaintiff would have great difficulty proving a direct link between Arbitron's conduct and actual WGTW dollars lost.  The final prong, though, weighs for Plaintiff, as there is no apparent risk of duplicative damages or complexity in apportioning damages.

Balancing the above five factors, it is apparent that Plaintiff lacks standing to bring a § 43(a) claim.  Yet, even if this Court were to find standing, the facts pled cannot satisfy the elements necessary to prevail on such a claim:

> 1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will,

etc.

*U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 922-23 (3d Cir. 1990) (*quoting Max Daetwyler Corp. v. Input Graphics, Inc.*, 545 F.Supp. 165, 171 (E.D. Pa. 1982) (Pollak, J.)).

   With respect to the first element, the Amended Complaint does not allege that Arbitron made any statements about WGTW, specifically.  As to the second element, Arbitron's PPM test reports, which omitted data for WGTW, could not plausibly "deceive" a substantial portion of the intended audience.  Nor would Defendant's representation that such reports were accurate cause a reasonable person to infer anything whatsoever negative about WGTW.  Similarly, as to the third element, the facts pled do not support a conclusion that Arbitron's actions caused "material" deception.  As Plaintiff acknowledges, Nielsen has long been in the television ratings market and continues to operate in that regard, separately from the PPM system now being developed.  *Id.* ¶ 11; Transcript of Motion to Dismiss Hearing (Oct. 8, 2002) at 35 ("Nielsen is in the market, absolutely.").  Therefore, any advertiser could easily refer to Nielsen's data on the Philadelphia market, and would not, rationally, be influenced in making purchasing decisions by the absence of WGTW from Arbitron's PPM tests.

   As Plaintiff's pleading cannot satisfy any of the first three elements of a § 43(a) claim, it is not necessary to consider the elements of interstate commerce or injury.  Because Plaintiff has not stated a valid claim under the Lanham Act, Count III must be dismissed.  Because the Court believes, given the industry structure and nature of Plaintiff's business compared to Defendant's business, any effort to amend would be futile, dismissal is with prejudice.

   D.  <u>Count IV – Disparagement of Commercial Products</u>

-37-

Plaintiff next asserts that Arbitron has "unfairly and falsely disparaged plaintiff's product, *i.e.* by misrepresenting its listening [*sic*] audience and importance in the market." Amended Complaint ¶ 63. Plaintiff appears to allege that Arbitron misrepresented the quality of WGTW's broadcasts or viewership, by omitting WGTW from the PPM test data, and by representing to the industry that the PPM data were, nevertheless, complete and accurate. *See id.* ¶ 59.

The tort at issue here is "variously referred to as `trade libel,' `commercial disparagement,' and `injurious falsehood.'" *Neurotron Inc. v. Medical Serv. Ass'n of Pa.,* 254 F.3d 444, 448 (3d Cir. 2001); *Electro Med. Equip. Ltd. v. Hamilton Med. AG*, No. 99-cv-579, 2000 U.S. Dist. LEXIS 7078, at *8 n.3 (E.D. Pa. May 24, 2000). Traditionally, to sustain a claim of commercial disparagement under Pennsylvania law, a plaintiff had to plead three elements:

> 1) that the disparaging statement of fact is untrue or that the disparaging statement of opinion is incorrect; 2) that no privilege attaches to the statement; and 3) that the plaintiff suffered a direct pecuniary loss as the result of the disparagement.

*Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 579 (E.D. Pa. 1999); *Electro Med.,* 2000 U.S. Dist. LEXIS 7078, at *9.

Recently, however, the Court of Appeals for the Third Circuit predicted that the Pennsylvania Supreme Court would alter the "parameters" of the tort by adopting a Restatement section that had never before been cited by the state's highest court. *Neurotron,* 254 F.3d at 449. The Restatement section at issue, § 623A, provides that:

> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if
>
> (a) he *intends* for publication of the statement to result in harm to interests of the other having a pecuniary value, *or* either recognizes

-38-

> or should *recognize that it is likely* to do so, *and*
>
> (b) he *knows* that the statement is *false* or acts in *reckless disregard* of its truth or falsity.

Restatement (Second) of Torts § 623(A) (1977) (emphasis added).  Notably, this Restatement formulation of the tort includes an element of knowledge or "reckless disregard" as to truth or falsity.  Such state of mind was not required by the traditional three-prong formulation.  *See Synygy,* 51 F. Supp. 2d at 579; *Electro Med.*, 2000 U.S. Dist. LEXIS 7078, at \*9.

