```
                                                                      109RS3
Print Request:   LEXSEE

Time of Request: February 10, 2003   04:00 PM EST

Number of Lines: 623
Job Number:      1841:0:79918845

Client ID/Project Name: 27745-001

Research Information:

Lexsee 1984 U.S.  Dist. LEXIS 23834
```

```
Send to:  DUPLER, DEBORAH
          SPECTOR GADON & ROSEN
          1635 MARKET ST FL 7
          PHILADELPHIA, PENNSYLVANIA 19103-2217
```

LEXSEE 1984 U.S. Dist. LEXIS 23834

**ROXANNE MEMMOLO v. COMMODORE BUSINESS MACHINES, INC. and THOMAS RIZOL, SR.**

**Civil Action No. 83-6024**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1984 U.S. Dist. LEXIS 23834*

**September 6, 1984**

**OPINIONBY:**
 [*1]
   GILES

**OPINION:**

   M E M O R A N D U M

   GILES, J.

   Alleging that she was wrongfully terminated, Roxanne Memmolo ("Memmolo") sues her former employer, Commodore Business Machines ("Commodore"), and her former supervisor, Thomas Rizol, Sr. ("Rizol") Before the court is defendants' motion for summary judgment For the reasons which follow, the motion shall be granted in part and denied in part.

   I FACTS

   Memmolo was hired by Commodore on March 30, 1982 as a "long term temporary training specialist " The job was only ten weeks in duration, the first of which was spent in a training program. The remaining nine weeks were spent traveling around the country demonstrating Commodore's computer products to K-Mart sales personnel Training specialists were treated as independent contractors, rather than regular employees. See Exhibit C attached to Complaint. Memmolo's tour of duty extended from April 5, 1982 through June 15, 1982. During that time, she traveled with another training specialist, Diane Taylor ("Taylor") and her supervisor, Barbara Garris ("Garris").

   While working as a training specialist, Memmolo applied for the position of Personnel Administrator. n1 On April 14, 1982, she [*2] was interviewed by Rizol, the Personnel Director. On April 30, 1982, she was orally informed that she had the job and that Commodore would bear the cost of her relocation from upstate New Jersey. After completing her ten week tour, Memmolo began work on June 17, 1982 and was assigned the task of putting together a personnel manual. On June 25, 1982, apparently in response to Memmolo's request for written documentation, Rizol sent her a letter confirming the details of her employment, which she signed and returned. See Exhibit D attached to Complaint. Attached to the letter was information concerning Commodore's relocation policy.

   n1 Initially, Memmolo approached David Kaminer, the Director of Public Relations, and inquired about a permanent position. Memmolo stated in her deposition that she desired a job in the public relations area. See Memmolo Deposition at 15-16. Although it is not clear how Memmolo was put in touch with Rizol, Garris, her supervisor, recommended her for the job.

   For the first week or two as Personnel Administrator, Memmolo looked for housing and stayed at hotels or with other employees. She located a condominium for sale which she decided to purchase. [*3] The closing was set for July 12, 1982. On July 9, Memmolo approached Rizol to question him further about the relocation of her personal belongings to her new residence. On the same day, she completed the handbook which had been her exclusive task since assuming the position. The actual content of the conversations between Rizol and Memmolo on that day is hotly contested. However, it is agreed that Rizol discharged Memmolo, promising to try to find her

another position at Commodore. n2 At her deposition, Memmolo testified that she was given no explanation for the discharge other than Rizol's comment that she was no longer needed in that job. Memmolo Deposition at 11. However, her complaint states that she was informed that "she was not qualified for the position she held since it required someone with financial experience." Complaint [P] 16. Rizol maintains that she was terminated because it took her approximately three weeks to complete the personnel manual and he estimated that the job should have taken only two days.

> n2 Rizol maintains that he did make some inquiries and even set up an interview for Memmolo. Memmolo did not show up for the interview and has disclaimed knowledge of its existence. She claims to have tried to reach Rizol, who allegedly did not return her telephone calls. [*4]

The events following her discharge are even more murky. Memmolo alleges that she contacted various officials at Commodore about another job. Although she cancelled the closing on the condominium, she still contacted the movers used by Commodore sometime during the week of July 12, 1982 and continued with the relocation process. Memmolo Deposition at 76-77. Since she was no longer employed by Commodore, it is equally unclear whether she received any authority to engage the movers on behalf of the company. On July 9, 1982, Rizol told her that defendants would not pay her relocation expenses. Memmolo Deposition at 76. However, Memmolo claims that she had conversations with other officials at Commodore, which led her to contact the moving company. Memmolo Deposition at 76-77. A squabble ensued over who was responsible for the bill and the moving company, Bekins, apparently held Memmolo's belongings pending resolution of that dispute. Ultimately, Commodore paid for the move to Philadelphia, storage of her belongings, and Memmolo's final relocation to New York.

