IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRUNSON COMMUNICATIONS, INC. | : | |
| **Plaintiff** | : | |
| VS. | : | |
| ARBITRON, INC. | : | NO. 02-CV-3223 |
| **Defendant** | : | |

## SECOND AMENDED COMPLAINT

Plaintiff, Brunson Communications Inc. brings this suit upon a cause of action of which the following is a statement:

1.  Plaintiff Brunson Communications Inc. is a New York Corporation, having a principal place of business at 3900 Main Street (Manayunk) Philadelphia, Pennsylvania.

2.  Defendant Arbitron Inc., is a corporation of the state of Delaware, has a principal place of business located at Columbia, Maryland, and a Pennsylvania address at 1635 Market Street, Philadelphia, Pennsylvania.

3.  This Court has jurisdiction pursuant to 28 U.S.C. Section 1331 (federal questions) in that the matter arises under the antitrust laws, 15 U.S.C. Section 1 et seq, and

the Lanham Act, 15 U.S.C. Section 1525 et seq. Jurisdiction is also asserted pursuant to diversity of citizenship, 28 U.S.C. Section 1332, in that plaintiff and defendant are citizens of different states. The sum in controversy exceeds $100,000 exclusive of interest and costs.

4.   Venue is properly laid in the Eastern District of Pennsylvania in that the statutes provide for nationwide venue, and/or plaintiff is a citizen of the Eastern District, and most or all of the acts, which are relevant hereto, have occurred in the Commonwealth of Pennsylvania in the Eastern District.

## OPERATIVE FACTS

5.   Plaintiff s business is to own and operate WGTW TV Channel 48 television, which broadcasts program content from studios at 3900 Main Street, Philadelphia County, to Pennsylvania, New Jersey and Delaware and sells time on its station in interstate commerce.

6.   WGTW TV Channel 48 is a small corporation headed, as defined by the SBA Small Business Act, by a female and is the only minority owned station in the Philadelphia market and in the nation.

7.   WGTW TV Channel 48 is a dramatic success story of a small company which is independent of all networks and

cable systems and has achieved an audience penetration of nearly 30% of the Philadelphia market as measured by the Nielsen Ratings System and has maintained economic viability.

    8.  Television stations, competing with each other for revenue, utilize systems to measure viewing size to set rates for and to sell and market commercial air time on their stations. Advertising agencies, media buyers, and advertisers utilize the data to measure the economic desirability of advertising on various competing television stations based on the size of their audience.

    9.  Defendant Arbitron Inc. is in the business of constructing and operating measurement systems that monitor listeners and viewers for usage by radio, cable and, more recently, television stations and purchasers of advertising time from television stations.

    10. Prior to 2001, Arbitron developed a new and proprietary system for measuring viewership of television stations, currently called a "personal people meter" ("PPM"). As plaintiff only learned in April 2002, it operates by imbedding an inaudible signal in the transmitter of the various stations.  It then places a receiving device on the person of individuals to detect and record when they

are watching television sets tuned to only those stations whose signals which have been imbedded by Arbitron.

   11.  Nielsen Corporation had the only measuring system prior to Arbitron  s.  Nielsen and Arbitron have entered into a corporate financial relationship by which Nielsen and Arbitron are related in regard to the new system, the details of which are not known to plaintiff.  Nielsen has participated in the Arbitron program at issue herein in ways not yet known to plaintiff.

   12.  Deleted intentionally pursuant to Court  s Order.

   13.  In or about 2001, Arbitron commenced a program to penetrate the Philadelphia television viewing market with the new technology.  It selectively chose to working only with the larger conglomerates in the market.

   14.  This product is a product (a) in the television viewer measurement market, (b) a product utilized and also creates a new product market, i.e., imbedded direct measuring, whereby no reporting by the viewer is required (unlike the Nielsen system).  Defendant enjoys a monopoly in both markets.

   15. During the fourth quarter 2001 Arbitron conducted a test and announced that the launch of the test would be an open and equally competitive process that would   accurately

and creditably measure the performance of the entire market .

16. As Arbitron intended, the impartial nature of the work of rating companies and the representations of Arbitron led Brunson to believe that WGTW-TV 48 would be included in the survey.