Prior to *Neurotron*, the state Supreme Court had not decided a trade libel case in over two decades.  *See Neurotron*, 254 F.3d at 448.  However, the Superior Court, along with several Pennsylvania federal district courts, had cited Restatement § 623(A).  Moreover, as the Court of Appeals observed, the Pennsylvania Supreme Court has consistently adopted Restatement provisions.  *Id.* at 449-50.  Thus, the *Neurotron* court found that the state's highest court would accept § 623(A) as the "most reliable collation of the common law of injurious falsehood."  *Id.* at 451.  Accordingly, the Court of Appeals applied the "reckless indifference" standard to the facts presented in *Neurotron.  Id.* at 452.  Finding that the record did not support a finding that the defendant acted with knowledge of falsity, or reckless disregard, the court affirmed summary judgment for the defendants.  *Id.* at 454.

Fulfilling the Third Circuit's prediction, the Pennsylvania Supreme Court has recently cited Restatement § 623(A).  *See Pro Golf Mfg. v. Tribune Rev. Newsp. Co.,* No. 18-WAP-2001, 2002 Pa. LEXIS 2194, at \*6 (Pa. Oct. 22, 2002).  In *Pro Golf*, the plaintiff, a golf equipment maker, sued a newspaper which had allegedly stated, falsely, that the plaintiff's premises were soon to be demolished.  The trial court dismissed the claim based on a one-year limitations

-39-

period.  The Superior Court reversed, finding that a longer limitations period applied.  In

analyzing the tort of commercial disparagement, the Superior Court cited Restatement § 623(A):

> The Restatement (Second) of Torts § 623A labels this tort as
> "injurious falsehood."  Regardless of the label, the publication of a
> disparaging statement concerning the business of another is
> actionable where:  (1) the statement is false; (2) the publisher either
> *intends* the publication to cause pecuniary loss or reasonably
> should recognize that publication will result in pecuniary loss; (3)
> pecuniary loss does in fact result; and (4) the publisher either
> *knows* that the statement is false or acts in *reckless disregard* of its
> truth or falsity.  Restatement (Second) of Torts § 623(A) (1977).

*Pro Golf Mfg., Inc., v. Tribune Review Newspaper Co.*, 761 A.2d 553, 555-56 (Pa. Super. 2000)

(emphasis added).

The Pennsylvania Supreme Court reversed, holding that the trial court had correctly

applied a one-year limitations period to the commercial disparagement action.  *See Pro Golf*,

2002 Pa. LEXIS 2194, at *7.  In the October 2002 decision, however, the Supreme Court quoted

the above passage from the Superior Court's opinion with approval, which included the "reckless

disregard" element and a citation to § 623(A).  *Id.* at *5-6.

Thus, the state courts have, very recently, indicated a substantial change in the law of

commercial disparagement.  Accordingly, to sustain its cause of action under Count IV, Plaintiff

must allege, *inter alia*, that Arbitron made a false statement, which caused pecuniary loss to

Plaintiff, and that Arbitron knew that the statement was false or acted with reckless disregard of

its truth or falsity.  The allegations of the Amended Complaint do not fulfill these requirements.

Both parties, in their briefings, discuss only the traditional three-prong formulation of the

commercial disparagement tort.  Plaintiff and Defendant rely on *Synygy*, 51 F. Supp. at 579, for

definition of the cause of action's parameters.  Though Plaintiff asserts that Arbitron

-40-

"maliciously" disparaged WGTW, Amended Complaint ¶ 62, Count IV contains no allegation

that Arbitron acted with the knowing or indifferent state of mind referred to in *Pro Golf* and

*Neurotron*.  Accordingly, the claim cannot be sustained based on the facts as pled.

Nevertheless, as noted above, this claim should not be dismissed with prejudice unless

amendment would be futile.  Considering the whole of the Amended Complaint, Plaintiff has

provided enough factual background such that, if amended is allowed, the elements of the tort

may be satisfied.  For that reason, Plaintiff may amend its pleading to plead facts to support all

necessary elements of its commercial disparagement claim.  If Plaintiff files a Second Amended

Complaint, it shall contain sufficient factual detail to describe the nature of Arbitron's statements

and the reason why each was false; Arbitron's intention and knowledge in making the statement;

and the causal relationship between the statement and an approximate amount of pecuniary loss

to Plaintiff.  Hence, Count IV is dismissed without prejudice to Plaintiff's right to file a second

amended complaint.