In December of 1982, Memmolo filed a charge of discrimination with the EEOC, linking events which occurred while she was traveling [*5] as a training specialist to her subsequent discharge from the position of Personnel Administrator. Specifically, a K-Mart executive invited her to join him at the Indianapolis 500. After consulting with Garris, her supervisor, she declined the invitation. Garris indicated that the company had a "double standard," allowing male employees freedom to date corporate customers, while discouraging women from engaging in the same behavior. Although she refused the invitation, her EEOC charge stated that her conduct had been "slanderously misrepresented" so as to endanger her future at Commodore. See Exhibit A to Complaint. It is not clear whom she accuses of this misrepresentation. In addition, during the ten week tour, Memmolo mentioned to Garris that she noticed that only women were hired as training specialists and thought this practice to be discriminatory. n3 The EEOC charge alleges that this practice is discriminatory. Memmolo also contended that she was discharged because of her criticisms of the female only hiring policy and as a result of the misrepresentations about her conduct with the K-Mart executive. In the alternative, she avers that her transfer to permanent employment [*6] and subsequent speedy discharge were in retaliation for her conduct and criticisms. See Exhibit A to Complaint. A Right-to-Sue notice was issued on September 26, 1983.

> n3 Defendants claim that this practice was changed for the next ten week tour. Moreover, Memmolo admitted that her comments were made in the context of informal, social conversations. Memmolo Deposition at 83-84.

Memmolo proceeds before this court on several theories. In addition to her claims of sex discrimination and retaliation, (Counts VIII and IX), she alleges breach of contract (Count III), malicious breach of contract (Count IV), promissory estoppel (Count I, referred to as "reliance"), misrepresentation and intentional infliction of emotional distress (Count II), wrongful discharge (Count V), interference with existing contractual relations (Count VI), interference with prospective contractual relations (Count VII), and malicious misrepresentation (Count X). Defendant seeks summary judgment as to each and every count.

II. DISCUSSION

The familiar standard of Rule 56(c) teaches that summary judgment may only be granted if there are no genuine issues of material fact, entitling the moving party to [*7] a judgment as a matter of law. All doubts are to be resolved and inferences drawn in favor of the non-moving party. See, e.g., *Continental Ins. Co. v. Bodie, 682 F.2d 436, 438-39 (3d Cir. 1982); Hollinger v. Wagner Mining Equipment Co., 667 F.2d 402, 405 (3d Cir. 1981).*

A. Duration of Employment Relationship

Defendants contend that since plaintiff's employment contract did not have a specified duration, plaintiff was an employee terminable-at-will. As such, defendants argue, plaintiff has no claim for promissory estoppel (Count I, termed "reliance"), breach of contract (Count III), malicious breach of contract (Count IV), interference with

existing contractual relations (Count VI), or malicious misrepresentation (Count X).

Under Pennsylvania law, if an employment contract does not specify its term or duration, the contract may be terminated by either party at will. See, e.g., *Lubrecht v. Laurel Stripping Co., 387 Pa. 393, 396, 127 A.2d 687, 689 (1956); Cummings v. Kelling Nut Co., 368 Pa 448, 451, 84 A.2d 323, 325 (1951); Yaindl v. Ingersoll-Rand Co., 281 Pa. Super. 560, 570, 422 A.2d 611, 616 (1980);* Adams v. Budd Co., No. 83-1080, **[*8]** slip op. at 4 (E D Pa March 2, 1984); *Ruch v. Strawbridge & Clothier, Inc., 567 F. Supp. 1078, 1079 (E.D. Pa. 1983); Moorhouse v. Boeing Co., 501 F. Supp. 390, 395* (E.D. Pa.), aff'd mem., *639 F.2d 774 (3d Cir. 1980); McNulty v. Borden, 474 F. Supp. 1111, 1118-19 (E.D. Pa. 1979).* In endeavoring to show that the contract was not at will:

> The burden is on the plaintiff ... to overcome the presumption by showing facts and circumstances establishing some tenure of employment ..The intention of the parties governs. One relying on the contract as providing for a reasonable length of time must establish something in the nature and circumstances of the undertaking which would create the inference that a definite or reasonable period of employment was actually contemplated by the parties.