17. Arbitron s statement was false and malicious. Arbitron did not, in fact, possess enough actual equipment to measure all of the stations in the Philadelphia market. In light of its limited supply of equipment, Arbitron omitted the WGTW-TV48, Brunson Comm. Inc. signal in the survey data even though WGTW-TV48 has close to 30% cumulative audience reach. Arbitron and the large networks and cable systems, with whom it partnered in starting the test process, embedded the Arbitron signal only in the transmitters of those stations, excluding plaintiff.

18. Arbitron selectively and discriminatorily excluded WGTW Channel 48 in its embedding test measurement program. [Deletion pursuant to Court s Order.]

19. Deleted intentionally pursuant to Court s Order.

20. By failing to include WGTW Channel 48 viewership, Arbitron guaranteed that no usage of WGTW Channel 48 viewership would be reported in the survey, impairing WGTW s

ability to be competitive and operate on an equal basis with other stations in the market, and thus injuring Plaintiff and restraining competition in the market for sales of television listener time.

21. Arbitron concealed from WGTW that the new process was different from others and the measurement test required embedding into the transmitter. Because the only other survey, Nielsen, includes all stations, without any contact with the station, WGTW believed and assumed that its signal was being measured along with its competitors.

22. Because of Arbitron s misleading statements, and its decision not to inform WGTW-TV Channel 48 that imbedding was a necessary part of the process, WGTW assumed that no participation was necessary for its signal to be included in the measurement survey. Arbitron then precluded WGTW-TV Channel 48 from any advance action to protect itself.

23. In April 2002, WGTW-TV Channel 48 learned by happenstance that a meter was required to be imbedded in order to be included in the Arbitron survey. WGTW-TV Channel 48 notified Arbitron of its improper unfairness in excluding the station. By then Arbitron had substantially completed the initial survey. Arbitron responded that the survey was done in response to a request from a group of

stations to make Philadelphia a preference market. Arbitron acknowledged the concern and stated it would review the files and get back to WGTW TV Channel 48.  Arbitron did not disclose that it intentionally excluded plaintiff.

24.  Receiving no satisfaction, plaintiff continued to complain.  Arbitron then embedded a meter in plaintiff s cable, but only after completion of the survey.

25.  When the first survey was released, without WGTW TV Channel 48, to stations, advertisers, agencies and other media sources in the market, it was represented that the survey was complete and accurate.  As was known to Arbitron, Arbitron s action placed and will place WGTW TV Channel 48 at a clear disadvantage and disparaged its product.

26.  As known to Arbitron, because of the intense competition in the Philadelphia market for the declining television station revenue, inclusion in the survey was especially critical to an independent station like WGTW, because WGTW s competitors would be projected as the only  real  on-air commercial service in the market, and WGTW TV Channel 48, due to its unusual ownership and independence, would be unable to convince customers and others that WGTW was worth considering because of lack of critical data to support its representations, and would be unable to prove

its viability, all of which, as was made known to Arbitron, would cause serious economic losses to a profitable and growing station.

27. Plaintiff pointed out to Arbitron that the release of its measurement survey without WGTW would cause substantial and potentially irreparable harm to its ability to compete with other stations. On numerous occasions after plaintiff initiated contact with Arbitron, it was assured that Arbitron understood the data was flawed and that it could cause severe damage and harm to WGTW TV Channel 48 as it could not give a full picture of the market.

28. Even if the competing stations, advertisers, and agencies perceived that WGTW TV Channel 48 was excluded from the survey, Arbitron thereby de-facto reduced WGTW s standing in the eyes of the persons and companies it must solicit to buy the station s product, i.e. viewership watching time.

29. Although Arbitron knew and was informed by WGTW TV Channel 48 of its exclusion from the survey, and of the catastrophic and adverse pecuniary loss which publication of its survey would have on WGTW TV Channel 48, Arbitron refused to correct the obvious defect and to take appropriate action, namely to reconstruct and rewrite the

survey to properly include WGTW TV Channel 48 as a element instead of releasing it, and not to release an inaccurate survey.

30. For selfish reasons and what Arbitron identified as promises to their core group whom they promised the information to , and with knowledge of the detrimental, anti-competitive effect on WGTW, which was unwarranted and unjustified, Arbitron nevertheless persisted in promulgating two surveys which it knew were faulty and incomplete.