E.  Count V – Tortious Interference with Prospective Contractual Relations

Next, Plaintiff claims that Arbitron has "improperly interfered with plaintiff's likely and

prospective contractual relations," by omitting WGTW from the PPM test data and representing

to the industry that the PPM data were, nevertheless, complete and accurate.  Amended

Complaint ¶ 59, 66.  The elements of the tort of interference with prospective contractual

relations are as follows:

> (1) the existence of a contractual or prospective contractual
> relationship between the plaintiff and a third party; (2) a purpose or
> intent to harm an existing relationship or to prevent a prospective
> relationship from accruing; (3) the absence of privilege or
> justification on part of the defendant; and (4) the occurrence of

> actual harm or damage to the plaintiff as a result of the defendant's
> conduct.

*Fresh Made, Inc. v. Lifeway Foods, Inc.*, 01-cv-4254, 2002 WL 31246922, at *12 (E.D. Pa. Aug.

9, 2002).

As to the first element, a prospective contract "`is something less than a contractual right,

something more than a mere hope.' . . .[I]t exists if there is a reasonable probability that a

contract will arise from the parties' current dealings." *Alvord-Polk, Inc. v. F. Schumacher & Co.*,

37 F.3d 996, 1015 (3d Cir. 1994) (*quoting Glenn v. Point Park College*, 272 A.2d 895, 898-99

(Pa. 1971)).  Plaintiff cannot rest its tortious interference claim on the "mere hope that additional

contracts or customers would have been forthcoming but for defendant's interference." *Fresh

Made, Inc.*, 2002 WL 31246922, at *12.

Plaintiff has not identified a single past, present or prospective customer of WGTW with

whom it had a prospective contract which did not finalize because of Defendant's actions.  Nor

does Plaintiff assert facts which would suggest the loss of any particular potential client.  If these

events had occurred, Plaintiff would have knowledge.  Nor has Plaintiff endeavored to explain a

causal connection between Arbitron's conduct and WGTW's loss of a contract that otherwise

might have been realized.  The tort of tortious interference is entirely inapplicable to the facts

alleged in the Amended Complaint.  Accordingly, Count V is dismissed with prejudice.

F.  Count VI – Negligence

Next, Plaintiff alleges negligence.  Under Pennsylvania law, a negligence claim consists

of four elements:

> (1) a duty or obligation recognized by the law, requiring the actor
> to conform to a certain standard of conduct; (2) a failure to

> conform to the standard required; (3) a causal connection between
> the conduct and the resulting injury; and (4) actual loss or damage
> resulting to the interests of another.

*Kleinknecht v. Gettysburg College,* 989 F.2d 1360, 1366 (3d Cir. 1993).

Plaintiff states that, in April 2002, Arbitron "requested permission to, and was permitted," to enter WGTW's premises for the purpose of installing a PPM encoder. Amended Complaint ¶ 67-68. Plaintiff asserts that Defendant was, thereafter, obligated to inform WGTW of any defect or malfunction in the encoder and to provide WGTW with instructions as to its use. *See id.* ¶ 70-71. Yet, Arbitron breached this duty of care, Plaintiff claims, by improperly installing the equipment, failing to instruct WGTW as to its use and failing to correct a defect in the equipment. *Id.* ¶ 73. Moreover, even after Plaintiff learned of the defect, Arbitron continued to exclude Plaintiff from its PPM surveys. *Id.* ¶ 77. These actions or omissions allegedly caused "irreparable damage" to Plaintiff. *Id.*

Defendant stresses that Plaintiff's negligence claim is barred by the "economic loss doctrine." That rule prevents recovery on a negligence theory for an economic loss, where the plaintiff's entitlement "flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995); *Constar, Inc. v. National Distrib. Ctrs., Inc.,* 101 F. Supp. 2d 319, 322 (E.D. Pa. 2000). The rationale is that negligence law is not intended to compensate a party for a loss resulting from a breach of duty, where that duty was assumed only by the parties' agreement. *See Constar,* 101 F. Supp. 2d at 322.