*Cummings, 368 Pa. at 452, 84 A.2d at 325.* Accord *McNulty, 474 F. Supp. at 1119.*

The written contract sent to Memmolo at her request did not specify a term or duration. See Exhibit D to Complaint. n4 However, it did contain an integration clause providing that "[t]he offer contained in this letter supercedes all prior (sic) understandings and discussions, whether **[*9]** oral or written, in connection with the matters addressed in this letter." Exhibit D to Complaint. Arguably, this clause would preclude Memmolo from introducing parole evidence with respect to prior negotiations and discussions with Rizol, making her employment indisputably terminable at will. See, e.g., *Scott v. Bryn Mawr Arms, 454 Pa 304, 307-08, 312 A.2d 592, 595-96 (1973); Keyser v. Margolis, 422 Pa. 553, 559, 223 A.2d 13, 16-17 (1966); Harrison v. Fred S. James, P.A., Inc., 558 F. Supp. 438, 442 (E.D. Pa. 1983).* Assuming that she could overcome the parole evidence problem, n5 there is no evidence that the parties agreed upon a specified term for the contract. During her deposition, Memmolo admitted that Rizol did not mention the duration of the contract. Memmolo Deposition at 105-109. Nevertheless, Memmolo argues that the position was a "permanent" one, extending for a "reasonable" period of time. Since no duration was mentioned by Rizol, the presumption arises that the position was terminable at will. See *Cummings, 368 Pa. at 451, 84 A.2d at 325.* The court must determine if plaintiff has carried the burden of proving that the parties contemplated otherwise. **[*10]**

> n4 The letter did state that her salary would be "$20,000 per annum". However, an inference does not thereby arise that the contract was for a period of one year. See, e.g., *Gillian v. Consolidated Foods Corp., 424 Pa. 407, 414, 227 A.2d 858, 862 (1967).*

> n5 Under Pennsylvania law, evidence of fraud or mistake is always admissible. *Scott, 454 Pa. at 307, 312 A.2d at 594; Keyser, 422 Pa. at 559, 223 A.2d at 17.* Count X of Memmolo's complaint, titled "malicious misrepresentation" alleges that defendant "misrepresented the prospects for permanent employment," Complaint [P] 38. If this misrepresentation was made when the parties were entering into the contract, parole evidence of conversations relating to the duration of the contract may be admissible. Alternatively, extrinsic evidence may be admitted to prove that, despite the existence of an integration clause, the written agreement did not embody all of the terms of the contract.

In endeavoring to establish that her employment contract was to run for a reasonable period of time, Memmolo appears to rely n6 primarily upon her expectations, as they were related to Rizol during her interview. At her deposition, **[*11]** Memmolo described the conversations she had with

A. The first conversation was on April 14th, I think, the first interview I had in Tom Rizol's office.

Q. What did he say to you according to your recollection?

A. What I said to him was that I was looking for a permanent position, that I was not interested in a temporary position.

Q. The relationship to your ten-week tour that you had just come off of; correct?

A. Ten weeks was a temporary position in that at the end of ten weeks, I would no longer be employed by Commodore. I was not looking for another job under those circumstances.

Q. And your opinion of a permanent employment would be one that would not have an ending date; correct?

A. A permanent position is one that I can be secure in

bringing my family to relocate. I explained to him the situation with my children. My daughter was a junior in high school, and I had to have two years in one place so that she could graduate from high school.

Q. Did Mr. Rizol tell you that if you accepted and was offered this position as personnel administrator that there would be any length of time to this relationship?

A. He did not mention a length of time, but I told [*12] him what my needs were and I told him the job that I was looking for.

Q. Okay, but he never told you that you were on probation --

A. No.

Q. -- for any period of time?

A. No.

****Q. During that time that you were employed as personnel administrator, were there any further discussions between you and Mr. Rizol concerning the length of this relationship?

A. Only that I maintained that this was a permanent position that I was looking for.

Q. Did he actually say that this was a permanent position?

A. This was a permanent full-time position, it was not a temporary position as would be offered by the touring group.

Q. But my question was: Did he say that?

A. Did he say what?

Q. Did he say that you were going to have a year-to-year written contract similar to one of your prior jobs that we had already gone into? When you said you had a one-year contract, it was with Marycrest College. Did you sign a one-year contract?

A. He did not say it was a one-year contract.

Q. Did he say it was a six-month contract?

A. No, he did not.

Q. So, basically, since you had held other jobs similar to this without written contracts, you were entering into a relationship with [*13] Commodore that if you performed satisfactorily and you liked us, you would continue to be on the payroll is that correct?

MR. SYRE: I object, I just want to state an objection. I don't mind you answering the question.

THE WITNESS: I can't.

MR. SYRE: It calls for a legal conclusion, that's my objection.

MS. CRAWFORD: It calls for a factual conclusion.

MR. SYRE. Go ahead and answer my questions she asks you I don't have any objection to you answering any now.

THE WITNESS This job had no relationship and was not based on any other job that I had previously held

***BY MS. CRAWFORD:

Q. You mean in all the previous jobs that you held up until this time, you had written contracts for specific periods of time?

A. No.

Q. Well, there was no written contract that you entered into promising you a position for a specific length of time; correct?

A. The only written contract I have is this letter. In the many conversations I had with Tom Rizol, we discussed the permanence of our relationship. Now, none of these conversations are in writing, so there is no written contract.

I took him at his word when I said I needed a permanent job and he said yes. He didn't use the word permanent [*14] I used the word "permanent", but when he said yes, that's an agreement to me.