31. Despite knowing of its inaccuracy, competitive unfairness and the exclusion of WGTW-TV 48, defendant not only promulgated the survey but also maliciously publicized to the industry and the public that the survey was, accurate, creditable and fair.

32. Appearing at a meeting of the Pennsylvania Association of Broadcasters on May 20th, 2002, after having acknowledged to plaintiff that the survey was improper in having excluded WGTW TV Channel 48, Arbitron, by Kevin Smith, Senior Vice President, knowingly and intentionally falsely represented that the survey was fair, accurate and complete.

33. If there was any doubt in reviewing the survey and noticing the absence of WGTW TV Channel 48, Smith compounded

the misinformation by arbitrarily and falsely stating that although there had been glitches, that they had been rectified.

34. Arbitron further compounded the injury by refusing to mitigate the damage by prominently informing the public that WGTW TV Channel 48 had been inappropriately excluded from the survey without justification. While offering to disclose the fact of the omission in a footnote, Arbitron did not offer to correct the false impression that the omission of WGTW TV Channel 48 was so unimportant that its omission did not affect the accuracy, e.g., by stating that WGTW was inappropriately excluded and corroborating that fact by acknowledging the many meetings it held with the competitor larger network owned stations while designing and pre-testing the system.

35. Arbitron was motivated in its false and misleading activity by its own selfish desire to obtain the benefit of working with the larger networks, plaintiff s competitors, who have most of the outlets in the markets. Therefore, its pursuit of profits caused it to knowingly give preferential treatment to plaintiff s competitors and knowingly and exclude and subject to disparagement an independent non-

network station that did not have the market power of the competitors.

36. In April to June 2002, defendant maliciously perpetuated the exclusion of WGTW by intentionally and/or negligently causing and allowing defective encoding of WGTW s signal, in violation of its commitment and the fiduciary duty it assumed, despite the fact that its equipment allowed it to verify the signal s quality at any time.

37. Arbitron s above described actions knowingly caused substantial on-going damage and injury to plaintiff in that plaintiff s prospective and actual customers will believe that plaintiff is so insignificant as to have been disregarded in relationship to surveying performed by an impartial agency, as well to avoid acknowledging WGTW TV Channel 48 s audience size, to answer inquiries by referring to the fact that WGTW TV Channel 48 was ignored in the survey, thereby substantially depriving WGTW TV Channel 48 of competitive capability.

38. As also known to Arbitron, advertising agencies were unable to recommend WGTW TV Channel 48, for lack of comprehensive data, and advertisers will hesitate to

advertise with WGTW TV Channel 48 as a result of not having information.

39. As a result of the foregoing, Arbitron is and should be liable for the cost and damage to WGTW TV Channel 48, and should also be required to fully inform the community as to its improper and inaccurate actions.

## COUNT I

### DISPARAGEMENT OF COMMERCIAL PRODUCTS

40. The allegations of paragraphs 1 through 39 of this Complaint are realleged herein as if fully set forth.

41. It is an actionable misconduct for a party to maliciously substantially, unfairly and without privilege to disparage the product of another, causing pecuniary loss.

42. Arbitron made a false statement that its survey was complete and represented viewership with substantial accuracy, and including all outlets of significance, which Arbitron knew was false.

43. Plaintiff suffered substantial pecuniary loss as a result thereof, in that prospects and agencies would conclude that plaintiff s viewership was considered so insignificant as not to warrant either inclusion in the survey or recognition of the exclusion; as was foreseen by defendant.

**WHEREFORE**, on this Count, plaintiff prays for damages and injunctive relief, together with counsel fees and such other relief as may be appropriate.

### COUNT VI - NEGLIGENCE

44. The allegations of paragraphs 1 through 43 of this Complaint are realleged herein as if fully set forth.

45. Due to its program, self-description of its survey, and representations of accuracy of its survey, and its knowledge that an outlet such as plaintiff would be injured by omission and by representations of completeness, defendant had a duty to outlets such as plaintiff to be inclusive and/or not to falsely represent its survey as accurate, representative and inclusive.