This Court cannot discern from the Amended Complaint whether or not Plaintiff bases his theory of duty upon the existence of an agreement, or other business arrangement, between the parties. On one hand, Plaintiff claims that Arbitron "requested permission to, and was

-43-

permitted" by Plaintiff to enter WGTW's premises. Amended Complaint ¶ 67-68. Plaintiff further claims that Arbitron "directly and knowingly assumed" a duty of care when it visited WGTW for the purpose of installing a PPM encoder. *Id.* ¶ 68-69. On the other hand, Plaintiff does not use the word "contract" to describe the business relationship between the parties. Under clear Pennsylvania precedent, if Arbitron's duty arose from the parties' agreement, then Plaintiff may not recover for economic losses caused by Arbitron's negligence. If Plaintiff envisions some other basis for Arbitron's duty, other than a business relationship between the parties, Plaintiff has not sufficiently alleged that basis.

As Plaintiff has not properly stated a legal duty, this Court need not address the remaining elements of breach, causation and injury. Nevertheless, Plaintiff's Amended Complaint offers enough clues as to his negligence theory to allow an amended pleading on this count. Therefore, with respect to Count VI, the motion to dismiss is granted, without prejudice to Plaintiff's right to submit a Second Amended Complaint, with sufficient factual details to establish a claim for negligence.

G. Count VII – Promissory Estoppel

Finally, Plaintiff raises a claim under the equitable doctrine of promissory estoppel. In order to succeed on a promissory estoppel theory, a party must establish that

> (1) the promisor made a promise that he should have reasonably
> expected would induce action or forbearance on the part of the
> promisee; (2) the promisee actually took action or refrained from
> taking action in reliance on the promise; and (3) injustice can be
> avoided only by enforcing the promise.

*Shoemaker v. Commonwealth Bank*, 700 A.2d 1003, 1006 (Pa. Super. 1997). *See also Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000). An action for promissory estoppel should be

dismissed where the complaint is "bereft of any allegation of a promise or reliance thereupon."

*Holewinski v. Children's Hosp.*, 649 A.2d 712, 714 (Pa. Super. 1994).

> Count VII of Plaintiff's Amended Complaint states that:

>> Upon gaining and being allowed entry to the plaintiff's equipment, defendant assumed, accepted, and is burdened with the duty to use a reasonable standard of care in regard to the protection of the equipment, and the proper utilization of the equipment for the purpose for which it was admitted, *i.e.*, to provide an accurate and satisfactory transmission of plaintiff's viewership.

>> [¶] 81.  Through its neglect and failure to observe the standard of care, and due to its reckless and malicious conduct, for the reasons aforesaid, defendant, and others which may become known to plaintiff through discovery and otherwise, defendant violated the duty of reasonable care, causing serious injury to the plaintiff, as aforesaid.

Amended Complaint ¶ 80-81.  Upon review of the entire Amended Complaint, Plaintiff has not alleged that Arbitron made a promise, or that Plaintiff reasonably relied on such promise.  Moreover, Plaintiff's assertion that Arbitron "violated the duty of reasonable care," *id.* ¶ 81, simply makes no sense in the context of a promissory estoppel claim.  If facts existed to support such a claim, Plaintiff would know them.  Accordingly, Count VII must be dismissed, with prejudice.

**V.    Conclusion**

For the foregoing reasons, Defendant's motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6) is granted.  Counts I, II, III, V and VII are dismissed with prejudice.  Counts IV (Disparagement of Commercial Products) and VI (Negligence) are dismissed without prejudice to Plaintiff's right to file a second amended complaint.  An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


BRUNSON COMMUNICATIONS, INC.    :        CIVIL ACTION
                                :
                        v.      :
                                :
ARBITRON, INC.                  :        NO. 02-3223


**<u>ORDER</u>**

AND NOW, this            day of December, 2002, it is hereby ORDERED that the

Defendant's motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6) is GRANTED.

It is further ORDERED that:

1.  Counts I, II, III, V and VII are dismissed with prejudice; and

2.  Counts IV and VI are dismissed without prejudice to Plaintiff's right to file a Second

    Amended Complaint within twenty (20) days.


**BY THE COURT:**


_____
**MICHAEL M. BAYLSON, U.S.D.J.**


O:\CIVIL\02-3223 Brunson Commun. v. Arbitron\ORDER.wpd