Memmolo Deposition at 105-109 (emphasis added).

> n6 Plaintiff's theories, as set forth in her complaint and brief, are not paragons of clarity.

Memmolo argues that Rizol knew she sought "permanent" employment and hired her on that basis She also suggests that defendants' promise to pay for her relocation expenses strengthens her position that the contract was to last for a reasonable period of time. However, Memmolo's communication of her desire to settle down with her children, absent some manifestation of assent on Commodore's part, does not alter the at-will nature of this contract. Memmolo admitted that it was she, not Rizol, who used the word "permanent." Even assuming that defendants tacitly agreed to a "permament" relationship, that does not necessarily impute any specific duration to the contract. In her deposition, Memmolo agreed that her position as a training specialist was "temporary" in that it had a fixed duration of ten weeks. Memmolo Deposition at 105. The designation "permanent employment" simply means that there is no fixed duration

-- it could last three weeks, three months, **[*15]** or three years. See *Moorhouse v. Boeing Co., 501 F. Supp. 390 (E.D. Pa.) aff'd mem., 639 F.2d 774 (3d Cir. 1980).* In Moorhouse, the defendant had described the employment as permanent. The company argued that permanent employment had no fixed duration, while temporary employment had a definite termination date. The court concluded that "whatever import was attached to use of the term permanent, it had nothing to do with the length of plaintiff's future tenure with the company." *Moorhouse, 501 F. Supp. at 395.* I agree with the reasoning of Moorhouse. Plaintiff's use of the word "permanent" does not determine the duration of the employment contract. See also *Green v. Medford Knitwear Mills, Inc., 408 F. Supp. 577, 580 (E.D Pa. 1976)* (use of word permanent adds nothing to status as employee at will). That Commodore was willing to bear the expense of Memmolo's relocation is not probative of the duration of the contract. In sum, there is no evidence to "create the inference that a definite or reasonable period of employment was actually contemplated by the parties." *Cummings, 368 Pa. at 452, 84 A.2d at 325* (emphasis added). Although Memmolo may have intended **[*16]** the contract to last for a specified or reasonable period of time, there is no indication that defendants shared that intent. As such, Memmolo has not overcome the presumption that the contract was terminable at will. n7

> n7 In reaching this conclusion, I have not relied upon defendants' alleged probation policy, whereby an employee is placed on probation for the first thirty (30) days of employment. There is a factual dispute over whether Memmolo was informed of this policy. Moreover, she argues that since the policy is not contained in the written document, it is not part of the contract, citing the integration clause. Ironically, strict application of the clause would preclude the admission of her prior conversations with Rizol, ensuring her status as an at-will employee.

Since Memmolo's employment was terminable at will, her discharge could not amount to a breach of the contract. Applying the same reasoning, her termination could not state a claim for malicious breach of contract, assuming that such a cause of action exists, see, e.g., *Daniel Adams Assoc., Inc. v. Rimbach Pub., Inc., 287 Pa. Super. 74, 77-78, 429 A.2d 726, 728 (1981)* (punitive damages not recoverable **[*17]** in contract absent some breach of duty). Accord, *Argo Welded Products v. J.T. Ryerson Steel & Sons, Inc., 528 F. Supp. 583, 586-87 (E.D. Pa. 1981); Iron Mountain Security Storage Corp. v. American Specialty Foods, Inc., 457 F. Supp. 1158, 1165 & n.7 (E.D. Pa. 1978).* Therefore, defendants are entitled to summary judgment on Counts III and IV.

Defendants suggest that Memmolo's status as an employee at will resolves many of her other claims. This is not exactly accurate. That which makes the contract terminable at will, the lack of any agreement as to its duration, will also defeat some of her other causes of action. Since Memmolo's other common law claims are interrelated, I shall address them all in this section.

1. Reliance

Count I of the complaint, titled "reliance", is apparently a claim for promissory estoppel. Memmolo alleges that defendants made oral promises upon which she justifiably relied, which were intended to induce her to accept "permanent" employment with Commodore. Complaint [P] 19. In reliance upon those promises, Memmolo ceased looking for employment, purchased a home here, n8 moved her family and assumed the position. Id. Although the complaint **[*18]** does not indicate what these oral promises were, I gather from the brief that they relate to the permanence of the employment relation. Although promissory estoppel is well recognized in Pennsylvania, see, e.g., *Central Storage & Transfer Co. v. Kaplan, 487 Pa. 485, 410 A.2d 292 (1979); Murphy v. Burke, 454 Pa. 391, 311 A.2d 904 (1973); Berliner v. Bee Em Mfg. Co., 383 Pa. 458, 119 A.2d 65 (1956); Fried v. Fisher, 328 Pa. 497, 196 A. 39 (1938),* it is not applicable here. The doctrine enforces promises reasonably relied upon where the promissor could expect the promise to induce such reliance. The missing element here is the promise. Although there was certainly a promise of employment, there was admittedly no promise that it would last for a particular period of time. Defendants honored the promise of employment. n9 It belabors the obvious to state that Memmolo could not justifiably rely or sue upon a promise that was never made; i.e., that her employment would last a particular or "reasonable" period of time.