46. Commencing at sometime in 2001, the exact date of which is unknown to plaintiff (pending discovery), and continuing until in or about July 2002, defendant conducted and engaged in a serious of actions which singly and in the aggregate breached defendant s duty to plaintiff, including, but not limited to the following:

(a) In or about late 2001, defendant, having decided to commence a viewer measurement program in the Philadelphia viewership market, (which it defined by reference to the primary signal reception of stations

approximately sixty miles from Philadelphia, in accordance with previously established boundaries utilized by its cooperating entity, Nielsen, Inc.); and undertook such a project knowing that it did not have adequate equipment, and/or learned shortly thereafter that it did not have adequate equipment to include all broadcasters in its survey; nevertheless, without regard for its effect on plaintiff, determined to proceed with its program, and exclude plaintiff.

    (b)  Between late 2001 and April 2002, defendant thereafter collaborated with plaintiff s competitors in the implementation of the program, but neither gave plaintiff the opportunity to participate, nor informed plaintiff of its being excluded, nor made any effort to include plaintiff; and

    (c)  After being contacted by plaintiff, defendant determined to, and did in fact, repeatedly represent to persons who sell and purchase advertising, including agencies and advertisers and the general public in the industry, from April 2002 to May 2002, that its survey would be (and was after completed) a comprehensive representative measurement of the viewership of the public of the

Philadelphia area, while plaintiff was not even included, as was well known to the defendant;

(d)  In so doing, defendant misinformed survey recipients that the survey was representative, despite defendant's actual knowledge of its falsity, and with reckless disregard to the impact on plaintiff; and

47.  Defendant's foregoing actions violated its duty, imposed by law, not to perpetuate and extend a condition creating a high probability of serious harm to one such as plaintiff, in that defendant knew that it had itself created the likelihood of foreseeable highly probable adverse impact to plaintiff; that such impact was avoidable by actions which were available to it (including, but not limited to, prominent disclaimers, withholding false claims, postponing until adequate equipment was available, acquiring adequate equipment with additional effort, and other actions.

48.  In further violation of the selfsame duty, when notified by plaintiff of the facts, defendant adamantly refused to correct or modify its actions; and on the contrary, falsely, intentionally, maliciously and recklessly informed the public that its surveys were authoritative.

49.  In further violation of the selfsame duty, after all the foregoing had occurred, leading up to the release of May 19, 2002, and after defendant purportedly connected plaintiff s signals to permit plaintiff s viewership to be measured, and agred to properly install and monitor, defendant nevertheless recklessly and wantonly disregarded the fact that the signal was not operating properly, and failed to check the signal, which was readily accessible to defendant at its own facility, so that plaintiff was thereby disconnected to the extent that its signal could not validly be included in the second survey which was released in July 2002.  Defendant intentionally and knowingly, out of malice and retaliation for plaintiff having brought this suit, violated its selfsame duty in failing and refusing to check the signal, and/or knowingly failing to notify plaintiff that its signal was not being properly encoded until after the second survey was complete, on or about July 1, 2002.

50.  Defendant could have readily avoided the harm to plaintiff, but it recklessly and wantonly decided to ignore the adverse effect on plaintiff which its actions had caused to plaintiff.

51.  The foregoing breached a duty which defendant

owed to plaintiff as a result of defendant s position and representations as aforesaid, as a result of the self proclaimed accuracy and completeness of defendant s survey; including the representation that Nielson (a respected impartial surveyor) was involved.

52. Defendant s actions violated its duty by pursuing its own selfish interest at the expense of plaintiff, through implicit disparagement, and slander of plaintiff s value as an advertising outlet.

53. As stated above, plaintiff suffered substantial adverse impact, the extent of which is unknown due to the fact that it represented an adverse impact on plaintiff through advertising prospects, and agencies, who would foreseeably conclude that plaintiff s viewership was considered so insignificant as not to warrant either inclusion in the survey or recognition of the exclusion.

54. Defendant thus and in these respects negligently, recklessly and wantonly, caused serious and irreparable damage to plaintiff.

55. Instead of correcting the problem defendant perpetuated it, both negligently and recklessly, and on information and belief, intentionally.

**WHEREFORE**, on this Count, plaintiff prays for compensatory and punitive damages, in an amount exceeding $100,000, together with interest and costs, and such other relief as may be just and appropriate.

**JURY TRIAL DEMANDED.**

---
ROBERT J. SUGARMAN
Counsel for Plaintiff

OF COUNSEL:

SUGARMAN & ASSOCIATES
11th Floor, Robert Morris Building
100 North 17th Street
Philadelphia, PA 19103
(215) 864-2500

Dated: March 3, 2003