> n8 Contrary to the assertion in the complaint, Memmolo never went through with the closing on the condominium. She was able to get back her down payment as well. Memmolo Deposition at 112. As damages, she seeks, inter alia, relocation expenses which were already paid by Commodore. Id. at 116. **[*19]**

> n9 This is the crucial fact which distinguishes this case from *Grouse v. Group Health Plan, Inc., 306 N.W.2d 114 (Minn. 1981),* upon which Memmolo relies. In Grouse, the promise of employment was breached before the plaintiff

1984 U.S. Dist. LEXIS 23834, *

assumed the position.

In her brief, Memmolo also maintains that Rizol had a duty to "prevent her further reliance upon his encouragement of relocation " Plaintiff's Memorandum in Opposition at 7. Although this reference is not clear, it appears that she maintains that Rizol should not have sent her the written document on June 25th if he had already determined that she was unsuitable. However, Rizol obviously did not make the final decision until July 9th, when he discharged her. Other than the arrangements for the purchase of the condominium, which she cancelled without losing any money, see Memmolo Deposition at 112, Memmolo did not act in reliance upon the document. If Memmolo is contending that Rizol should not have told her that he would try to find her a position in another division at Commodore, her argument is equally unavailing Rizol did not promise her another job, but simply promised to make the attempt. Reliance upon such a promise is **[*20]** not reasonable. Therefore, Memmolo has not stated a claim for promissory estoppel and defendants are entitled to summary judgment on Count I.

2. Misrepresentation and Emotional Distress

Count II of the complaint alleges that defendants "made false promises inducing plaintiff to rely upon false representations of permanent employment in reckless disregard for the harm caused to plaintiff intentionally inflicting upon plaintiff, in addition to the injuries stated, emotional stress and harm." Complaint [P] 22. It is not clear whether this count pertains to the tort of misrepresentation, intentional infliction of emotional distress, or both. n10 To the extent that it relates to misrepresentation, this claim suffers the same fatal flaw as promissory estoppel. Memmolo admitted that defendants did not promise employment of any specified duration. See Memmolo Deposition at 105-109. If there was no misrepresentation, defendants cannot be held liable for the resulting emotional distress Moreover, looking at the behavior alleged in the complaint as a whole, I find nothing which rises to the level of "extreme and outrageous" conduct. See, e.g., *Wells v. Thomas*, 569 F. Supp. **[*21]** 426, 433-34 (E.D Pa. 1983); *Beidler v. W.R. Grace*, 461 F. Supp. 1013, 1016 (E.D. Pa. 1978).

> n10 In her brief, Memmolo seems to indicate that Count II contains claims for both torts. See Plaintiff's Memorandum in Opposition at 9.

Perhaps in recognition of the patent weakness of Count II, Memmolo presents a novel, though somewhat incomprehensible, theory in her brief. n11 Referring to the dispute with Bekins, the moving company, she characterizes Commodore's initial refusal to pay the bill as "a device to leverage an advantageous settlement of all other claims it deemed may arise out of the firing." Plaintiff's Memorandum in Opposition at 9. Assuming that Commodore was liable for the bill, its initial refusal to pay does not rise to the level of misrepresentation At most, the refusal could be characterized as a breach of contract. However, Commodore subsequently paid not only for the relocation, but also for storage of Memmolo's goods and her ultimate move to New York.

> n11 This theory is not contained in the complaint. In fact, the complaint does not contain any factual reference to the episode with Bekins. Since it is not found in the pleadings, I could exercise my discretion and refuse to consider it. However, plaintiff should not be penalized for her attorney's inartful pleading. **[*22]**

Memmolo also tries to force Commodore's actions into the definition of intentional infliction of emotional distress. The exact chronology of events is difficult to discern, as plaintiff does not bother to set out the facts. Apparently, it took Commodore some time to decide whether and how much to pay of Memmolo's relocation expenses. Bekins stored Memmolo's belongings at her request, awaiting a delivery address. See Appendices C, D, E, attached to Plaintiff's Memorandum in Opposition. When the bill was not paid, Bekins continued to hold her goods pending payment. Memmolo received a bill from Bekins, stating that if she did not pay in full, she would receive notice of their intent to sell her household goods at a public auction. See Appendix F. She argues that since Commodore was liable for the bill, n12 their non-payment caused the emotional distress suffered when she was temporarily deprived of her possessions and advised that they might be sold at an auction. I am unable to conclude that this conduct is "extreme and outrageous." The notice she received from Bekins was simply a dunning letter -- her goods were never sold at an auction, nor was she advised that they would **[*23]** be. Memmolo could have prevented both the deprivation of her possessions and the potential auction by paying the bill. She then could have proceeded against defendants for the amount she paid to Bekins. Assuming that Commodore was liable for the bill, their actions do not rise to the level of intentional infliction of emotional distress. Accordingly, summary judgment shall be entered in favor of defendants on Count II.

> n12 There is certainly a threshold issue concerning whether Memmolo had the authority to engage Bekins on behalf of Commodore, given her terminated status.

3. Malicious Misrepresentation

From the face of the complaint, Count X is redundant to Count II, alleging that defendant "maliciously misrepresented the prospects for permanent employment ...." Complaint ? 38. The addition of the word "malicious" adds nothing in the absence of a misrepresentation. However, like most of the claims in this case, new dimensions are added in plaintiff's brief. Memmolo argues that her treatment was discriminatory, concluding that "[h]er claims for fraud, therefore, arise out of Title VII considerations ...." Plaintiff's Memorandum in Opposition at 20. Claims of discrimination [*24] are actionable under Title VII and the Pennsylvania Human Relations Act, Pa. Stat. Ann. tit. 43 § 951-63 (Purdon's Supp. 1984-1985) ("PHRA"), not under common law fraud theories. Since Memmolo has failed to point to any misrepresentation, malicious or otherwise, summary judgment shall be entered on this Count.

4. Interference with Contract

Count VI of the complaint purports to state a claim for interference with existing contractual relations and Count VII seeks redress for interference with prospective contractual relations. Neither of these theories is supported by the evidence and summary judgment shall be granted in favor of defendants.

a. Existing Contractual Relations

Memmolo asserts two distinct causes of action under this theory. First, if Rizol never intended her employment to be permanent, he interfered with her opportunity to find other permanent employment with Commodore. This is not a claim for interference with existing contractual relations, the essence of which is causing a third person to break an existing contract with another party. See, e.g., *Adler, Barish, Daniels, et al. v. Epstein, 482 Pa. 416, 429-32, 393 A.2d 1175, 1181-83 (1978)* [*25] (adopting Restatement (Second) of Torts § 766); *Glenn v. Point Park College, 441 Pa 474, 477, 272 A.2d 895, 897 (1971); Caskie v. Phila. Rapid Transit Co., 321 Pa. 157, 159-60, 184 A. 17, 18 (1936); Wells v. Thomas, 569 F. Supp. 426, 434-35 (E.D Pa. 1983)*. The rule was plainly stated in Caskie; "if one maliciously interferes in a contract between two parties, and induces one of them to break that contract to the injury of the other, the party injured can maintain an action against the wrongdoer." *321 Pa. at 160, 184 A. at 18*. Rizol did not induce a third party to breach a contract with Memmolo. In the first instance, since her employment was terminable at will, her discharge was not a breach of the contract. To the extent that Memmolo claims that she was precluded from obtaining other permanent employment with Commodore, this sounds more akin to interference with prospective contractual relations Moreover, as is clear from all definitions of this tort, it requires three parties -- the two original parties to the contract and the interloper who endeavors to seduce one of the contracting parties away from the other. See, e.g., *Wells, 569 F Supp. at 434-35* [*26] (must have a third party who induces breach). Here, the alleged interloper, Rizol, is the agent of the contracting party. One party to a contract cannot assert interference with existing contractual relations against the other party. *Id. at 435*. See also *Fincke v. Phoenix Mutual Life Ins. Co., 448 F. Supp. 187, 190 (W.D. Pa. 1978)*.

Memmolo's second theory is beset with the same problem. She argues that Commodore interfered with the contract between it and Bekins, by "using Bekins to threaten plaintiff with the judicial sale of her belongings ...." Plaintiff's Memorandum in Opposition at 17. Once again, there is no third party inducing the breach of a contract. Since the goods were ultimately delivered and paid for, it is also questionable if there was a breach. Accordingly, plaintiff's claim for interference with existing contractual relations must fail.

b. Prospective Contractual Relations

Plaintiff argues that by promising to find her another job at Commodore, Rizol interfered with her prospective contractual relations vis-a-vis Commodore. Simply put, this contention makes no sense. Rizol merely stated that he would try to find her another job within the [*27] company. Memmolo deposition at 69. His failure to find another job for her does not state a claim under any theory. There is no evidence that he made derogatory statements about her abilities or engaged in any other type of behavior which would hamper her chances of obtaining alternate employment. On the contrary, Rizol testified that he set up an interview for Memmolo the day after her termination. Rizol Deposition at 25-26. Thus, the evidence indicates that Rizol attempted to aid, rather than impede, Memmolo in her quest to find other employment at Commodore There is simply no basis for this claim and summary judgment shall be entered in favor of defendant on both Counts VI and VII.

5. Wrongful Discharge

The fifth count of Memmolo's complaint alleges that she was "wrongfully discharged ... without justification or privilege." Complaint [P] 28. Assuming that the complaint refers to the wrongful discharge/public policy exception to at-will terminations, see *Geary v. United States Steel Corp., 456 Pa. 171, 184-85, 319 A.2d 174, 180 (1974); Yaindl v. Ingersoll-Rand Co., 281 Pa Super 560, 572, 422 A.2d 611, 617 (1980); Reuther v. Fowler & Williams, Inc., 255* [*28] *Pa. Super 28, 31-32, 386 A.2d 119, 120*

(1978); *Wolk v. Saks Fifth Ave., Inc.*, 728 F.2d 221, 222-23 (3d Cir. 1984); *Novosel v. Nationwide Ins. Co.*, 721 F 2d 894, 897-99 (3d Cir 1983); *Bruffett v. Warner Communications, Inc.*, 692 F.2d 910, 917-18 (3d Cir. 1982),* defendants argue that Memmolo has failed to identify the clear mandate of public policy upon which she relies. Alternatively, if the ban on sex discrimination is the offended public policy, defendants contend that her claim is preempted by the PHRA. The courts of Pennsylvania would not recognize a wrongful discharge claim where a remedy exists under the PHRA. See *Bruffett, 692 F.2d at 918-19.* See also Shaffer v. National Can Corp., No. 82-5202, slip op. at 3-4 n.4 (E.D. Pa. May 25, 1984). Therefore, Memmolo does not have a claim for wrongful discharge under the Geary line of cases.

In her brief, Memmolo does not respond to defendants' attack, arguing instead that a just cause requirement for discharge should be implied based upon the conduct of the employer. In Novosel, the Third Circuit recognized that the employer's custom, practice or policy could create a contractual just cause requirement **[*29]** *Novosel, 721 F.2d at 902-903.* The court also held that this is an issue of fact, inappropriate for resolution pre-discovery on a motion to dismiss. *Id. at 903.* However, in Wolk, the court affirmed a grant of summary judgment in favor of the defendant on this issue, where the plaintiff was unable to point to the abridged contractual right. *Wolk, 728 F.2d at 225.*

It is unclear what "custom, practice or policy" Memmolo relies upon for creating a just cause requirement. At one point, she argues that Rizol's act of explaining the reasons for her discharge before the EEOC and at his deposition was an acknowledgement of a just cause requirement. Plaintiff's Memorandum in Opposition at 13-14. Providing an after-the-fact explanation for termination is not an admission that just cause was required. Furthermore, there is no evidence of any "custom, policy or practice" which became part of the contract, as was envisioned in Novosel and Wolk. In Wolk, for example, the dispute focused upon provisions in a personnel manual. See *Wolk, 728 F.2d at 225.*

The remainder of Memmolo's analysis on this issue consists of sweeping conclusory allegations to the effect that defendants **[*30]** did not deal with her in good faith. See Plaintiff's Memorandum in Opposition at 16. In Wolk, plaintiff asked the court to impose a general obligation upon employers to "discharge an at-will employee in good faith and with good cause." *Wolk, 728 F.2d at 225.* The Third Circuit responded:

As we stated in Novosel, whatever the merits of this position, there is no indication that the Pennsylvania courts have as yet fashioned or indicated their intention to fashion a uniform just cause requirement for all discharges. Absent such a declaration on the part of the state courts, a federal tribunal sitting in diversity is not empowered to take this step for the state courts.

Id. Given the lack of any specific "custom, policy or practice" establishing a just cause requirement and in light of the availability of a remedy under the PHRA, summary judgment shall be entered in favor of defendants on the wrongful discharge count.

B. Title VII Claims

Memmolo's complaint contains two distinct Title VII claims. Count VIII alleges discrimination in that women are hired only for temporary positions. This policy affected Memmolo's retention as a permanent Commodore **[*31]** employee. Complaint [P]34. Count IX avers that defendants retaliated against her for her criticism of hiring only women for the position of temporary training specialist. She characterizes defendants' decision to hire her as a regular employee and her speedy termination as "a pretext to mute her criticism of the all female employment practice." Complaint [P] 36. Defendants argue that Memmolo failed to exhaust her administration remedies and challenge the sufficiency of the evidence to support her substantive theories.

1. Exhaustion

Defendants contend that Memmolo's refusal to sign a "perfected" EEOC charge bars her cause of action. I do not agree. Some procedural background is necessary to place this argument in context Memmolo's charge of discrimination, attached to the complaint as Exhibit A, was deemed sufficient for docketing by Gloria Murphy, an Equal Opportunity Specialist ("EOS"), with the Intake Division of the Philadelphia District Office of the EEOC. Murphy Affidavit [P] 5. After conducting a telephone interview with Memmolo, Murphy forwarded the file to the Fact-Finding Unit. Stanford Lamb, an EOS with that unit, "perfected" the charge and sent it to Memmolo. **[*32]** The second charge was somewhat different than the original and Memmolo refused to sign it. Plaintiff's counsel, expressing dissatisfaction with the perfected charge, requested a Right-to-Sue notice. Lamb Affidavit [PP] 7, 9, 10.

Defendants argue that Memmolo's refusal to sign the second charge was motivated only by a desire to prevent an EEOC investigation and "no cause" finding. This conclusion is not supported by the evidence. During her

deposition, Memmolo pointed to at least one substantive error in the perfected charge, relating to the importance of her personal relationship with David Kaminer, Commodore's Public Relations Director, see Memmolo Deposition at 90, 92. An inference arises that she refused to sign the charge because it contained inaccurate allegations. Moreover, defendants have cited no authority for the proposition that the refusal to sign a perfected charge, which differs from the original is grounds for granting summary judgment. n13 Although a full EEOC investigation would have been preferable to the rather summary issuance of a Right-to-Sue notice, Memmolo has exhausted her administrative remedies and shall be permitted to present her claims to this court. **[*33]**

> n13 *Montano v. Amstar Corp., 502 F. Supp. 295 (E.D. Pa. 1980),* relied upon by defendants, is inapposite The plaintiff in Montano unsuccessfully sought to amend her Title VII claim to include an incident not contained in her original EEOC charge *Id. at 296.* Unlike the Montano situation, all of Memmolo's claims and allegations were presented to the EEOC in her original charge.

2. Sufficiency of Evidence

Defendants' evidentiary challenges appear directed to Memmolo's retaliation claim, leaving her claim of direct discrimination unscathed. Defendants point out that Memmolo admittedly did not file a "formal complaint" about the female-only policy in hiring training specialists. See Memmolo Deposition at 95. Memmolo concedes that her criticism of this policy was made to her supervisor, Garris, in the context of informal conversations. Id. at 83-84. I am unable to adopt defendants' suggestion that criticism related to a supervisor in a quasi-social setting cannot form the basis of a claim of retaliation. The very case cited by defendants holds that the filing of a charge with the EEOC or a state agency is not a prerequisite to a retaliation claim. See *Sias* **[*34]** *v. City Demonstration Agency, 588 F.2d 692, 695 (9th Cir. 1978)* (quoting *Hearth v. Metropolitan Transit Comm., 436 F. Supp. 685, 688-89 (D. Minn. 1977)).* All that a plaintiff must prove is that she was discharged for saying or doing something which she was entitled to say or do Criticism of an employer's hiring practices certainly falls into that category. The context in which the criticism was made is not relevant, provided that it caused plaintiff's termination.

The second prong of defendants' argument focuses upon Rizol's relative knowledge of Memmolo's criticism. In an affidavit, Garris states that she did not advise Rizol of Memmolo's observations about the female-only hiring policy. n14 She further avers that she recommended Memmolo for the position of Personnel Administrator, but played no role in any decisions affecting Memmolo's hiring or firing. Garris Affidavit [PP] 4, 7, 10. Defendants maintain that Memmolo's criticism never came to the attention of Rizol, the individual responsible for her hiring and firing. As such, her discharge could not have been retaliatory. Although F R.Civ.P. 56(e) places the burden upon Memmolo to present evidence refuting the Garris affidavit, **[*35]** in this context, the task is impossible. Memmolo simply has no way of knowing whether or what Garris told Rizol. Rizol's knowledge of Memmolo's criticism is a question of fact, the resolution of which may well rest upon inferences and credibility determinations. As such, summary judgment is inappropriate. Memmolo shall proceed to trial on her Title VII claims and judgment shall be entered in favor of defendants on the remaining counts.

> n14 Garris actually disclaimed any recollection of Memmolo's criticisms. Garris Affidavit [P] 4.

An appropriate order follows.

O R D E R

AND NOW, this 6th day of September, 1984, for the reasons stated in the foregoing memorandum, it is hereby ORDERED that Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part. It is further ORDERED that trial shall be held on plaintiff's remaining claims on January 28, 1985 at 9:00 a.m. in Courtroom 8(B).

O R D E R

AND NOW, this 6th day of September, 1984, it is hereby ORDERED that JUDGMENT is ENTERED in favor of defendants and against plaintiff on Counts I, II, III, IV, V, VI, VII and X of the complaint.

109RS3

********** Print Completed **********

Time of Request:   February 10, 2003   04:00 PM EST

Print Number:   1841:0:79918845
Number of Lines:   623
Number of Pages:

Send To:  DUPLER, DEBORAH
      SPECTOR GADON & ROSEN
      1635 MARKET ST FL 7
      PHILADELPHIA, PENNSYLVANIA 19103-2217

F:\27745\001\LEXIS\Memmolo.doc